IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE S. GARZA, | S | |
| Plaintiff | S | |
| | S | |
| v. | S | CA: H-4:12-cv-03532 |
| | S | Jury |
| NATIONAL OILWELL VARCO, LP, | S | |
| Defendant | S | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Premised upon the following Plaintiff respectfully moves the court to deny Defendant's Motion for Summary Judgment. Genuine issues of material fact exist which preclude summary judgment.

## SUMMARY OF ARGUMENT

Defendant has filed a typical dispositive motion. It distorts relevant facts, ignores most relevant facts, and paints the Plaintiff as an evil person, while the person who harassed him and Defendant's managers are portrayed as victims of Plaintiff's allegedly unreasonable and irrational conduct. Defendant's motion concentrates little on the sexual harassment and the facts related to it. It also fails to appraise the court that it terminated the Plaintiff two days after his last plea that Defendant separate him from the harasser and after informing management that he was not going to work with him anymore. The harasser, however, also turned out to be a violent person, whom Defendant finally terminated after he pulled the knife on a coworker. (Exhibit 19)

Defendant concedes that there are no legal grounds for dismissal, only factual. However, the facts, when viewed in their totality, objectively, and in the light most favorably to the Plaintiff, raise significant issues of material fact and mandate denial of summary judgment.

## FACTS – PLAINTIFF'S TESTIMONY

Born in 1972, Plaintiff is married and the father of three (3) children. (Exhibit 1 pp. 8-9, 21) He worked for Defendant from September 2005 to October 2009. (Exhibit 1, p. 84)

Page 2

Previously he worked for Defendant as contract labor through a staffing agency. (Exhibit 1, p. 84) Defendant employed him at its FM 529 location in Harris County, Texas. (Exhibit 1, p. 88) He worked in Defendant's drawworks department and reported to William Goff, his immediate supervisor. (Exhibit 1, pp. 92-93) Goff reported to Bill Miller, Manufacturing Supervisor. (Exhibit 1, pp. 96-97) Plaintiff also reported to a foreman, or "lead man," Rudy Lopez. (Exhibit 1, p. 97) Lopez was still Plaintiff's supervisor when Plaintiff was terminated in October 2009, but Miller and Goff had retired earlier that year. Miller was replaced by Jack Landis. (Exhibit 1, pp. 97-98)

Plaintiff's performance was good, as shown in his performance evaluations. (Exhibit 21)

In September 2008 Steven Hunt joined Plaintiff's group as a welder. Plaintiff first complained about him within "four or five weeks after he started." (Exhibit 1, pp. 96-98) He complained to Lopez that Hunt was "weird" and playing "man to man." (Exhibit 1, p. 99) Lopez laughed. (Exhibit 1, p. 99) Hunt had grabbed the Plaintiff's chest and nipples. ("He start like this you know. Grab it, you know, my chest. Tits or whatever calling it." Plaintiff told Lopez "you need to talk with [Hunt]. I don't want to play like that." (Exhibit 1, p. 100) Lopez again laughed. (Exhibit 1, p. 101) Plaintiff also informed Lopez that Hunt had touched his rear end with tools, like the long scale or the welding rod. ("I mean, all the time you – he waiting for the opportunity, when I'm climbing, bending, laid down the drawworks, he – you know, he use any tools long scale, welding rod, you know, to touch me, you know, my back – I mean, my ass. Well, you know. He waiting for the opportunity to touch me.") (Exhibit 1, p. 102)

This conduct repeated itself for weeks, which led the Plaintiff to make another complaint to Lopez in April 2009. (Exhibit 1, p. 105) Up to that point in time, over a period of weeks to months," Hunt had grabbed Plaintiff's chest "20 to 25 times." (Exhibit 1, pp. 104-105) The grabbing consisted of pinching Plaintiff's nipples. Plaintiff reacted by pushing Hunt away, and raising his voice "stop. Get away from me." (Exhibit 1, p. 106) Plaintiff also told him "20 times, I don't like that. I like woman." (Exhibit 1, p. 106) The grabbing of Plaintiff's nipples occurred

Page 3

over time all the way till Plaintiff left the company. (Exhibit 1, p. 115)

Three times Hunt told the Plaintiff "he want[ed] to have sex with me." (Exhibit 1, p. 106) The requests occurred from "September 4, 2008 to October [2009] when I lost my job." (Exhibit 1, p. 107) Plaintiff actually believed Hunt wanted to have sex with him. The sexual comments were accompanied by the caressing of Plaintiff's hand, occasionally in front of employees, including Lopez. ("He touching my hand like this. And then I push him. Too many times. In front everybody. Everybody in shock. Rudy, front of Rudy Lopez." (Exhibit 1, p. 107)

One of the sex requests occurred while Hunt touched Plaintiff's bottom with his hand "and he told me he want to make sex with me." (Exhibit 1, p. 110) He told Lopez about this incident and Lopez responded "calm down, calm down, calm down." (Exhibit 1, p. 110)

When Hunt asked Plaintiff to have sex with him Plaintiff responded "You know what" You crazy. You need to see the doctor. You need to see the psychologist. You no – you need to working here." (Exhibit 1, p. 108) The second time, Plaintiff pushed Hunt and told him "if you want to touch me again, I want to punch your face." (Exhibit 1, p. 108) The third time Plaintiff felt like taking a hammer and hitting Hunt. (Exhibit 1, p. 109) However, one of his coworkers pulled Plaintiff to the side to calm him down. (Exhibit 1, p. 113)

Hunt also touched Plaintiff's rear end "28 times or 25 times," with both, his hands, and his tools. (Exhibit 1, pp. 115-116) Approximately "12" of those incidents consisted of Hunt actually "grabbing" Plaintiff's rear. (Exhibit 1, p. 116)

Approximately "12, 14 times" Hunt touched Plaintiff's penis 'with different tools," such as the broom, big scale, piece of metal, round bar, or flat bar. (Exhibit 1, pp. 117) After doing so, Hunt would ask the Plaintiff "you like it?" (Exhibit 1, p. 118) Occasionally, Hunt used the tools to insert them into Plaintiff's rectum. The pressure was significant because it ruined Plaintiff's uniform, and the welding rod penetrated his pants. (Exhibit 1, pp. 203-204)

Hunt also made "facial" expressions to the Plaintiff conveying a sexual interest in him, and also blew kisses at him. This happened "too many times", between "38 and 40." (Exhibit 1,

Page 4

pp. 205-209)

Based on these incidents Plaintiff concluded Hunt was homosexual. (Exhibit 1, p. 118) In conversations with Lopez, Plaintiff understood that Hunt had been raped by his older brother in childhood. (Exhibit 1, p. 119) Lopez told the Plaintiff that for this reason Plaintiff had to be more understanding of Hunt's behavior. ("You need to understand to him because he got a psychological problem." (Exhibit 1, p. 119) This conversation with Lopez occurred in April 2009. (Exhibit 1, p. 120)

The harassment stopped for a while, but then it resumed. Plaintiff complained a second time to Lopez on April 9, 2008. He told Lopez Hunt had touched him again and had requested sex from him. (Exhibit 1, pp. 109, 122, 217-220) Plaintiff also complained again to William Goff on April 13, 2009. (Exhibit 1, pp. 108, 122, 124, 221) Goff, too, laughed at Plaintiff's complaint. (Exhibit 1, p. 125)

Lopez told the Plaintiff he had spoken with Hunt, and Hunt claimed he touched the Plaintiff by accident. (Exhibit 1, p. 122) Plaintiff asked Lopez "to do something," and Lopez responded he was not Hunt's boss. (Exhibit 1, p. 123)

Hunt, however, touched other male employees as well. One of them was Miguel Gutierrez. Gutierrez, too, complained about Hunt, on April 29, 2009. (Exhibit 1, p. 127) Plaintiff personally saw Hunt touch Gutierrez, specifically grabbing his nipples, and calling him "Miguela," the feminine version of "Miguel." Hunt also commented to Gutierrez "I like Miguela." (Exhibit 1, pp. 128-129)

Another male employee Hunt sexually harassed was Luis Gonzales. Plaintiff witnessed Hunt touch Gonzales' intimate parts with the welding rod. (Exhibit 1, pp. 130-131) Gonzales complained to Landis about the incident and Landis came to Plaintiff's work area to inquire about what happened. (Exhibit 1, pp. 132-133)

Another male employee, Freddie Amaya, told the Plaintiff Hunt had cornered him in the bathroom, touching his rear end. (Exhibit 1, pp. 134-135)

Page 5

After Plaintiff complained about Hunt, Hunt complained about Plaintiff calling him racist names. Miller asked the Plaintiff if he called Hunt a "stupid Americano," and Plaintiff denied it. He also refused to sign the write up Biller gave him on April 27, 2009. (Exhibit 1, pp. 139-143)

On April 27, 2009 Plaintiff asked Miller what happened with his sexual harassment complaint. Miller stated he was not aware of any complaints by Plaintiff against Hunt. (Exhibit 1, pp. 144-145) He asked Plaintiff to write a statement about the harassment, and Plaintiff complied on April 29, 2009. (Exhibit 1, pp. 147-148) (Exhibit 12)

The sexual harassment continued after April 13, 2009. (Exhibit 1, 148) ("he never stopped.") (Exhibit 1, p. 148)

A few days after Plaintiff complained to Miller about the harassment he was suspended for three days on May 1, 2009. (Exhibit 1, p. 153, Exhibit 7) The write up accused the Plaintiff of having used racist language toward Hunt, kicking chairs in the break room, being aggressive toward employees, and threatening employees with termination. Plaintiff denied all allegations and refused to sign the disciplinary form. (Exhibit 1, pp. 157, 249-250)

On May 6, 2009 Plaintiff filed his EEOC charge of discrimination. (Exhibit 1, p. 169) On June 18, 2012 the EEOC issued a Determination finding that Plaintiff had been subjected to same-sex harassment and retaliation. (Exhibit 22)

Shortly after May 6, 2009 Plaintiff asked Goff to move him to a different team because he did not want to work with Hunt. His request was denied. He continued to work around Hunt "every day." (Exhibit 1, pp. 157-159) By mid June 2009 Hunt resumed the sexual harassment "touching and saying words, bad words" to the Plaintiff. (Exhibit 1, pp. 160-161) Hunt told the Plaintiff "hey, I like you." Plaintiff resumed complaining about Hunt to Lopez, but Lopez continued to laugh. (Exhibit 1, pp. 161-162) In June 2009 Plaintiff again complained about Hunt to Goff and asked, once more, he be moved to a different work area. Nothing happened, and Goff retired soon thereafter. (Exhibit 1, pp. 163-164)

After June 2009 Plaintiff stopped complaining because it was futile. He realized that if he

Page 6

complained, he would be disciplined again, as he had been on May 1, 2009. He also feared losing his job. (Exhibit 1, pp. 164-165)

After Goff retired, Kevin Warren replaced him. Plaintiff told Warren about the sexual harassment and asked Warren to move him away from Hunt, but was not transferred. (Exhibit 1, pp. 167-169) Instead, on August 13, 2009 Warren wrote Plaintiff up, claiming he had "argued the correct procedures" for an operation. Plaintiff, however, did not even comment on the procedure, let alone argue. He also did not involve himself in the procedure and did not drive the forklift as alleged. (Exhibit 1, pp. 170, 252) He refused to sign the disciplinary action. (Exhibit 1, p. 172)

On October 28, 2009 Plaintiff was terminated. (Exhibit 1, p. 169) Butler told him he had been fired, but no reason was given to him for the termination. (Exhibit 1, pp. 179-180) On October 27, 2009 Plaintiff told Warren Hunt continued to touch him and asked Warren to move him to a different department because he could not work with Hunt any more. Warren told the Plaintiff he would not be transferred and that if he did not like the decision he would be fired. (Exhibit 1, p. 182) ("I talked with Kevin to transfer me to the mud pump because I don't want to say (sic!) with – again with Mr. Hunt, and then he say 'if you no like, you see the door? Left'") (Exhibit 1, p. 181)

The same day Plaintiff made the same complaint about Hunt to Landis. ("I want a transfer, because … I got Mr. Hunt touching me …) (Exhibit 1, p. 183)

Immediately after his conversation with Warren Plaintiff went back to his work area. (Exhibit 1, p. 182)

Fifteen minutes after this conversation Landis and Warren took the Plaintiff to Butler's office and Warren requested Plaintiff be terminated. (Exhibit 1, pp. 181, 186) Plaintiff was immediately suspended. He was not transferred out of Hunt's area. He called the following day for un update and was terminated. (Exhibit 1, p. 182)

## DEFENDANT'S FACTUAL POSITION

Page 7

Testimony of Jack Landis

Since June 2009 Jack Landis has been Production Manager at Plaintiff's plant. Defendant employed him for 35 years. (Exhibit 2, pp. 4-8) As Production Manager he supervises supervisors and is authorized to fire and hire employees. Supervisors can recommend terminations of employment. In June 2009 he replaced Bob Miller as Production Manager. (Exhibit 2, pp. 8-11)

Landis recalled both the Plaintiff and Hunt. Hunt's nickname was "Snack" because he "ate a lot" and weighed "250, 300" pounds. (Exhibit 2, pp. 13-15) Hunt was terminated in 2011 after "pulling a knife" on an employee at a company sponsored event. (Exhibit 2, p. 14) Landis characterized Hunt as an "odd duck," who used excessively vulgar language at work. Every "third word" he used was vulgar. (Exhibit 2, pp. 16-18) However, Defendant had no policy against using vulgar language in the work place. (Exhibit 2, p. 19)

Landis knew Plaintiff had filed a complaint of sexual harassment against Hunt. In fact, it was "common knowledge" in the plant that Plaintiff had filed the complaint, and employees talked about Plaintiff's complaint for "at least months." (Exhibit 2, pp. 20-21)

Landis recalled that Plaintiff told him directly he did not want to work with Hunt "the day that his termination began," or in his department. (Exhibit 2, pp. 23-24) Plaintiff was specific he "was not comfortable working with Steve Hunt." He made that statement in the presence of Landis, Warren, and Lopez. (Exhibit 2, pp. 49-50) Even so, Landis did not find it necessary to ask Plaintiff why he was not comfortable working with Hunt. This is unusual because by this time Landis already believed Hunt was an "odd duck" and knew Plaintiff had complained of sexual harassment by him. (Exhibit 2, pp. 50-51) Landis did not recall Plaintiff being impolite or vulgar when requesting the transfer. (Exhibit 2, p. 48)

Landis wrote a statement about Plaintiff refusing to work with Hunt and seeking a transfer. (Exhibit 3) In it he alluded to "prior acts of insubordination" by Plaintiff. However, in deposition he was unable to identify any acts of insubordination. (Exhibit 2, p. 55) However, the

Page 8

October 2009 act of insubordination, Landis states, was Plaintiff's "refusal to return to work" in his area. (Exhibit 2, p. 56) For that reason, he, Butler, and Warren jointly agreed to fire the Plaintiff. ("It was agreed upon anyway between us.") (Exhibit 2, p. 57)

Landis only received sexual harassment training at Defendant in 2013. That was the first and only time he underwent sexual harassment training or has seen a written sexual harassment policy of the Defendant. (Exhibit 2, pp. 25-27, 57) In the 2013 sexual harassment seminar he learned for the first time that same-sex sexual harassment was unlawful, as was retaliation for complaining about sexual harassment. (Exhibit 2, p. 58)

In summer 2009 when Plaintiff was disciplined for "arguing the correct procedures for assembling shafts," Defendant had no written or standard procedures for assembling shafts. The procedures were "informal." (Exhibit 2, pp. 40-41)

Testimony of Bob Miller

In 2008-2009 Miller was Production Manager at Plaintiff's plant. He retired in May 2009. Both, Hunt and the Plaintiff reported to him. (Exhibit 4, pp. 5-6)

On March 24, 2009 he issued a corrective action report to Hunt for engaging in "horseplay and inappropriate behavior." (Exhibit 4, p. 23) (Exhibit 5) However, Miller was unable to identify any facts related to the horseplay or the inappropriate behavior. Nor could he tell who had complained about Hunt. (Exhibit 4, pp. 23-25) Nor did he provide details in the write up about the horseplay or the inappropriate behavior. (Exhibit 4, pp. 30-31)

On April 27, 2009 Miller issued a corrective action report to the Plaintiff alleging he used "racial language" toward Hunt. Plaintiff refused to sign it. (Exhibit 4, pp. 44-45) (Exhibit 6) However, as of April 24, 2009 Miller had already been told by the Plaintiff that Hunt had "poked" him in the "buttocks" with "something." (Exhibit 4, pp. 49-51) Miller investigated the "poking" incident and substantiated it. However, he does not recall if he recommended any disciplinary action against Hunt, or whether the "poking" incident was the basis for the March 24, 2009 corrective action related to "horseplay."(Exhibit 4, p. 52)

Page 9

On May 1, 2009 Miller gave the Plaintiff another disciplinary action, consisting of a "suspension/final warning." (Exhibit 4, p. 55) (Exhibit 7) The body of the final warning states that Plaintiff's "allegation of sexual assault has not been substantiated." (Exhibit 4, p. 57) (Exhibit 7) Miller, however, was unable to identify the "sexual assault" incident, but believed it was different from the "poking incident" which had been substantiated. (Exhibit 4, pp. 58-59)

Testimony of Bill Butler

Butler hired on with the Defendant in September 2001 and is still employed with the Defendant. Between December 2006 and January 2011 he was Defendant's HR Manager at the FM 529 plant. (Exhibit 8, pp. 5-6)

Defendant's sexual harassment policy, in effect during Plaintiff's employment, was issued on February 12, 1988 and was revised on April 20, 1998. (Exhibit 8, p. 14) (Exhibit 9) Butler does not know if it had been updated since that time. (Exhibit 8, p. 15) However, he testified that all levels of supervision, from team leads to management, had to report sexual harassment. (Exhibit 8, pp. 39-40)

On April 20, 2009 Butler was summoned to a meeting with Hunt and Miller in which Hunt complained that Plaintiff had called him a "stupid Americano." (Exhibit 8, pp. 31-34)

On April 27, 2009 Miller disciplined the Plaintiff as a result of this allegation. (Exhibit 8, pp. 34-35) (Exhibit 6) During the disciplinary meeting Plaintiff asked that Hunt be disciplined for "sexual assault." (Exhibit 8, p. 39) On April 28, 2009 Plaintiff told Butler it was unfair to write him up. (Exhibit 8, p. 42)The same day Butler and Miller met with Bob Urquhart, Plant Manager, to discuss Plaintiff's "sexual assault" claim. (Exhibit 8, p. 42) Urquhart instructed Miller and Butler to investigate it. (Exhibit 8, p. 44) (Exhibit 11) Butler asked the Plaintiff to provide a statement. Plaintiff complied, and, on Wednesday, April 29, 2009, brought to Butler a notarized statement of facts. (Exhibit 8, pp. 44-45) (Exhibit 12) Butler did not ask Plaintiff any questions about his statement or his sexual harassment allegations. (Exhibit 8, pp. 47-48)

Butler asked Defendant's main HR office to investigate Plaintiff's complaint. The

Page 10

investigation was conducted by Meredith Black within a day or two of April 29, 2009. (Exhibit 8, pp. 49, 51-52) At the end, Black told Butler Plaintiff's sexual harassment allegation "was unfounded" and recommended Plaintiff be suspended. Butler was not concerned the recommended action could be construed as retaliatory. (Exhibit 8, pp. 52-53)

On May 1, 2009 Black drew up Plaintiff's suspension, which was presented to the Plaintiff the same day in the presence of Black, Miller, and Butler. (Exhibit 8, pp. 54-55) (Exhibit 7) Plaintiff was suspended for three days, on May 4, 5, and 6, 2009. (Exhibit 58) In contrast, Hunt was not recommended for any disciplinary actions. (Exhibit 8, p. 62)

Black's investigation revealed that about  a month and a half prior to the investigation, one of Plaintiff's coworkers, Miguel Gutierrez, informed William Goff, that Hunt had "pulled his overalls back exposing his breast" to him. (Exhibit 8, pp. 64-65) (Exhibit 11 #217) Goff failed to inform anyone, including Butler, of this incident. (Exhibit 8, p. 65) Butler did not find the chest exposing incident "odd" or inappropriate for the workplace. (Exhibit 8, p.66)

Butler recalled having received Plaintiff's EEOC charge of discrimination, dated May 6, 2009. He forwarded it to Defendant's main HR office on Richmond Avenue in Houston, specifically to Jeff Dodd, Defendant's HR Director. (Exhibit 8, pp. 18-19) (Exhibit 10) A few days after he received the charge, Plaintiff visited Butler's office and asked him if he had received the charge. Butler confirmed he did. (Exhibit 8, p. 24)

Butler compiled and signed Plaintiff's termination record of October 28, 2010. (Exhibit 8, pp. 69-70) (Exhibit 13) It states Plaintiff "was terminated due to several acts of insubordination to supervisors." (Exhibit 13) However, Butler was unable to identify, let alone explain, the "several acts of insubordination." Plaintiff's August 13, 2009 write-up was not for "insubordination." (Exhibit 14) Nor was the May 1, 2009 write-up. (Exhibit 7) Nor was the April 27, 2009 write-up. (Exhibit 6) The only write-up related to "insubordination" is dated July 10, 2007. (Exhibit 15) However, as of October 28, 2009 Butler did not recall Plaintiff having received a write-up for "insubordination" in July 2007. (Exhibit 8, p. 71)

Page 11

Butler summarized his testimony by stating he does not remember any acts of insubordination by Plaintiff. ("Q: I need to know what acts of insubordination … Mr. Garza had committed that resulted in his termination. A: I do not remember.") (Exhibit 8, p. 71) Curiously, however, his narrative of the events leading up to Plaintiff's termination explains the rationale as follows: "It was decided that with the several instances documenting insubordination in the past and Mr. Garza had never corrected his *disruptive* behavior that employment termination was appropriate." (Exhibit 8, pp. 78-79) (Exhibit 3 #134) Butler was given a second chance to present facts of insubordination and could not do so. ("Q: I need to conclude … that the statement 'several instances documenting insubordination in the past' is a false statement? A: I do not. Q: You cannot tell me when, where, and how and so on and so forth? A: I cannot.") (Exhibit 8, p. 80)

As for the "disruptive" behavior, Butler claims that it consisted of "once" Garza having left for lunch without clocking out, and "threatening employees to get them fired." However, Butler is unaware if, or when, these incidents actually occurred, or if they occurred prior to May 1, 2009 or thereafter. (Exhibit 8, pp. 81-84)

On October 27, 2009 Plaintiff told Butler directly that he wanted a transfer out of his group, but claims not to remember the reason Plaintiff gave him for requesting the transfer. (Exhibit 8, p. 76)

<u>Testimony of Meredith Black</u>

Black worked for Defendant since 1999, and in 2008-2009 was Senior HR manager. (Exhibit 16, p. 5) At the end of April 2009 she investigated Plaintiff's complaint against Hunt. (Exhibit 16, pp. 16-17) She read Plaintiff's Affidavit and investigated for one or two days. (Exhibit 16, pp. 20-22) At the end, she consulted with Jeff Dodd, HR Director, and decided to suspend the Plaintiff because they concluded Plaintiff's allegation of "sexual assault" had not been substantiated. (Exhibit 16, pp. 24-26)  However, Plaintiff's Affidavit of Facts does not complain of a sexual assault but of sexual harassment. (Exhibit 12) Black could not explain why

Page 12

she investigated a claim of "sexual assault" when in fact Plaintiff complained of "sexual harassment." (Exhibit 16, pp. 28-30) She nevertheless concluded that Hunt had "poked" the Plaintiff. (Exhibit 16, p. 31)

Black further concluded that Plaintiff's complaint of "sexual assault" was retaliatory against Hunt. She explained that Plaintiff's complaint to Lopez about the "poking" had been "resolved" by Lopez days before, and Plaintiff "retaliated" against Hunt by once again complaining of sexual harassment even though the "poking" incident had been resolved. (Exhibit 16, pp. 34-35) She did not consider the legal repercussions of suspending Plaintiff for complaining about Hunt's sexual behavior or the fact that Plaintiff's suspension could be viewed as retaliation for complaining about sexual harassment. She was disturbed by Plaintiff raising the issue again. (Exhibit 16, p. 35) Neither Black nor Dodd considered that Plaintiff's suspension, as worded, could be viewed as retaliatory. (Exhibit 16, pp. 36-37)

Black does not recall being informed that on March 24, 2009 Hunt had been reprimanded for "horse playing and inappropriate behavior." (Exhibit 16, p. 38) (Exhibit 5)

Black was aware Plaintiff had filed an EEOC charge of discrimination. (Exhibit 16, p. 42)

On October 29 and November 1, 2010 Black gave a sexual harassment seminar at Plaintiff's plant, but does "not recall" giving any previously. (Exhibit 16, p. 39) (Exhibit 17)

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 US 317, 322). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 US 242, 248 (1986). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. <u>TIG Insurance Company v. Sedwick James of Washington</u>, 276 F.3d 754, 759 (5th Cir. 2002)

Page 13

When considering the evidence, "doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001). However, the court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F. 2d 565, 567 (5th Cir. 1987).

## PLAINTIFF'S CLAIM FOR HOSTILE WORK ENVIRONMENT

Elements of Hostile Work Environment

A sexual harassment plaintiff must prove that (1) s/he is a member of a protected class; (2) s/he was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term,  condition, or privilege of the employee's employment; and (5) the employer knew or should  have known of the harassment and failed to take preventive, prompt, or effective remedial action. Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 298 (5th Cir. 2001);  Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 343 (5th Cir. 2005).

Same-sex sexual harassment is actionable. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 1001-1003 (1998).

Defendant claims Plaintiff's hostile work environment fails because (1) the harassment was not directed at him "based on his sex;" and (2) the harassment was not severe or pervasive. Defendant is in error in both respects.

"Because of Sex"

Defendant does not explain why it is entitled to summary judgment as a matter of law on the "because of sex" prong of the cause of action. It merely concludes that "there is no *credible* evidence that Hunt is homosexual and that he intended to have sexual contact with Plaintiff." (Page 15 of Defendant's Motion for Summary Judgment) However, "a plaintiff need not, …, establish that her harasser is homosexual in order to demonstrate that the harassing conduct was motivated by sexual desire." Dick v. Phone Directories Company, Inc., 397 F.3d 1256, 1260

Page 14

(10th Cir. 2005). As the Fifth Circuit Court of Appeals also ruled in 2012, all Plaintiff is required to show is that the "harassment was sexual in nature," not that the harasser was homosexual. Cherry v. Shaw Coastal, Inc., 668 F.3d 182, 188 (5th Cir. 2012) Curiously, if Plaintiff were a woman, this argument would not have been made. It would be a given, because it is presumed that men have a sexual interest in women. A man who would grab a woman's nipples, blow kisses at her, touch her sexual organ and rectum with a welding rod, asking her explicitly, no less than three times, to have sex with him, expose his chest to her, and caress her hand multiple times, would be presumed to do so because of the woman's sex. This would be deemed conduct of a sexual nature because this is how men externalize sexual interest in women. However, men externalize sexual interest in other men in this same manner. Moreover, a woman subjected to sexual harassment by a man in the same fashion as the Plaintiff would not have to prove that the male is heterosexual as a precondition to proceed to trial on a sexual harassment claim. Why then impose this burden on the Plaintiff?

Harassment "Based on Sex"

Defendant claims Plaintiff is limited to three (3) exclusive avenues for proving same-sex harassment and posits that all are missing. Defendant errs because it proceeds from the assumed position that the harassment was perpetrated by an allegedly heterosexual man (Hunt) against a heterosexual man (the Plaintiff). The Supreme Court eliminated this argument in Oncale, supra, at 1002.

In the heterosexual harassment environment, the Court indicated, "the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." Id. at 1002. But, the Court ruled, the "same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual."

What Is Hunt's Sexual Identity?

There is ample evidence that Hunt is homosexual and that he had a sexual interest in the

Page 15

Plaintiff and other male employees. The average male does not behave toward another male as Hunt did toward the Plaintiff unless he is or has homosexual tendencies or is bisexual. Plaintiff perceived Hunt as being homosexual.

Plaintiff's position that Hunt's sexual conduct precludes summary judgment is supported by La Day v. Catalyst Technology, 302 F.3d 474 (5th Cir. 2002) where the court reversed summary judgment finding issues of fact as to whether the harasser was homosexual. There, the only evidence that the harasser might be homosexual was very thin. "Craft did not explicitly state his desire to have sexual relations with the victim, nor did he make anywhere near as many physical gestures suggesting such interest. He did, however, touch La Day in a sexual manner" once. In contrast, here, the evidence that Hunt is homosexual or had a sexual interest in the Plaintiff is massive.

No Sexual Desire Is Required

In Oncale, supra, the Court further ruled that the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Id. at 1002. As the Seventh Circuit Court of Appeals commented in Shepherd v. Slater Steels Corporation, 168 F3d 998, 1008 (7th Cir. 1999), Oncale "has previously made it clear that the means of proving discrimination cannot be reduced to rigid formulae. (internal citations omitted) What matters, then is not whether the facts [the plaintiff has] alleged correspond exactly to any of the examples the Supreme Court has identified [in Oncale], but whether a reasonable factfinder could infer from those facts that [the plaintiff] was harassed 'because of sex.'" Therefore, Oncale does not require that Plaintiff prove Hunt was in-love with him or desired him sexually or pursued him for a sexual end. Simply stated, in trial, not summary judgment, Plaintiff will have to prove Hunt's actions were motivated, at least in part, by his sex, male.

To require Plaintiff, in summary judgment, to demonstrate Hunt's sexual orientation, i.e. homosexuality, is not a burden the law imposes on him, and, to some extent, is an impossible task. At the beginning of the Third Millennium, sexuality, sexual identity, sexual orientation, and

Page 16

the whole span of modern day sexual ideology are so fluid that it would be virtually impossible for Plaintiff to pin down with exactitude Hunt's sexual identity and orientation. Sexuality in the post-modern age reveals itself in varied forms, from strict heterosexuality or homosexuality, to bisexuality, to transient sexual orientation, transgenderism, to asexuality, and to other forms of sexual expression which defy the strict anthropological heritage of the human race. The sexual revolution is in full bloom, manifests itself diversely, and it is in constant motion. So much so, in fact, that it seems to even be a step ahead of jurisprudence.

Sociology and psychology also seem be a step ahead of anthropology, not the other way around. See, Michael Bailey, The Man Who Would be Queen (2004) (Available online in pdf in full text: http://faculty.wcas.northwestern.edu/JMichael-Bailey/TMWWBQ.pdf) Sexual fluidity is manifest in the lives of certain persons more often and more pronouncedly than in others and gender-bending is no longer the rarest of human manifestations and human conduct. In short then, for a court to grant summary judgment as a matter of law on the "because of sex" ground in the age of sexual liberation, would seem highly inappropriate.

Nevertheless, the evidence Plaintiff has brought to the table about Hunt suffices to raise genuine issues of material fact that Hunt was interested in him sexually, or, alternatively, harassed him "because of sex." Hunt's actions gravitate toward the inference that he was sexually interested in men. The experience of humanity has always been that men do not typically behave toward other men as Hunt did toward the Plaintiff unless they have a sexual interest or desire in other men. Obsession with male nipples, a man's sexual organ and rectum, and requests for sexual acts do not exist on the part of heterosexual males, only on the part of men who have sex with other men or desire sex with other men. The rectum is a locus for sexual activity for men interested in sex with other men. So is a man's sexual organ.

Plaintiff believes that at this stage he is required to do no more to survive summary judgment. Richardson v. BFI Waste Systems of North America, Inc., 232 F.3d 207 (5th Cir. 2000) is instructive on this point. There, the court of appeals reversed summary judgment

Page 17

because, among others, it found that the employee was being sexually harassed because of his sex. The court rejected the harasser's plea that he was not homosexual because, among others, he had children with different women, and concluded that the "because of sex" prong had been met.

> However, considering the entire record in the light most favorable to Richardson, a reasonable jury could infer from his actions that Sheppard was sexually oriented toward members of the same sex and was, as a result, harassing Richardson because he was a man. See Shepherd v. Slater Steels Corp., 168 F.3d 998, 1010 (7th Cir. 1999) ("Although none of these incidents necessarily proves that [the harasser] is gay . . . the connotations of sexual interest in [the plaintiff] certainly suggest that [the harasser] might be sexually oriented toward members of the same sex. That possibility in turn leaves ample room for the inference that [the harasser] harassed [the plaintiff] because [he] is a man.").

The court of appeals also reversed the grant of summary judgment finding that the harassment was "sufficiently severe or pervasive" to withstand summary judgment.

> The district court alternatively dismissed Richardson's sexual harassment claim because Sheppard's harassment "was not sufficiently severe or pervasive enough to create an objectively hostile or abusive work environment that altered the terms or conditions of [Richardson's] employment." However, viewing the record in the light most favorable to Richardson, a reasonable jury could find that Sheppard's conduct was "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Oncale, 523 U.S. at 82, 118 S.Ct. 998. Summary judgment on this issue was thus inappropriate. Accordingly, we find that the district court improperly granted summary judgment on Richardson's sexual harassment claim.

Plaintiff's position is further strengthened by another summary judgment reversal in La Day, supra, at 481 where the court found issues of material fact as to whether the harasser was homosexual. The only evidence of the harasser's homosexuality was that the harasser "poked" the harasee in the anus on one occasion. Here, Hunt "poked" the Plaintiff in the anus many times.

 Fifth Circuit Precedent

On September 30, 2013 the Fifth Circuit Court of Appeals issued the en banc opinion in EEOC v. Boh Brothers Construction Company, L.L.C., 731 F.3d 444 (5th Cir. 2013). Boh was a same-sex harassment case where the employer made the same arguments as the Defendant here. It claimed the harassment was not "because of sex" or sufficiently severe or pervasive. The jury

Page 18

found for the employee and the en banc Fifth Circuit Court of Appeals affirmed. Notably, Boh involved two males, neither of whom having been alleged to be homosexual. It seemed to be a same sex harassment case between heterosexual males.

The court of appeals emphasized that the three (3) avenues outlined in Oncale for proving "because of sex" are "illustrative, not exhaustive, in nature." Proving "because of sex" is a matter of intent, Boh stated, and the focus is on the "alleged harasser's subjective perception of the victim. … We do not require a plaintiff to prop up his employer's subjective discriminatory animus by proving that it was rooted in some objective truth. … Rather, in considering the motivation behind a harasser's behavior, we look to evidence of the harasser's subjective view of the victim." Id at 451. After so framing the issue, the en banc court determined that Boh contained enough evidence that the victim was harassed because of sex.

The evidence supporting the "because of sex" finding in Boh is strikingly similar to the evidence here. The Boh victim was called "f…," "p…," "princess" many times, the harasser simulated anal sex with him, exposed his penis to him while urinating, and expressed oral sex toward him. Hunt's conduct toward the Plaintiff was no less sexually explicit. Accordingly, Boh would seemingly mandate rejection of Defendant's summary judgment plea on both, the "because of sex" ground, and the "insufficiently severe or pervasive" ground.

Defendant has ignored Boh, the ultimate and controlling authority on this point. It points, instead, that  Hunt had a "wife," when the records, reflect he was single. (Exhibit 18)

Finally, Defendant relies on Hawkins v. Avalon Hotel Groups, LLC 2013 WL 6328132 (MD La December 4, 2013). Hawkins nowhere cites to Boh, the ultimate authority on point which does not require proof that Hunt be a homosexual for the case to proceed to trial. Rather, in Hawkins, the district judge simply found that the statement a woman made to another woman "I would like to have a sexual relationship with you" was insufficient to prove same-sex harassment. In contrast, the evidence here is massive that Hunt had an explicit sexual interest in the Plaintiff.

Page 19

## ACTIONABLE SEXUAL HARASSMENT

Defendant next argues Plaintiff is unable to prove the harassment was sufficiently severe or pervasive to the extent that "it alters the conditions of the plaintiff's employment and destroys his equal opportunity to succeed in the workplace." (Defendant's Motion for Summary Judgment p. 16) Defendant only devoted one page and a half to this argument and deliberately failed to inform the court of the nature, extent, frequency and duration of the sexual harassment. Additionally, a sexual harassment plaintiff is not required to present egregious sexual harassment that "destroys" his chances of succeeding in the workplace. The Supreme Court rejected this standard in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986).

Level of Proof for Hostile Work Environment

The level of proof in hostile work environment cases has been articulated by the United States Supreme Court in Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370-371, 510 US 17 (1993). It requires (1) discriminatory intimidation, ridicule, and insults; which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment; and (4) create an abusive work environment. See, also, DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 594 (5th Cir. 1995)

Sufficiency of the Evidence

The Supreme Court reemphasized the contours of an actionable hostile work environment in 1998 in Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2283 (1998). ("So, in Harris, we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance.") (internal quotations omitted)

Page 20

The Court also indicated that whether sexual harassment is actionable is an issue of fact for the jury, not a legal issue. Harris explicitly delegated this assessment to the "factfinder's attention." Id. at 371. The United States Supreme Court reiterated this position in 1998 in Oncale, supra, at 1002.

Frequency

The sexual incidents to which Plaintiff was subjected were extremely frequent. Hunt grabbed Plaintiff's nipples about "20 times" and for weeks from September 2008 to April 2009 and beyond. It continued even after Plaintiff complained and up to the time he left the company. (Exhibit 1 pp. 96-115) During the same time period Hunt asked the Plaintiff three (3) times to have sex with him. (Exhibit 1, pp. 106-107) Hunt caressed Plaintiff's hand. (Exhibit 1, p. 107) Between 25 and 28 times Hunt touched Plaintiff's rear end and rectum with his hands or tools. Twelve of these incidents involved the actual "grabbing" of Plaintiff's rear. (Exhibit 1, pp. 115-116) Between "12, 14 times" Hunt touched Plaintiff's penis with tools or inserted them in his rectum. (Exhibit 1, pp. 117-118) Also frequently, Hunt made sexually explicit facial expressions toward the Plaintiff and blew kisses at him. These incidents occurred "too many times," Plaintiff approximating the number at 38 to 40. (Exhibit 1, pp.205-209)

Length

Plaintiff was subjected to the sexual harassment for a long time, from September 2008 to October 2009.

Severity

The touching of Plaintiff's body, with hands or tools, was severe.

Humiliating

Plaintiff found the sexual harassment to be humiliating, and the harassment can objectively be described as such.

Physically Threatening

Some of the conduct, especially the penetrating of Plaintiff's pants with the welding rod

Page 21

to reach Plaintiff's rectum, was threatening.

Interference With Work Performance

Plaintiff's testimony on this subject has not been contradicted. He testified Hunt's comments impaired his ability to work. In fact that is what eventually led to his termination. He could no longer work with Hunt and when, for the last time he reported Hunt and requested to be transferred away, he was terminated. That Hunt's conduct was physically threatening and interfered with Plaintiff's ability to do his job is further reflected in Plaintiff's stressed state of mind. He considered hitting Hunt with the hammer, and physically pushed him away to avoid being touched.

Physical Contact

There was physical contact between Hunt and the Plaintiff and it was unwelcomed.

Notice

Defendant does not dispute Plaintiff put it on notice of the sexual harassment.

Failure to Take Remedial Action

Defendant failed to take prompt, effective remedial action. It also failed to take preventive action. On the latter point, it only trained Hunt in sexual harassment prohibition in October-November 2010, about two (2) years after Plaintiff first complained of the sexual harassment. (Exhibit 17)

Plaintiff's sexual harassment complaints to Lopez were met with laughter. (Exhibit 1, pp. 99, 101, 161-162) So were the complaints made to Goff. (Exhibit 1, p. 125)

The second time Plaintiff complained, in April 2009, Lopez told the Plaintiff he was not Hunt's "boss." (Exhibit 1, p. 123) Only when Plaintiff complained the third time, on April 27, 2009, was an investigation conducted. However, it did no result in the disciplining of Hunt, but in the disciplining of the Plaintiff. It can hardly be stated, then, that Defendant took prompt remedial or effective action.

In fact, Defendant took no action at all. The record is void of any evidence that anyone in

Page 22

management spoke with Hunt, warned him, or disciplined him. Defendant's motion does not identify any "prompt remedial action" taken in response to Plaintiff's complaint. If Defendant, however, equates Plaintiff's May 1, 2009 suspension of the Plaintiff as remedial action, that was retaliation instead.

Furthermore, even if one accepts that Defendant took "remedial action" by investigating Plaintiff's complaint, the action was not effective. Hunt continued to sexually harass the Plaintiff until two days before he was fired. Defendant's failure to take remedial action, in fact, resulted in Plaintiff's termination. Remedial action would have necessitated separating the Plaintiff from Hunt, precisely to avoid the reoccurring of the harassment.

## PLAINTIFF'S RETALIATION CLAIM

### Elements of Retaliation Claim

A prima facie case of retaliation requires that a plaintiff (1) engage in protected action; (2) sustain an adverse action; and (3) the existence of a causal link between the two. Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 348 (5th Cir. 2007). Here, Defendant alleges two grounds for dismissal of Plaintiff's retaliation claim: (1) lack of causal link; and (2) Plaintiff's alleged inability to demonstrate pretext.

### Causal Connection

Defendant conveniently alleges there is no causal connection between Plaintiff's May 6, 2009 filing with the EEOC and his termination on October 28, 2009. However, Defendant ignores the causal link between Plaintiff's April 27, 2009 engagement in protected action and the May 1, 2009 adverse action. But for Plaintiff's April 27, 2009 complaint, Plaintiff would not have been suspended. The link is obvious and irrefutable: because Plaintiff's "sexual assault" complaint was not substantiated by Defendant's investigation, Plaintiff was suspended for three

Page 23

days. It is not disputed that suspension is a harsh action, an adverse employment action. Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2421-2422 (2006).

After the suspension Plaintiff learned his lesson: he stopped complaining for fear of losing his job. (Exhibit 1, pp. 164-165) When he did it again, he was terminated.

However, for purposes of Plaintiff's termination, the causal link is between Plaintiff's last opposition to sexual harassment and his termination. The time gap between the two events is two (2) days. The Fifth Circuit Court of Appeals hare recently held that complaining of sexual harassment is protected action and being terminated for that reason is retaliation. Royal v. CCC& Tres Arboles, LLC, 736 F3d 396, 404-404 (5th Cir. 2013). It also stated that "the temporal link between the concerns Royal raised at the meeting and Royal's termination strongly supports a causal link." The Royal plaintiff was fired the day she complained of sexual harassment.

On October 27, 2009 Plaintiff told Warren and Landis that Hunt continued to sexually harass him and requested to be transferred to a different area. (Exhibit 1, pp. 179-182) (Exhibit 20, Plaintiff's Affidavit of Facts) Rather than comply, Warren and Landis showed the Plaintiff the door. ("if you no like, you see the door? Left.") (Exhibit 1, p. 181) This reflects that Warren and Landis already determined Plaintiff be terminated rather than be moved away from Hunt.

Plaintiff's insistence on remedial action was protected. Separation of the harasser and of the victim is a form of remedial action. Here, Defendant fired the Plaintiff on October 28, 2009 because he complained and requested remedial action. But for his complaint and request the day before, the events which unfolded after his request, including his termination, would not have occurred.

Pretext

Page 24

Defendant has become very creative in its dispositive motion regarding the reason for Plaintiff's termination. Plaintiff's termination slip states he was "terminated due to several acts of insubordination to supervisors." (Exhibit 13 and Exhibit 1) Butler, however, was unable to identify any acts of insubordination and none of Plaintiff's prior disciplinary actions involved insubordination. (Exhibit 8, 69-80) Similarly, Landis failed to identify any acts of Plaintiff's insubordination in his deposition. (Exhibit 2, p. 55) Yet, in his written statement he stated Plaintiff "refused" to return to his work area. (Exhibit 2, p. 56).

Plaintiff denied he was insubordinate. As soon a Warren and Landis told him that no transfer would occur, Plaintiff returned to his area. Fifteen minutes later Warren requested Plaintiff's termination. (Exhibit 1, pp. 181-186)

Plaintiff is taken aback by Defendant's statement that neither "Kevin Warren or Jack Landis, who made the termination decision, had any personal knowledge of Garza's alleged protected action." (Defendant's Motion for Summary Judgment, p. 22) Landis testified, plainly, he was aware Plaintiff had complained of sexual harassment by Hunt and that it was general knowledge at the plant that Plaintiff had complained. (Exhibit 2, pp. 20-21)

Plaintiff has established a prima facie case of retaliation. Consequently, "[t]he establishment of a prima facie case  and evidence **casting doubt** on the veracity of the employer's explanation is sufficient to find liability." Palasota v. Haggar Clothing Co., 342 F.3d 569, 576 (5th Cir. 2003) (citing  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Another court has defined pretext evidence as "evidence **tending to show** that the reason offered by the defendant is pretext for discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005).

Page 25

Here, Butler, the creator of Plaintiff's termination slip was unable to identify the factual basis for Plaintiff's termination. So was Landis, the initiator of Plaintiff's termination. Plaintiff has presented sufficient evidence to cast doubt on the veracity of their explanation for his termination. The only "disruptive" behavior in which Plaintiff engaged, was to report Hunt's sexual harassment. Defendant viewed it  as so "disruptive" as to penalize the Plaintiff. Terminating the Plaintiff for "disrupting" the work place by constantly complaining of sexual harassment is tantamount to terminating him because of the complaints.

CONCLUSION

Genuine issues of material fact exist which preclude summary judgment on both of Plaintiff's claims, same-sex harassment and retaliation.

PRAYER

WHEREFROE, PREMISES CONSIDERED, Plaintiff respectfully moves the court to deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

BY: _____
Peter Costea
TBN 04855900
Three Riverway, Suite 1800
Houston, Texas 77056
Tel. 713/337-4304
Fax 713/659-5302
ATTORNEY FOR PLAINTIFF
JOSE S. GARZA

<u>CERTIFICATE OF SERVICE</u>

I certify that on February 14, 2014 a true and correct copy of the foregoing pleading was served electronically by the clerk of the court on counsel for the Defendant, Mr. Jacob Credeur, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., One Shell Square, 701 Poydras Street, Suite 3500, New Orleans, Louisiana 70139.

_____
Peter Costea

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA,                          S
Plaintiff                               S
                                        S
v.                                      S      CA: H-4:12-cv-03532
                                        S      Jury
NATIONAL OILWELL VARCO, LP,             S
Defendant                               S

ORDER

Defendant's Motion for Summary Judgment Is Denied.

Signed this _____ day of _____, 2014.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA,                           S
Plaintiff                                S
                                         S
v.                                       S        CA: H-4:12-cv-03532
                                         S        Jury
NATIONAL OILWELL VARCO, LP,              S
Defendant                                S

<u>DECLARATION OF PETER COSTEA</u>

    I am the attorney for the Plaintiff. I declare under penalty of perjury that Exhibits 1 through 22 attached to Plaintiff's Response to Defendant's Motion for Summary Judgment are true and correct copies of discovery materials exchanged in this litigation.

_____
    Peter Costea

Signed: February 14, 2014