IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA )
)
VS. ) C.A: H-4:12-CV-03532
) JURY
NATIONAL OILWELL VARCO, )
LP )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

JACK LANDIS

OCTOBER 8, 2013

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of JACK LANDIS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 8th day of October, 2013, from 10:00 o'clock a.m. to 11:34 a.m., before Lana Sholders, CSR in and for the State of Texas, reported/recorded by machine shorthand, at the offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 400 Dallas, Suite 3000, Houston, Texas, pursuant to the Federal Rules of Civil Procedure.

PLAINTIFF'S EXHIBIT 2

JACK LANDIS
October 8, 2013                                Job No. 15141

Page 2

```
 1          APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
     MR. PETER COSTEA
 4   Attorney at Law
     Three Riverway, Suite 1800
 5   Houston, Texas  77056
     Phone  713.337.4304
 6   Fax  713.659.5302
     Email  costealaw@yahoo.com
 7
 8
     FOR THE DEFENDANT:
 9   MS. CHRISTINE M. WHITE
     Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
10   701 Poydras Street, Suite 3500
     New Orleans, Louisiana  70139
11   Phone  504.648.3840
     Fax  504.648.3859
12   Email  christine.white@ogletreedeakins.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2   Appearances.............................. 2
 3   JACK LANDIS:
 4       Examination by Mr. Costea............... 4
 5   Signature and Changes........................ 63-64
 6   Reporter's Certificate Page.................... 65
 7
 8              EXHIBITS
 9
10   NO.   DESCRIPTION                    PAGE
11   1     Charge of Discrimination        27
12   2     Department Tally Sheet          27
13   3     Promotion/Raise Documents       31
14   4     Employee Warning Notice/Corrective
             Actions                       38
15
     5     Statements                      46
16
     6     Policy Statement                57
17
     7     Job Skills Inventory            60
18
```

Page 4

```
 1         JACK LANDIS,
 2   having been first duly sworn, testified as follows:
 3              EXAMINATION
 4   BY MR. COSTEA:
 5       Q. Good morning. Please state your full name.
 6       A. Jack Landis.
 7       Q. Mr. Landis, are you employed anywhere right
 8   now?
 9       A. Yes, sir.
10       Q. Where do you work?
11       A. National Oilwell Varco.
12       Q. How long have you worked there?
13       A. 35 years.
14       Q. And that puts us back -- that means you
15   started when?  In 1978?
16       A. Yes, sir.
17       Q. You're nodding. Okay. 1978. What was the
18   name of the company when you started out 35 years ago?
19       A. National Supply Company.
20       Q. And you have worked for them in Houston all
21   this time?
22       A. Yes, sir.
23       Q. Continuously?
24       A. Yes.
25       Q. If you don't mind me asking you, how old are
```

Page 5

```
 1   you?  What is the year of your birth?
 2       A. I'm 65. Born in 1948.
 3       Q. And how much longer do you plan on working
 4   with NOV?
 5       A. Probably a couple years.
 6       Q. And what is your current position at NOV?
 7       A. Production manager.
 8       Q. At what facility?
 9       A. We call it FM 529. It's --
10       Q. Is that in Tomball?
11       A. No, sir. It's on 290 west of Houston on the
12   west side.
13       Q. How large is that facility employee wise?
14       A. How large?
15       Q. Yes.
16       A. Just over 500.
17       Q. Are you over the whole plant?
18       A. No, sir. Just the assembly department.
19       Q. How large is the assembly department
20   employee wise?
21       A. Roughly about 200.
22       Q. So right now you're in charge of about 200
23   employees?
24       A. You know, I think I shot a little high
25   there. 150 to 200.
```

2 (Pages 2 to 5)

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                    93c91fb3-9fd3-4d55-8953-346e2d037322

Page 6

1    Q.  No problem. 150 to 200. Fair enough. And
2  what types of crafts are the employees that work in
3  the assembly department or what crafts?
4    A.  Well, they assemble heavy equipment, oil
5  field equipment.
6    Q.  They assemble oil field equipment such as?
7    A.  Draw works, mud pumps.
8    Q.  What else?
9    A.  Rotating tables, torque converters.
10   Q.  Torque?
11   A.  Torque converters, swivels.
12   Q.  Okay.
13   A.  Hooks and blocks.
14   Q.  Among others, right?
15   A.  Yes.
16   Q.  What is -- what is draw works?
17   A.  Well, it's a great big winch.
18   Q.  Okay.
19   A.  It's what pulls the pipe in and out of the
20  well.
21   Q.  Fair enough. A mud pump?
22   A.  It pumps drilling fluids down the well.
23   Q.  Go ahead.
24   A.  That's what it does.
25   Q.  Oh, down the well?

Page 7

1    A.  Pumps fluids down the pipe down the bottom
2  to the drill bit.
3    Q.  What is a rotating table?
4    A.  That's what turns the bit.
5    Q.  So am I to understand that the assembly
6  department is more or less organized along the various
7  products that it manufactures like? You've got draw
8  works, I don't know, group or division; is that
9  correct?
10   A.  Yes.
11   Q.  More or less?
12   A.  More or less.
13   Q.  And how do you call those groups?
14  Departments, divisions?
15   A.  Departments.
16   Q.  So we are talking about, for instance, the
17  draw works department, right?
18   A.  Yes, sir.
19   Q.  And I would imagine that over each
20  department there is like a manager or --
21   A.  Supervisor.
22   Q.  Supervisor. You called them supervisors.
23  Okay. And about how many employees are there in a
24  department? I guess it depends?
25   A.  Like it depends on the department. On draw

Page 8

1  works and mud pumps as well, those are two pretty
2  large ones. There's about 50 assemblers per
3  department.
4    Q.  And how -- for instance, how is the draw
5  works department organized? In teams? In groups?
6    A.  Teams.
7    Q.  I would imagine each time as a team leader
8  assigned to it?
9    A.  A team lead and about roughly four members
10  to the team including the team lead.
11   Q.  Is the team lead viewed as part of
12  management?
13   A.  No, sir.
14   Q.  What about the supervisors?
15   A.  Yes, they are.
16   Q.  As production manager, do you have the
17  authority to hire and fire employees?
18   A.  Yes, sir.
19   Q.  What about the supervisors, do they have the
20  authority to hire and fire?
21   A.  They have the authority to recommend, yes.
22  Not the actual.
23   Q.  How long have you been production manager?
24   A.  Four years.
25   Q.  So that puts us back in to 2009, right?

Page 9

1    A.  Yes, sir.
2    Q.  What part of 2009 did you become production
3  manager?
4    A.  I'm thinking June.
5    Q.  Did you transfer to this facility from
6  somewhere else or were you --
7    A.  Yes, I did.
8    Q.  From where?
9    A.  They call it North Houston Bammel.
10   Q.  And what was your job at North Houston
11  Bammel?
12   A.  Field service.
13   Q.  Field service what?
14   A.  Rep.
15   Q.  What does that mean?
16   A.  That means I was a mechanic. I run around
17  all over the world fixing broke drilling rigs.
18   Q.  Singapore and everything?
19   A.  Yes, sir.
20   Q.  Got it. I travel overseas quite a bit; and
21  I run into folks like you, just chitchat.
22   A.  We're everywhere there's oil field.
23   Q.  And I see they wear their NOV caps and KBR
24  caps and so I recognize them. So you are one of
25  those?

3 (Pages 6 to 9)

Page 10

1    A.  I'm one of those guys.
2    Q.  So I take it that before June of 2009 you
3  were not in management or supervision?
4    A.  No.
5    Q.  And so you got a pretty good promotion then,
6  right, back in June, 2009 from field service rep to
7  plant production manager?
8    A.  I made more money before.
9    Q.  I see.  But along the lines --
10   A.  What I did do is as a field service rep I
11 was salary nonexempt and that means I did -- was -- I
12 got overtime, paid overtime and I went to salaried
13 exempt which is no overtime involved.  It's just
14 salary.
15   Q.  Right.  I understand.  But in terms of your
16 job responsibilities, you became a member of
17 management in June of 2009 supervising 150, maybe more
18 employees?
19   A.  Yes, sir.
20   Q.  Did you apply for that position, or were you
21 just promoted?
22   A.  I applied for it.
23   Q.  Applied.  Did you replace someone in that
24 position?
25   A.  Yes, I did.

Page 11

1    Q.  Who did you replace?
2    A.  A guy named Bob Miller.
3    Q.  What happened to Bob Miller?
4    A.  He retired.
5    Q.  Do you know approximately how old he was at
6  that time, at the time that he retired?
7    A.  I don't.
8    Q.  60's?  You don't know?
9    A.  Probably early 60's maybe.  I don't know.
10   Q.  Do you know Jose Garza?
11   A.  Yes, sir.
12   Q.  And when did you -- did you and Mr. Garza
13 work together at NOV?
14   A.  Yes.
15   Q.  Beginning with when?
16   A.  He was there when I came there in June.
17   Q.  June, 2009?
18   A.  Yes, sir.
19   Q.  What was his job when you came over?
20   A.  What was his job?
21   Q.  Yes, sir.
22   A.  He was an assembler in the draw works
23 department.
24   Q.  And who was his boss at that point in time?
25   A.  Supervisor?

Page 12

1    Q.  Yes.
2    A.  Kevin Warren.
3    Q.  Is Mr. Warren still employed with NOV?
4    A.  No, sir.
5    Q.  What happened?  He left?  Was he fired?
6    A.  No, he quit.
7    Q.  When did he quit?
8    A.  When?
9    Q.  Yes.
10   A.  A couple of years ago.
11   Q.  Do you know why he quit?
12   A.  He got a better paying job.
13   Q.  A job somewhere else?
14   A.  Yeah, with a drilling contractor.  With one
15 of our customers.
16   Q.  Approximately how long after you came on
17 board did he leave, did he quit?  A year, two years?
18   A.  Probably a year plus a little change.
19   Q.  So let's talk about the group in which
20 Mr. Garza worked.  So he was an assembler, reported to
21 Mr. Kevin Warren.  Who else worked in that group, in
22 Mr. Garza's group?
23   A.  There was a Rudy, but I can't --
24   Q.  Rudy Lopez?
25   A.  Rudy Lopez.  That's it.  Yes, sir.

Page 13

1    Q.  Who else?
2    A.  There was a welder in his group.
3    Q.  Do you recall his name?
4    A.  We call him Snack, but I can't think of
5  offhand his real name.
6    Q.  Snack?
7    A.  Yeah.
8    Q.  Why would you call him Snack?  Why was his
9  nickname Snack?
10   A.  Because he ate a lot.
11   Q.  He ate a lot?
12   A.  Yeah.
13   Q.  Was he a big man?
14   A.  Yes, sir.
15   Q.  Can you describe him for me?  Like his size,
16 how tall he was.
17   A.  He was probably not quite as tall as me, but
18 he out weighed me by a lot.  He was big, heavy set.
19   Q.  Heavy set.  About how tall was he?
20   A.  Oh, he might have barely been 6 feet.
21   Q.  And what would you think?  200 pounds?
22   A.  Oh, more.
23   Q.  More.  300 pounds?
24   A.  250, 300.
25   Q.  Do you recall his name?

Page 14

1    A. I will before the day is out.
2    Q. Is he still employed with the company?
3    A. No, sir.
4    Q. What happened? Did he quit? Was he fired?
5    A. He was terminated.
6    Q. By whom?
7    A. HR actually.
8    Q. Did someone recommend to HR that he be
9    terminated?
10   A. I don't think so.
11   Q. Did you sign off on his termination papers?
12   A. I didn't have to.
13   Q. Oh, I see. Why was he fired?
14   A. Well, he got in an altercation with another
15   employee. We were having a baseball tournament. It
16   was a United Way thing raising money and he --
17   actually I wasn't there but he -- I think he might
18   have pulled a knife on a guy just playing, not really
19   open it up or nothing but he pulled it out and that
20   was enough for HR to terminate him.
21   Q. On whom did he pull the knife?
22   A. I have no idea.
23   Q. Was it an employee of NOV?
24   A. Yes, it was.
25   Q. So so far you told me -- well, strike that.

Page 15

1    When was Snack fired? Well, let's
2    see. Was it this year?
3    A. No. It was last year.
4    Q. 2012?
5    A. It may have been 2011 even.
6    Q. 2011?
7    A. I'm not sure about that.
8    Q. Do you recall what part of the year this
9    incident occurred?
10   A. Well, it would have been in the spring
11   between March and April.
12   Q. Who informed you that he had been
13   terminated?
14   A. Who informed me?
15   Q. Right. How did you become aware that he had
16   been terminated?
17   A. I would assume HR told me.
18   Q. Now, other than Jose Garza, Kevin Warren,
19   Rudy Lopez, and the welder Snack, did anybody else
20   work in Mr. Garza's group? You gave me four names so
21   far.
22   A. I don't remember.
23   Q. Is the name Steve Hunt familiar to you?
24   A. That's Snack.
25   Q. That's Snack?

Page 16

1    (Witness moving head up and down.)
2    Q. (By Mr. Costea) Now, I understand Mr. Garza
3    is no longer employed with the company, right?
4    A. Correct.
5    Q. When Mr. Garza -- I understand Mr. Garza was
6    let go, fired?
7    (Witness moving head up and down.)
8    Q. (By Mr. Costea) Sir?
9    A. Yes.
10   Q. Who fired him?
11   A. I probably did. Either me or HR. I'm not
12   sure. It was probably a joint effort.
13   Q. Now, was Mr. Garza fired before or after
14   Mr. Hunt?
15   A. Before.
16   Q. Let's talk about Mr. Hunt and I apologize
17   for being blunt here but given the nature of the case,
18   I have to. Were there any rumors about Mr. Hunt being
19   homosexual in the work place?
20   A. No.
21   Q. Did you hear any feedback from coworkers or
22   employees that he was behaving oddly, inappropriately
23   in the work place?
24   A. It's according to what you call oddly. He
25   is kind of an odd duck.

Page 17

1    Q. He's an odd duck.
2    A. He --
3    Q. Can you substantiate -- go ahead.
4    A. I guess just his way of speech maybe. He's
5    just a pretty vulgar guy.
6    Q. Vulgar?
7    A. Yeah.
8    Q. I won't ask you to actually give me the
9    words, but are you talking about along the lines of
10   using the "F" word in the work place?
11   A. Oh, yeah.
12   Q. SOB?
13   A. Yeah.
14   Q. In referencing -- in reference to
15   coworkers? In reference to what?
16   A. No, just -- no, material things mostly. I
17   don't think he ever called any of his coworkers.
18   Q. So he's -- his speech was vulgar. What else
19   with respect to his speech made him an odd duck in
20   your terms?
21   A. I guess that's pretty much basically it.
22   Q. Okay.
23   A. Just listening to the guy.
24   Q. What about his behavior? Did you notice
25   anything odd in his behavior?

Page 18

1   A. No.
2   Q. What about his interactions with coworkers?
3   A. I think he generally got along okay with
4   everybody he worked with.
5   Q. When he would use vulgar words, in reference
6   to what would he use the vulgar words?
7        MS. WHITE: Objection. Form.
8   Q. (By Mr. Costea) You said it was not
9   people. If it was not people, what was it?
10  A. Mostly just work related things, what goes
11  on in the shop.
12  Q. Like what? Complaining about assignments,
13  complaining about --
14  A. No, he never did complain.
15  Q. I'm trying to figure out from you,
16  Mr. Landis, you supervised him for a while: On what
17  do you base your statement that he was vulgar?
18  A. Well, just the words that he used.
19  Q. Yeah. Referencing what? The tools, the
20  food, the company?
21       MS. WHITE: Objection. Form.
22  A. He's just one of those guys that every third
23  out of his mouth is a can you say word. Not
24  particularly talking about anything.
25  Q. (By Mr. Costea) I see. Do you know whether

Page 19

1   or not he was married at the time that he worked for
2   the company?
3   A. Yes.
4   Q. He was married?
5       (Witness moving head up and down.)
6   Q. (By Mr. Costea) Had a wife and kids?
7   A. Had a wife and at least a kid. I'm not sure
8   if he had more.
9   Q. Had he gotten married while he was employed
10  with the company?
11  A. Oh, I don't know. He was there when I got
12  there.
13  Q. So you did not hire him, right?
14  A. No, sir, I didn't hire him.
15  Q. Have you had -- have you counseled him on --
16  reprimanded him on the vulgar language he used in the
17  work place?
18  A. No.
19  Q. Did the company have a policy against the
20  use of vulgar language in the work place?
21  A. No.
22  Q. Sir?
23  A. No.
24  Q. It did not?
25      (Witness shaking head from side to

Page 20

1   side.)
2   Q. (By Mr. Costea) Have you received any
3   complaints from his coworkers about Mr. Hunt?
4   A. No.
5   Q. Did anyone complain to you about him?
6   A. No.
7   Q. Did anyone disclose to you that before you
8   came on board various coworkers of Mr. Hunt had
9   complaints about him?
10       MS. WHITE: Objection. Form.
11       Answer if you can.
12       THE WITNESS: Pardon me?
13       MS. WHITE: Answer if you can.
14  Q. (By Mr. Costea) I understand that no one
15  came to you to complain about Mr. Hunt.
16  A. Right.
17  Q. I understand that much. My question is a
18  bit different. When you came on board or thereafter,
19  did anyone tell you that in the past before you came
20  to the plant that his coworkers complained about him?
21       MS. WHITE: Objection. Form.
22  A. Yes, I heard rumors.
23  Q. (By Mr. Costea) What did you hear?
24  A. Well, I heard that Mr. Garza had filed a
25  complaint against him for sexual harassment, I guess.

Page 21

1   Q. Who told you about that?
2   A. It was just common knowledge.
3   Q. It was common knowledge on the floor in the
4   department?
5   A. Yes.
6   Q. In the plant?
7   A. Yes.
8   Q. So you cannot actually tell me who told you
9   that he had filed a complaint of sexual harassment?
10  A. No.
11  Q. Just people talking about it?
12  A. Correct.
13  Q. Over what period of time do you recall that
14  there was talk in the shop about Mr. Garza filing a
15  complaint of sexual harassment against Mr. Hunt?
16  Weeks, months, years?
17  A. At least months.
18  Q. When was the last time that you recall that
19  you heard people talk about his complaint of sexual
20  harassment?
21  A. Shoot. They both have been gone so long
22  it's been a couple years at least.
23  Q. Did you ask any questions, details about
24  Mr. Garza's sexual harassment complaint?
25       MS. WHITE: Objection. Form.

Page 22

1    A.  Actually I don't think I did ask any
2  questions about it, no.
3    Q.  (By Mr. Costea) Did Mr. Garza himself tell
4  you that he had filed a complaint of sexual
5  harassment --
6    A.  No, sir.
7    Q.  -- against Mr. Hunt?
8    A.  No, sir.
9    Q.  Did anyone else -- I'm sorry. Did -- were
10 you told about anyone else other than Mr. Garza
11 complaining about Mr. Hunt?
12   A.  No.
13   Q.  From the time that you came on board in
14 2009, June of 2009, until Mr. Hunt was terminated, did
15 you discipline him at all for anything?
16   A.  No.
17   Q.  Do you know if he received any disciplinary
18 actions, if not from you maybe from someone else?
19   A.  Not that I'm aware of.
20   Q.  In 2009 when you came on board, was there an
21 HR office at the plant?
22   A.  Yes.
23   Q.  And who was in charge of the HR office?
24   A.  Bill Butler.
25   Q.  Is Mr. Butler still employed with NOV?

Page 23

1    A.  Yes, sir.
2    Q.  Did you and Mr. Butler have any
3  conversations about Mr. Garza filing a complaint for
4  sexual harassment against Mr. Hunt?
5    A.  I don't know.
6    Q.  Did any employees come to you to tell you
7  that they did not want to work with Mr. Hunt?
8    A.  No, sir.
9    Q.  I'm including --
10   A.  If you're including Mr. Garza, yes.
11   Q.  So Mr. Garza --
12   A.  He did.
13   Q.  Mr. Garza said that he didn't want to work
14 with Mr. Hunt?
15   A.  Yes.
16   Q.  When did he say that to you?
17   A.  Actually the day that his termination began.
18   Q.  And did he say to you yourself directly that
19 he didn't want to work with Mr. Hunt?
20   A.  He said that directly, yes.
21   Q.  Did he say why he did not want to work with
22 Mr. Hunt anymore?
23   A.  No, sir.
24   Q.  Did you connect in your mind that maybe he
25 did not want to work with Mr. Hunt because of the

Page 24

1  sexual harassment?
2    A.  No, sir.
3    Q.  Between the time that you came on board in
4  June of 2009 and October, the end of October when I'll
5  represent to you Mr. Garza according to the documents
6  was let go, did you have any other conversations with
7  Mr. Hunt in which -- I'm sorry, with Mr. Garza in
8  which he complained about Mr. Hunt?
9         (Witness shaking head from side to
10 side.)
11   Q.  (By Mr. Costea) Sir?
12   A.  No, sir, I don't think so.
13   Q.  Tell me what you recall about the time when
14 Mr. Garza came to you and said he did not want to work
15 with Mr. Hunt. Tell me everything you recall,
16 please.
17   A.  Well, we were out on the shop floor and he
18 came up and he was hollering and shouting and shaking
19 the finger in the face and said he wanted to transfer
20 to mud pumps. Actually I'm not sure that he mentioned
21 any names why. He said he just couldn't stand it
22 there any longer and he wanted to go to mud pumps and
23 Kevin Warren, who is his supervisor, walked up at the
24 time and he said -- told him just, you know, quit
25 causing trouble, just go on back to work and he

Page 25

1  refused to and there were more words exchanged and
2  then we finally walked him to HR and after a visit
3  with HR sitting there, we determined to send him home
4  for the day.
5    Q.  We will get back and we are going through
6  some documents but let me ask you a couple of
7  questions about other subjects on which I don't have
8  documents, at least not yet or maybe not the documents
9  that I would need. Have you received sexual
10 harassment training at NOV?
11   A.  Yes.
12   Q.  When was the last time that you received
13 sexual harassment training?
14   A.  Probably a year.
15   Q.  A year ago?
16   A.  Yes.
17   Q.  Where?
18   A.  There.
19   Q.  At 529?
20   A.  Yes.
21   Q.  Was it like in a classroom type training, or
22 what do you remember?
23   A.  We have had classroom and online as well.
24   Q.  Approximately how many employees attended
25 that classroom training in sexual harassment?

Electronically signed by Lana Sholders (101-225-766-0482)

93c91fb3-9fd3-4d55-8953-346e2d037322

Page 26

1    A. There were several classes.
2    Q. How large were the classes?
3    A. Oh, 20 people maybe.
4    Q. All 20 people?
5    A. 20 people per class maybe.
6    Q. 20 people per class. Okay. Did the whole
7    plant attend the sexual harassment classes over the
8    period of time?
9    A. More or less, yes.
10   Q. And was that over the period of a week?
11   A. It was for sure any supervisors or team
12   leads.
13   Q. And how long was your class?
14   A. What I mostly remember is doing it online.
15   I wouldn't think more than an hour maybe.
16   Q. Sir?
17   A. Maybe an hour.
18   Q. Before last year did you take any other
19   sexual harassment courses at NOV?
20   A. No.
21   Q. Do you know what brought about this class?
22   Did anything happen that prompted -- as far as you
23   know that prompted the company to hold sexual
24   harassment classes for --
25   A. No, sir. I think just -- I think more or

Page 27

1    less it's an industry wide thing to do.
2    Q. So for the previous 34 years or so with your
3    employment with NOV, you had not received training in
4    sexual harassment?
5    A. No.
6    Q. We're going to look at some documents now.
7         (Exhibit No. 1 marked.)
8    Q. (By Mr. Costea) We are looking at Exhibit
9    No. 1; and I have a simple question for you,
10   Mr. Landis. Have you seen either page 1 or page 2 of
11   this document?
12   A. No.
13   Q. Before today?
14   A. No.
15   Q. Thank you.
16        (Exhibit No. 2 marked.)
17   Q. (By Mr. Costea) We are now looking, sir, at
18   Exhibit No. 2; and I have the same question for you.
19   Have you seen this document or any pages of this
20   document of this exhibit before?
21   A. I have seen this before.
22   Q. You recognize this document as being a
23   performance evaluation on Mr. Garza?
24   A. Yes, sir.
25   Q. With a review date of April 26 of 2007,

Page 28

1    right?
2    A. Uh-huh.
3    Q. When was the first time you saw this
4    evaluation?
5    A. This particular one?
6    Q. Yes.
7    A. Right now.
8    Q. Right now. Well, before today, have you
9    seen it before today?
10   A. On Jose Garza?
11   Q. Yes.
12   A. No, sir.
13   Q. Now, in looking at this document, Exhibit
14   No. 2 -- well, strike that.
15        Right now do you do performance
16   evaluations at the plant?
17   A. Yes.
18   Q. Is the format for the performance
19   evaluations identical to this format that you have in
20   front of you?
21   A. It's not identical anymore. It's changed,
22   but basically it is the same.
23   Q. And how --
24   A. Just a little.
25   Q. Go ahead, please.

Page 29

1    A. They've just changed the format a little
2    bit. Made it faster, easier.
3    Q. Okay. And how frequently are employees
4    supposed to be reviewed on their performance?
5    A. Yearly. Annually.
6    Q. Do you recall Mr. Hunt receiving employment
7    evaluations beginning with, let's say, 2009 and onward
8    since you came on board?
9    A. He would have been evaluated but not by me.
10   Q. By who?
11   A. By his supervisor.
12   Q. I failed to ask you: In 2009 who was his
13   supervisor?
14   A. Kevin Warren. In 2009?
15   Q. Yeah. You came on board in -- at the 529
16   facility in June of 2009. Kevin Warren was the lead
17   man, right, the team lead?
18   A. He came after I did.
19   Q. Then who was the team lead? Was it
20   Rudy Lopez?
21   A. No. It was -- you're saying team lead, or
22   are you saying supervisor?
23   Q. Well, I know they are two different things.
24   So let's start with the team lead.
25   A. The team leads don't get involved in these

Electronically signed by Lana Sholders (101-225-766-0482)                           93c91fb3-9fd3-4d55-8953-346e2d037322

Page 38

1   Q. Yeah. You said there's about 150 to 200.
2   A. I think there's -- actually that report
3   directly to me, one.
4   Q. One. What's her job classification?
5   A. Clerical assistant.
6   Q. Clerical assistant to you?
7   A. She doesn't work on the floor.
8   Q. Tell you what, let's go ahead and look at
9   another document here which is going to be Exhibit No.
10  4.
11      (Exhibit No. 4 marked.)
12  Q. (By Mr. Costea) And, again, I'll represent
13  to you, Mr. Landis, these are documents given to me by
14  defense counsel in the course of this litigation and
15  I'll ask you about the first page. Have you seen the
16  first page of this document before, page 1 of Exhibit
17  4?
18  A. No, I have not seen it.
19  Q. What about page 2 of Exhibit 4?
20  A. I've never seen this.
21  Q. Go ahead and read the -- strike that.
22      Page 2 of Exhibit No. 4 is a corrective
23  action, right?
24  A. Yes, it is.
25  Q. You will see at the top Mr. Garza's name;

Page 39

1   and to the right you will see date of the incident
2   April 24, 2009, right?
3   A. Yes, sir.
4   Q. Did Mr. Miller tell you about the incident
5   that's identified in this corrective action?
6   A. Mr. Miller didn't change any notes from me.
7   I walked in the door, and he walked out.
8   Q. Fair enough. Thank you. Now, just go ahead
9   and look at the description of the incident. And the
10  first line says "On April the 13th Mr. Garza was
11  alleged to have used racial language to a coworker."
12  Did you know anything about that before today?
13  A. Nothing.
14  Q. Going on to the next page of Exhibit No. 4,
15  Mr. Landis, it's a corrective action report on
16  Mr. Garza with a date of May the 1st, 2009. Have you
17  seen this document before?
18  A. No, I've not seen it before.
19  Q. Next one is actually the last page -- no,
20  it's not the last page. It's page 4 of Exhibit No.
21  4. It's a corrective action report on Mr. Garza and
22  you're identified as being his manager, right?
23  A. Yes.
24  Q. And the date of this corrective action
25  report is August the 13th, 2009, correct?

Page 40

1   A. Yes.
2   Q. Is the -- is the signature right at the
3   bottom of that page your signature?
4   A. Yes, it is.
5   Q. You recall having -- you recall this
6   corrective action report being given to Mr. Garza,
7   correct?
8   A. Yes.
9   Q. Do you remember it?
10  A. Yes.
11  Q. You remember it?
12  A. Uh-huh.
13  Q. I would like for you to explain to help me
14  understand this document. It says here that "The
15  employee," which is Mr. Garza, "argued the correct
16  procedures for assembling shafts." First of all what
17  is a shaft? I'm talking about in your -- at your --
18  A. The shaft they're talking about is that big
19  in diameter and probably 6 feet long.
20  Q. It's like a pipe, a huge pipe?
21  A. Except it's solid.
22  Q. Okay. Solid.
23  A. Solid steel and it's got different
24  dimensions machined on it.
25  Q. And as of August of 2009, were there any

Page 41

1   written procedures for assembling the shafts?
2   A. No, probably not.
3   Q. Were those procedures standard procedures?
4       (Witness moving head up and down.)
5   Q. (By Mr. Costea) Along the lines of an ISO
6   standard procedure?
7   A. You're talking about the procedure that
8   Jose Garza was using here?
9   Q. I'm talking about it says "Employee argued
10  the correct procedures for assembling shafts" and
11  first of all I'm trying to figure out if in August of
12  2009 there were written procedures for assembling
13  shafts and your answer was, no, there were not written
14  procedures. So the next question is: What types of
15  procedures are you talking about? Procedures along
16  the lines of ISO? You know what an ISO procedures is,
17  right?
18  A. I know what that is, yes.
19  Q. Is that what this document is intended to
20  convey?
21  A. No.
22  Q. What procedures then? Are you talking about
23  informal procedures --
24  A. Informal, yes.
25  Q. -- used at the plant?

11 (Pages 38 to 41)

Electronically signed by Lana Sholders (101-225-766-0482)                        93c91fb3-9fd3-4d55-8953-346e2d037322

Page 46

1  forklift someone needs to have a certification or
2  something to be able to drive a forklift; is that
3  accurate?
4      A.  Today.
5      Q.  Back in 2009?
6      A.  Not back in '09.
7      Q.  But in 2013 that would be required?
8           (Witness moving head up and down.)
9      Q.  (By Mr. Costea)  When did that change come
10 about?
11     A.  A couple years ago.
12     Q.  Was that -- is that like an OSHA
13 requirement?
14     A.  No.  It's just a plant requirement.
15     Q.  Industry standard plant?
16     A.  Yes.  Yes, sir.
17     Q.  Fair enough.  Thank you.
18          (Exhibit No. 5 marked.)
19     Q.  (By Mr. Costea)  Mr. Landis, you are looking
20 at Exhibit No. 5; and I'm going to ask you a couple of
21 questions about this document.  Let's see.  On page 2
22 of Exhibit No. 5, your name appears.  Do you recognize
23 page 2 of Exhibit No. 5?
24     A.  Yes, sir.
25     Q.  So you remember this document.  Did you

Page 47

1  actually type up this page, sir?
2      A.  I didn't actually type it.  I wrote it.
3      Q.  You handwritten -- I'm sorry.  You hand
4  wrote it?
5      A.  Hand wrote it, yes.
6      Q.  And who typed it up?
7      A.  The receptionist.
8      Q.  What's her name?
9      A.  Sabrina Carr.
10     Q.  Is the handwritten -- is your handwritten
11 statement still around?  Do you know?
12     A.  I haven't been able to find it.
13     Q.  You've been looking for it?
14     A.  Yes.
15     Q.  When did you write it?
16     A.  I would say October the 28th.
17     Q.  And did somebody suggest you write this
18 statement, or how did this statement come about?
19     A.  I'm feeling the HR asked me to write it.
20     Q.  Who in HR?
21     A.  Bill Butler.
22     Q.  Did he tell you for what purpose?
23     A.  No.
24     Q.  You just read the one paragraph statement
25 that you wrote, right?

Page 48

1      A.  Yes, sir.
2      Q.  Do you recall any discrepancies between the
3  typed statement and the handwritten statement that you
4  actually wrote?
5      A.  No.
6      Q.  Let's see what your statement says.  It says
7  that on Tuesday, October 27th at 3:30 p.m. Mr. Garza
8  stopped you on the shop floor and demanded that he be
9  moved from draw works assembly over to mud pump
10 assembly.  Did he use the word "I demand that I be
11 moved over to the mud pump assembly"?
12     A.  He did not use the exact word "demand."
13     Q.  Tell me --
14     A.  He told me in uncertain terms that he wanted
15 to be moved.
16     Q.  Well, what -- I mean, you use the word
17 "demand" and that kind of implies that he was being
18 impolite.  And I'm trying to figure out upon what you
19 base that.  Was it -- did he use vulgarity when he
20 asked that he be transferred?
21          MS. WHITE:  Objection.  Form.
22     A.  I don't remember.
23     Q.  (By Mr. Costea)  And the next line says that
24 he stated to you that he could not work with those
25 people any longer.  Did he give names?

Page 49

1      A.  I don't think so.
2      Q.  With reference to quote "those people," did
3  he mean people in draw works?
4      A.  Well, I'd have to --
5          MS. WHITE:  Objection.  Form.
6      A.  -- assume those were the people he was
7  working with.
8      Q.  (By Mr. Costea)  Sir?
9      A.  Yes.
10     Q.  You state that you replied that "We have no
11 need for more assemblers in mud pumps or over head
12 equipment" and then you state that Kevin Warren and
13 Rudy Lopez walked up and Kevin asked Mr. Garza "What
14 is the problem?"  Now, based upon in light of this
15 sentence here, do you recall Mr. Lopez being the team
16 lead over draw works, over the group in which
17 Mr. Garza worked?
18     A.  I think he was.
19     Q.  The next line says that Mr. Garza stated
20 that Rudy had been telling lies about him and he was
21 not comfortable working with Steve Hunt, right?
22     A.  Correct.
23     Q.  So that statement that Mr. Garza was not
24 comfortable working with Steve Hunt was made in your
25 presence?

13 (Pages 46 to 49)

JACK LANDIS
October 8, 2013                                    Job No. 15141

Page 50

1   A.  Yes.
2   Q.  And in the presence of Mr. Warren and
3   Mr. Lopez?
4   A.  Uh-huh.
5   Q.  "Yes," sir?
6   A.  Yes.
7   Q.  Did Mr. Garza explain what lies Mr. Lopez
8   had allegedly told about him?
9   A.  Not that I'm aware of.
10  Q.  Did you or Mr. Warren or Mr. Lopez ask in
11  this conversation during this incident, did you ask
12  Mr. Garza why he was not comfortable working with
13  Steve Hunt?
14  A.  No.
15  Q.  Do you think that it was your responsibility
16  to make inquiries to ask why he was not comfortable
17  working with Steve Hunt?
18  A.  Maybe but I didn't.
19  Q.  Now, by this point in time, you knew that
20  Mr. Hunt was an odd duck, right?
21  A.  Uh-huh.
22  Q.  That's a "yes"?
23  A.  Yes.
24  Q.  And by this point in time, you knew that
25  Mr. Garza had alleged that Mr. Hunt had sexually

Page 51

1   harassed him?
2   A.  I think I knew it by then.
3   Q.  And even though you knew these details, you
4   did not bother to ask Mr. Garza why he felt
5   uncomfortable working with Mr. Hunt?
6       MS. WHITE:  Objection.  Form.
7   A.  Right.  I don't recall asking him.
8   Q.  (By Mr. Costea) The next line in your
9   paragraph states "As far as I know, Rudy had not said
10  anything about Mr. Garza and Steve was okay working
11  with him." I want to ask you about Steve.  It seems
12  to me that you are stating in that sentence that
13  Steve Hunt was okay working with Mr. Garza.  Is that
14  what you are conveying in that sentence?
15  A.  Yes.
16  Q.  How do you know that? Did you ask Steve
17  that?
18  A.  I'm sure I did, yes.
19  Q.  Then next you say that Mr. Garza began
20  shaking his finger in your face and in Kevin's face
21  saying he wanted to be moved to another group.  You're
22  talking about Mr. Garza literally pointing his finger
23  in your face and Kevin's face saying "I want to be
24  moved to another group"?
25  A.  Yes.

Page 52

1   Q.  Now, who was over the -- over the mud pump
2   assembly?  Who was the supervisor?
3   A.  At that time it was probably a guy named
4   Henry Castellanos.
5   Q.  Is Mr. Castellanos still employed with NOV?
6   A.  Yes.
7   Q.  Have you made any inquiries of
8   Mr. Castellanos to see if there were any spots
9   available in mud pump?
10  A.  Yes.
11  Q.  Another sentence in your statement states
12  that "Mr. Garza became furious and started shaking his
13  finger in our faces again." Did he use vulgarity at
14  all?
15  A.  I don't remember.
16  Q.  "And then at that point we asked him to
17  joint us at the office of Bill Butler." And did he
18  comply with your request?
19  A.  Yes, he did.
20  Q.  So tell me, who went to Mr. Butler's office?
21  A.  Who went in?
22  Q.  Right.
23  A.  It was Kevin Warren, Jose Garza, and myself.
24  Q.  What about Rudy?
25  A.  No, sir.

Page 53

1   Q.  Tell me what happened in Mr. Butler's
2   office.  Did you say anything?
3   A.  I don't remember.
4   Q.  Well, let me see if I can refresh your
5   recollection.  Did you say anything?
6   A.  Did I say anything?
7   Q.  Right.
8   A.  I don't know.
9   Q.  Did Mr. Garza say anything?
10  A.  Again, I don't know.
11  Q.  Okay.
12  A.  That's a long time ago.
13  Q.  Well, we lawyers are curious.  So --
14  all right.  We want to know everything.  So I
15  apologize.  Just be patient with me, please.
16  Mr. Warren, did he say anything?
17  A.  I just don't remember what all was said,
18  what all was said or who said it.
19  Q.  How did Mr. Garza behave in this meeting?
20  A.  I don't know.
21  Q.  Was there any discussion whatsoever among
22  the four of you about why Mr. Garza wanted to leave
23  the draw works group?
24  A.  I don't recall any, no.
25  Q.  Did the name of Steve Hunt come up in that

14 (Pages 50 to 53)

Electronically signed by Lana Sholders (101-225-766-0482)            93c91fb3-9fd3-4d55-8953-346e2d037322

Page 54

conversation?
A. Not that I recall, no, sir.
Q. Did Mr. Butler ask Mr. Garza why he wanted to move out of the department -- I'm sorry, out of the draw works assembly?
A. Again, I don't know.
Q. Do you recall approximately how long this meeting was with the four of you?
A. It seems it probably wasn't more than 15 minutes.
Q. So the meeting, I understand, concluded by suspending Mr. Garza, right?
A. Yes, sir, for one day or two.
Q. Who came up with the idea of suspending him?
A. I'm not real sure.
Q. Why was Mr. Garza suspended?
A. Well, basically I think when he was asked to, you know, pipe down and get back to work he refused to do it. He refused to go back to work or he failed to do it and --
Q. Was he suspended with or without pay?
A. I'm sure it would have been without.
Q. And what was supposed to take place during his suspension of one or two days? What was supposed to take place during the suspension? An

Page 55

investigation, conversations?
A. As far as I know HR, Bill Butler was going to investigate the incident and see.
Q. Okay.
A. Just make a decision as to what to do.
Q. Were you also considering -- was the suspension designed to give you time to move him from draw works to the mud pump?
A. No.
Q. In the last line of -- the last sentence of your paragraph, you talk about Mr. Garza's quote "Prior acts of insubordination." Tell me about those. What prior acts of insubordination have occurred before October 27th?
A. I don't remember.
Q. Well, did you know -- I mean, did you know for a fact when you hand wrote this statement that prior to October 27th, 2009 Mr. Garza had engaged in prior acts of insubordination?
A. I can't just sit here and give an example of it, no. It's too long ago.
Q. I understand. But do you recall anyone telling you that prior to October 27th, 2009 Mr. Garza had engaged in prior acts of insubordination? I understand you do not know what those were. The

Page 56

question is a bit different. Did anyone advise you that he had engaged in prior acts of insubordination?
A. Well, I'd assume I found out through HR that he had prior write-ups, yes.
Q. So was it at the end of this meeting that you had with Mr. Butler that Mr. Butler asked you and Mr. Warren to write statements about what happened that day?
MS. WHITE: Objection. Form.
Q. (By Mr. Costea) You told me that you wrote your statement because Mr. Butler suggested that you do so.
A. It could have been the next morning. You know, I don't know.
Q. So then was it that act of insubordination that caused Mr. Garza's termination that he refused to go back to work?
MS. WHITE: Objection. Form.
A. I think that was the final act, yes.
Q. (By Mr. Costea) So tell me in your own words what was your understanding as to why he was let go.
A. Well, just reading the final write-up, it says insubordination.
Q. And who made the decision to fire him? Who

Page 57

first suggested it? Was it you, was it Mr. Butter, Mr. Warren?
MS. WHITE: Objection. Form.
A. Yeah, it could have been me. It could have been any of the above. I'm not sure.
Q. (By Mr. Costea) Any of the three of you?
A. Yes. It was agreed upon anyway between us.
Q. Right. Do you know how long Mr. Garza was out on suspension?
A. No, I don't. Just reading this it says two days.
Q. Let's look at another document now.
(Exhibit No. 6 marked.)
Q. (By Mr. Costea) Mr. Landis, you are looking at Exhibit No. 6. I'll represent to you once again that this document consists of pages of documents given to me by defense counsel in this case. The first document that appears on page 1 of Exhibit 6 is National Oilwell Varco's Nondiscrimination and Anti-Harassment Policy with a date, effective date of 2-12-1988, revision date 4-20 of 1998, right?
A. Yes.
Q. Have you seen this document before?
A. I can't say that I've exactly seen this document, no.

JACK LANDIS
October 8, 2013
Job No. 15141

Page 58

1    Q.  In the sexual harassment training that you
2   received a year ago, was it mentioned that same sex
3   harassment is against the law?
4    A.  Is it against the law?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Was it mentioned that same sex harassment is
8   against the law meaning male on male and female on
9   female?
10   A.  Yes.
11   Q.  Was it also mentioned that retaliation,
12  retaliating on an employee because an employee
13  complains of sexual harassment is also against the
14  law?
15   A.  Retaliation is, yes.
16   Q.  Failed to ask you: The classroom training
17  that you received, was it given by a person as opposed
18  to watching a video, for instance?
19   A.  I think it was a combination.
20   Q.  Combination. Who gave the training? Was it
21  a lawyer? Was it HR?
22   A.  It wasn't a lawyer. It was probably HR.
23   Q.  Both a lawyer and HR?
24   A.  No, no lawyer.
25   Q.  I'm sorry. HR, no lawyer?

Page 59

1    A.  Right.
2    Q.  Do you recall the name of the person that
3   gave the seminar?
4    A.  I think it was Nicole Derrick.
5    Q.  Nicole Derrick?
6       (Witness moving head up and down.)
7    Q.  (By Mr. Costea) What was her job at HR?
8    A.  She's HR manager now.
9    Q.  At 529?
10   A.  Yes.
11   Q.  And what was Mr. Butler's position in
12  October, 2009?
13   A.  In October, 2009 he was an HR manager.
14   Q.  And what is his job now?
15   A.  He's in HS&E at a different location.
16   Q.  HS and --
17   A.  Health safety and environmental.
18   Q.  Something environmental?
19   A.  Yeah.
20   Q.  Were you given any handouts in the sexual
21  harassment training like, I don't know, papers,
22  documents, statements about sexual harassment, a
23  little booklet, a pamphlet, a flyer, anything along
24  those lines, materials?
25   A.  Not that I'm aware of.

Page 60

1    Q.  Does NOV have an employee handbook?
2    A.  An employee handbook?
3    Q.  Right.
4    A.  Such as?
5    Q.  Do you know what an employee handbook is?
6    A.  Well, I guess not.
7    Q.  A booklet that typically companies give out
8   advising employees of the company's rules and
9   policies?
10   A.  Okay. Rules and policies, no, I don't think
11  we do.
12   Q.  Handbook? Y'all don't have one?
13   A.  I don't think so.
14       (Exhibit No. 7 marked.)
15   Q.  (By Mr. Costea) Mr. Landis, we are looking
16  at Exhibit No. 7. Have you seen this document before
17  today?
18   A.  No.
19   Q.  This document at the top is identified as
20  being a job skills inventory, right?
21   A.  Yes.
22   Q.  Who fills out this form?
23   A.  Who fills it out?
24   Q.  Yes.
25       MS. WHITE: Objection. Form.

Page 61

1    Q.  (By Mr. Costea) Meaning what is the
2   procedure? I think I understand the rationale for a
3   job skills inventory on employees but my question is:
4   Who fills it out? Is it HR? Is it the employee
5   himself?
6    A.  I've never done it. Probably the employee
7   fills it out.
8    Q.  The employee himself?
9    A.  I would suspect.
10   Q.  I don't have anymore documents. I might
11  have a couple more questions. Just bear with me,
12  please. Is the name Miguel Gutierrez familiar to
13  you?
14   A.  Again?
15   Q.  Okay. Did he ever complain to you about
16  Mr. Hunt?
17   A.  Not that I know of.
18   Q.  Now, among the documents that I don't --
19  well, it might be in one of the exhibits; but we don't
20  have to reference that specific exhibit. There's talk
21  about Mr. Garza being asked to come back and take his
22  tools. Do you remember him being told to do so after
23  he was terminated to come back and pick up his tools?
24       MS. WHITE: Objection. Form.
25   A.  That would be standard procedure, yes.

16 (Pages 58 to 61)

Page 62

1  Q. (By Mr. Costea) Am I to understand that the
2  employees provided their own tools as opposed to the
3  company providing tools to employees?
4  A. It's a split. The employee furnishes their
5  own small tools, hand tools. Now, as far as bigger
6  wrenches, three quarter drive up and torque wrenches,
7  especially wrenches, the company furnishes.
8  Q. When you wrote your statement in October,
9  2009, the one that -- the handwritten statement, were
10 you in the presence of Mr. Warren, Mr. Butler,
11 Mr. Lopez when you wrote your statement?
12 A. No.
13 Q. Y'all wrote your statements separate from
14 one another?
15     MS. WHITE: Objection. Form.
16 A. Yes.
17     MR. COSTEA: Okay. That's all I have.
18 Thank you very much. I pass the witness.
19     MS. WHITE: We'll reserve our questions
20 until the time of trial.
21     (Deposition concluded at 11:34 a.m.)
22
23
24
25

Page 63

1           WITNESS' CHANGE/CORRECTION PAGE
2              DEPOSITION OF JACK LANDIS
3                TAKEN OCTOBER 8, 2013
4  PAGE/LINE  CHANGE            REASON
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25 _____  _____  _____

Page 64

1                WITNESS' SIGNATURE PAGE
2              DEPOSITION OF JACK LANDIS
3               TAKEN OCTOBER 8, 2013
4
5  I, JACK LANDIS, have read the foregoing
6  deposition and hereby affix my signature that same is
7  true and correct, except as noted above.
8
9              _____
                        JACK LANDIS
10 THE STATE OF _____)
11 COUNTY OF _____)
12
13 Before me,_____, on this day personally
14 appeared JACK LANDIS, known to me (or proved to me
15 under oath or through _____) (description of
16 identity card or other document) to be the person
17 whose name is subscribed to the foregoing instrument
18 and acknowledged to me that they executed the same for
19 purposes and consideration therein expressed.
20
21 Given under my hand and seal of office on this _____
22 day of _____, _____.
23
24              _____
               NOTARY PUBLIC IN AND FOR
               THE STATE OF _____
25

Page 65

1  COUNTY OF HARRIS )
2  STATE OF TEXAS   )
3
4            REPORTER'S CERTIFICATE
5  I, LANA SHOLDERS, Certified Shorthand Reporter in and
6  for the state of Texas, hereby certify that this
7  transcript is a true record of the testimony given by
8  the witness named herein, after said witness was duly
9  sworn by me.
10
11 I further certify that I am neither attorney nor
12 counsel for, related to, nor employed by any of the
13 parties to the action in which this testimony was
14 taken. Further, I am not a relative or employee of
15 any attorney of record in this cause, nor do I have a
16 financial interest in the action.
17
18 Certified to by me this the 28th day of October, 2013.
19
20    Lana Sholders
21 LANA SHOLDERS, Texas CSR
   Expiration Date: 12-31-14
22 Firm Registration # 530
   FOX Reporting
23 4550 Post Oak Place, Suite 201
   Houston, Texas 77027
24 Phone 713.622.1580
   Fax 281.768.5540
25 www.fox-reporting.com

                                    17 (Pages 62 to 65)

Electronically signed by Lana Sholders (101-225-766-0482)          93c91fb3-9fd3-4d55-8953-346e2d037322