Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA              )
                           )
VS.                        ) C.A: H-4:12-CV-03532
                           ) JURY
NATIONAL OILWELL VARCO,    )
LP                         )

*********************************************

ORAL DEPOSITION OF

BOB MILLER

OCTOBER 31, 2013

VOLUME 1

*********************************************

ORAL DEPOSITION of BOB MILLER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 31st day of October, 2013, from 10:06 a.m. to 11:40 a.m., before Lana Sholders, CSR in and for the State of Texas, reported/recorded by machine shorthand, at the offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 400 Dallas, Suite 3000, Houston, Texas, pursuant to the Federal Rules of Civil Procedure.


PLAINTIFF'S EXHIBIT 4

Page 2

1   APPEARANCES:
2
3   FOR THE PLAINTIFF:
    MR. PETER COSTEA
4   Attorney at Law
    Three Riverway, Suite 1800
5   Houston, Texas 77056
    Phone 713.337.4304
6   Fax 713.659.5302
    Email costealaw@yahoo.com
7
8
    FOR THE DEFENDANT:
9   MS. CHRISTINE M. WHITE
    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
10  701 Poydras Street, Suite 3500
    New Orleans, Louisiana 70139
11  Phone 504.648.3840
    Fax 504.648.3859
12  Email christine.white@ogletreedeakins.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           INDEX
2   Appearances.................................. 2
3   BOB MILLER:
4      Examination by Mr. Costea................. 4
5   Signature and Changes......................... 70-71
6   Reporter's Certificate Page................... 72
7
8           EXHIBITS
9
10  NO.   DESCRIPTION                        PAGE
11  1     Job Skills Inventory                 4
12  2     Promotion/Salary Increase Documents 36
13  3     Employee Warning Notice             39
14  4     Forklift Operator Form              65
15  5     Forklift Operator Form              66
16  6     Department Tally Sheet              66
17  7     Copy of Business Cards              68
18  8     Safety Meeting Training Report      68
19
20
21
22
23
24
25

Page 4

1                BOB MILLER,
2   having been first duly sworn, testified as follows:
3                EXAMINATION
4   BY MR. COSTEA:
5       Q.  Please state your full name?
6       A.  Bobby Jay Miller.
7       Q.  Mr. Miller, my name is Peter Costea and I am
8   an attorney and I thank you very much for showing up
9   here today.  I understand a couple of weeks ago, maybe
10  a month ago or so you've been subpoenaed, correct?
11      A.  Yes.
12      Q.  We're going to start out by looking at some
13  documents today.
14          (Exhibit No. 1 marked.)
15      Q.  (By Mr. Costea) The first document we are
16  going to look at has a label on it.  It's Exhibit No.
17  1.  Do you see the label on it?
18      A.  Yes.
19      Q.  The sticky.  You will also see that the
20  documents or most of the documents you are going to
21  look at today also have numbers right at the bottom of
22  the page.  For instance, page 1 of Exhibit No. 1 has a
23  number of NOVJFG341.  Do you see that?
24      A.  Yes.
25      Q.  And occasionally throughout our conversation

Page 5

1   today I might reference documents by exhibit number
2   and then also by the number, the number at the bottom
3   of the page.  Let's start with the first page of
4   Exhibit No. 1.  It's Job Skills Inventory for a person
5   by the name of Steven Hunt; right?
6       A.  Yes.
7       Q.  Were you employed by National Oilwell Varco
8   as of August of 2008?
9       A.  Yes.
10      Q.  What was your position?
11      A.  What was my position?
12      Q.  Yes, sir.
13      A.  Manufacturing -- I think National used the
14  term production manager.
15      Q.  How long have you worked for National
16  Oilwell Varco, NOV, in all?
17      A.  If I can recall the year, I think it was '99
18  during the acquisition of Continental Emsco and
19  National.
20      Q.  You said Continental Esco?
21      A.  Continental Emsco, E-m-s-c-o.
22      Q.  E-m?
23      A.  S-c-o and I was under the oil state industry
24  division which was part of Emsco at the time.
25      Q.  But you have been an employee of NOV since

Page 6

1  approximately 1999?
2      A. Yes.
3      Q. And as of 2008 NOV employed you as its
4  production manager, right?
5      A. Yes.
6      Q. At the FM 529 location?
7      A. Yes.
8      Q. Could you please tell me as of August of
9  2008 what a job skills inventory was or the relevance
10 of this document at NOV, page 1 of Exhibit No. 1?
11     A. Say that question again.
12     Q. Yes. What was the relevance, what was the
13 rationale for a job skills inventory at NOV in August
14 of 2008?
15         MS. WHITE: Objection. Form.
16     A. I don't recall.
17     Q. (By Mr. Costea) Do you know
18 Mr. Steven Hunt?
19     A. I do recall the gentleman.
20     Q. Has he ever reported to you?
21     A. Yes, he did.
22     Q. In 2008?
23     A. Yes.
24     Q. And in 2008 when he started reporting to
25 you, were you production manager?

Page 7

1      A. Yes, I was.
2      Q. How long did you stay employed with NOV?
3      A. I took the retirement package that they
4  offered and retired in 2009. I think it was May, if I
5  recall.
6      Q. Okay. May of 2009. How long in advance of
7  May of 2009 did you know that you were about to retire
8  or offered early retirement?
9      A. I don't recall exactly. I think it was the
10 early part of the year. I know there was -- some
11 individuals left earlier. I was retained to the very
12 end of the -- of their package deal that they offered,
13 but I don't recall what month.
14     Q. How old were you at that time?
15     A. Let me do my math here.
16     Q. Just give me the year of your birth.
17     A. '44. I was born in '44.
18     Q. So you're about --
19     A. September of '44.
20     Q. So you were about 65?
21     A. 64, I think.
22     Q. And how was the early retirement
23 communicated to you or the possibility of early
24 retirement communicated to you in the early part of
25 2009?

Page 8

1      A. In a formal letter.
2      Q. Do you still have that letter?
3      A. Yes, I do.
4      Q. Do you recall who signed that letter?
5      A. No, I don't recall. I couldn't say for
6  sure.
7      Q. As the production manager in 2009, did you
8  have the authority to hire or fire employees?
9      A. Yes.
10     Q. Did you have the authority to discipline
11 employees?
12     A. Yes.
13     Q. Did you have the authority to give them
14 raises?
15     A. Yes.
16     Q. Okay.
17     A. Let me clarify that. I could submit a
18 request for an increase.
19     Q. Okay. For raises. Fair enough.
20     A. To my supervisor.
21     Q. And who was your supervisor in 2009?
22     A. Richard Urquhart.
23     Q. You said Earnhardt?
24     A. Urquhart.
25     Q. And what was his job with NOV at that point

Page 9

1  in time?
2      A. He was plant manager, I think was probably
3  the formal title.
4      Q. Plant manager at the FM --
5      A. FM 529 facility.
6      Q. -- 529? And as of the early part of 2009,
7  did you know a person by the name of Jose Garza?
8      A. Yes.
9      Q. Did Mr. Garza and Mr. Hunt work in the same
10 division, the same group?
11     A. They worked in the assembly department in
12 different areas.
13     Q. Did they have the same supervisor?
14     A. No.
15     Q. As of --
16     A. Could I clarify that?
17     Q. Please. Absolutely.
18     A. We worked in teams. There was pump teams,
19 draw works team, and additional teams but for the
20 clarity of this, Mr. Garza worked in the pump team.
21 Mr. Hunt was in the draw works division or the teams,
22 but it was not uncommon as work would dictate to move
23 people from one team to the other to work with
24 additional people. To explain the pump deal, you
25 could move somebody out of the draw works division to

Page 22

1   Q. Going on to the next page, we see an
2   employee data form with a date at the bottom of the
3   page of 12-12-2008 signed by Bill Butler and it
4   reflects a salary change for Mr. Hunt and the
5   rationale is conversion from NOV temp to regular
6   employee, right?
7   A. Correct.
8   Q. And that obviously jives with what you just
9   told me, correct?
10  A. Yes.
11  Q. I am -- towards the top of the page right
12  below Mr. Steven -- well, his full name, I guess, is
13  Steven Bishop Hunt, we see a date of birth of October
14  the 5th, 1978. Do you see that?
15  A. Yes.
16  Q. So he appeared to be a young man to you --
17       MS. WHITE: Objection. Form.
18  Q. (By Mr. Costea) -- Mr. Hunt?
19  A. I see his date of birth.
20  Q. Right. October the 5th, 1978. Do you see
21  that?
22  A. Yes.
23  Q. Going on to the next page of that same
24  exhibit, I see a corrective action document given to
25  Steven Hunt by you with a date of the incident of

Page 23

1   March 24, 2009, correct?
2   A. Yes.
3   Q. Did you fill out this form, Mr. Miller?
4   A. Yes.
5   Q. And did you do so on March 24th, 2009?
6   A. Yes.
7   Q. Did someone instruct you to prepare this
8   corrective action report on Mr. Hunt?
9   A. No one instructed me. Somebody made a
10  complaint to me, and I would have took the action on
11  myself.
12  Q. And did you show this corrective action
13  report to Mr. Hunt himself?
14  A. Yes.
15  Q. Now, the reason for the action that's
16  identified there is "violation of company policy or
17  procedure," right? What company policy or procedure
18  did he violate on March 24, 2009?
19  A. Well, it states that he was engaged in
20  horseplay and inappropriate behavior. So that was the
21  policy that was not acceptable.
22  Q. What type of horseplay did he engage in?
23  A. I don't recall whether it was jokingly or, I
24  mean, I just don't recall.
25  Q. What was the inappropriate behavior?

Page 24

1   A. What would be?
2   Q. Yes, sir.
3   A. We didn't tolerate playing jokes. We didn't
4   tolerate, if I classify horseplay of child type
5   behavior, throwing things. You know, it's -- it's a
6   business environment and you're to conduct yourself
7   accordingly. For me to describe everything, I
8   couldn't go into every detail.
9   Q. Right. So you're saying to me that you
10  cannot actually factually substantiate the horseplay
11  and inappropriate behavior that resulted in this
12  corrective action report?
13       MS. WHITE: Objection. Form.
14  A. I can't tell you what action was on this
15  particular incident. I don't recall.
16  Q. (By Mr. Costea) You don't recall the
17  incident, you don't recall any facts you're telling
18  me?
19       MS. WHITE: Objection. Form.
20  A. I don't recall the facts. I mean, I see the
21  document; and I know that something was reported to me
22  that I saw a need to discuss it with him.
23  Q. (By Mr. Costea) Who reported the horseplay
24  and inappropriate behavior to you?
25  A. I don't recall.

Page 25

1   Q. Was it a man, or was it a woman?
2   A. I don't recall.
3   Q. Was it Mr. Garza?
4   A. I don't recall.
5   Q. Was it Mr. Butler?
6       MS. WHITE: Objection. The witness has
7   answered that he doesn't recall.
8   Q. (By Mr. Costea) Mr. Miller, I'm trying to
9   jog your memory. It's important for my case.
10  Otherwise, I could finish this testimony in five
11  minutes and go home.
12  A. Well, I understand what you're saying and it
13  could even be that I could be walking through the shop
14  and see him, you know, throw something or grab
15  somebody or, you know, to hug them or whatever. I
16  don't know but I can't recall this particular instance
17  but I know there was something or I wouldn't have
18  brought him in and discussed it with him.
19  Q. Yeah. But your memory seems to be fairly
20  sharp that about six months before you trained him in
21  sexual harassment?
22       MS. WHITE: Objection. Form.
23  A. Yeah, because that was policy.
24  Q. (By Mr. Costea) Well, it was policy; but
25  I'm asking you for a fact: Did you train him on

BOB MILLER
October 31, 2013                                                Job No. 15254

Page 26

1  sexual harassment on 9-4-2008 or you are saying to me
2  "Probably I did because that's policy"?
3        MS. WHITE: Objection --
4        Q. (By Mr. Costea) I want to know for a fact:
5  Did you train him in sexual harassment on September
6  the 4th of 2008?
7        MS. WHITE: Objection. Form. Asked
8  and answered. Argumentative.
9        You can answer.
10       A. I would say, yes, I did because that's
11 normal -- it's an important factor to me as well as to
12 the work place that I would have talked to him about
13 that.
14       Q. (By Mr. Costea) Do you have an
15 understanding as to what this case is all about,
16 Mr. Garza's case? Do you know what he's alleging in
17 this lawsuit?
18       A. I was informed why I was under subpoena,
19 yes.
20       Q. Yeah. What did you learn?
21       A. That he had filed suit because he was
22 wrongfully terminated due to the fact that he had
23 filed or took action against Steven Hunt on sexual
24 harassment. That he had filed a complaint, and that
25 he was unlawfully terminated.

Page 27

1        Q. So given the understanding that you have
2  about this lawsuit, I'm going back to the write-up
3  that you gave to Mr. Hunt on March 24th, 2009 and I'm
4  trying to figure out the best way you can what the
5  horseplay and the inappropriate behavior was. Did
6  that in any way relate to comments of a sexual nature,
7  foul mouth, inappropriate touching specifically of
8  that nature?
9        MS. WHITE: Objection. Form.
10       A. I can't recall this date and anything.
11       Q. (By Mr. Costea) When you gave this
12 corrective action report to Mr. Hunt, did you do so in
13 the presence of a witness?
14       A. I cannot tell you that I did on this
15 particular date, but it was general policy that I
16 would have their group leader presence during
17 corrective actions.
18       Q. And you presented this document to Mr. Hunt
19 for signature on March 24th, 2009?
20       A. Yes.
21       Q. Where did you give it to him? In your
22 office, in the shop?
23       A. It would have either been in my office or in
24 one of our conference rooms.
25       Q. And I take it that you yourself typed up

Page 28

1  this document, right?
2        A. Yes.
3        Q. Where did you get the form from?
4        A. They're online.
5        Q. They are online. Okay. And where did you
6  office?
7        A. Where did I office?
8        Q. Yes.
9        A. FM 529 facility.
10       Q. Right. But where?
11       A. In the front. As you come in the front door
12 to the right at the end of the office.
13       Q. Okay.
14       A. End of the hallway.
15       Q. So on March 24th somebody informed you of
16 some horseplay or inappropriate behavior and that on
17 the same day you went online and -- I mean, snatched
18 this form and filled it out and on the same day you
19 gave it to Mr. Hunt to sign?
20       MS. WHITE: Objection. Form.
21       Q. (By Mr. Costea) Everything happened on the
22 24th of March of 2009, right?
23       A. I would look at the document and say that it
24 was the 24th that I filled out this document.
25       Q. Sir?

Page 29

1        A. That I filled out this document.
2        Q. You say that in the -- you see where it says
3  "Description of the incident," it says complete --
4  "Provide a complete and concise description of the
5  circumstances that caused the issuance of this
6  warning. Be as specific as possible including names,
7  dates, times, and locations," right?
8        A. Yes.
9        Q. And you did not comply with that
10 requirement, did you?
11       MS. WHITE: Objection. Form.
12       Q. (By Mr. Costea) You provided no names, no
13 dates, no times, no locations, did you?
14       MS. WHITE: Objection. Form.
15 Argumentative.
16       A. Well, the date is the date that's on the
17 report. The name is the individual's name. The
18 date's on the report. There is no time on here, but
19 the location is on there FM 529 facility.
20       Q. Well, you were asked to substantiate the
21 incident by providing names, dates when the events
22 happened, the times, and the locations and you do not
23 give the name of the person that complained about him,
24 you do not identify the nature of the complaint, you
25 do not provide the facts, do you?

8 (Pages 26 to 29)

Electronically signed by Lana Sholders (101-225-766-0482)                    ec3a642c-01f7-450e-b0bd-fa15c5e264d3

Page 30

1   MS. WHITE: Objection. Form.
2   Argumentative and assumes facts not established.
3       Q. (By Mr. Costea) Mr. Miller, I am --
4       A. This --
5       Q. Go ahead.
6       A. This does not necessarily say that somebody
7   filed a complaint. As I told you earlier, I could
8   have witnessed something that --
9       Q. I'm trying to figure out what you witnessed,
10  Mr. Miller.
11      A. As I told you earlier, it could have been
12  numerous things.
13      Q. Fair to say you do not recall?
14      A. I do not recall.
15      Q. Under corrective action to be taken, you say
16  that he has to improve immediately, right?
17      A. Yes.
18      Q. I don't see Mr. Hunt signing this corrective
19  action report, do you?
20      A. It was not required. The form is presented
21  to the employees. They could either sign the form or
22  they could disagree and not sign it.
23      Q. Well, the box "I agree with this warning" or
24  "I disagree with this warning" is not checked, right?
25      A. Correct.

Page 31

1       Q. So that gives me the impression that you did
2   not meet with Mr. Hunt to discuss this write-up with
3   him?
4           MS. WHITE: Objection. Form.
5       A. No, I would not say that. I would say that
6   he just rejected the whole idea.
7       Q. (By Mr. Costea) Well, you're speculating.
8   I need facts. I need to know what you know,
9   Mr. Miller.
10      A. I do not know.
11      Q. What was his reaction? What did he say?
12          MS. WHITE: Objection. Form.
13      A. I don't recall.
14      Q. (By Mr. Costea) Okay. Witness signature,
15  no one has signed witnessing the fact that you gave
16  this corrective -- that allegedly you gave this
17  corrective action notice to Mr. Hunt, right?
18      A. Nobody signed.
19      Q. Why not?
20          MS. WHITE: Objection form.
21      Q. (By Mr. Costea) Did you ask somebody to
22  come in and witness you giving this corrective action
23  report notice to Mr. Hunt?
24      A. There was no -- apparently nobody there at
25  that time.

Page 32

1       Q. Are you speculating, or are you giving me a
2   fact?
3       A. It would be speculation. I do not recall.
4       Q. So you're saying that a plant where you
5   have, I don't know, maybe hundreds of employees nobody
6   was available to witness you giving this corrective
7   action notice to Mr. Hunt?
8           MS. WHITE: Objection. Form.
9   Argumentative. The witness has testified he doesn't
10  recall the specifics and so continuing to ask
11  questions about the specifics is really not getting us
12  anywhere.
13      Q. (By Mr. Costea) Mr. Miller, you understand
14  I'm testing your credibility here today?
15      A. I do understand.
16      Q. Okay. So I'm asking, I'm giving you the
17  option to try to answer my questions the best you
18  recall because I'm going to ask you the same questions
19  in front of the jury. And I'm asking you: Give me
20  for a fact, did you or did you not bring in a witness
21  to witness the fact that you allegedly gave this
22  corrective action report to Mr. Hunt on March 24,
23  2009? The answer can be "Yes, "No," "I don't know,"
24  or "I don't remember."
25          MS. WHITE: Objection. Form.

Page 33

1       A. I don't recall.
2       Q. (By Mr. Costea) Fair enough. Is that your
3   signature at the bottom of the page?
4       A. Yes, it is.
5       Q. Did you actually sign your name in that --
6   next to the manager's signature or did you imprint an
7   electronic signature on the top document?
8       A. That's my actual signature.
9       Q. And did you sign this document in Mr. Hunt's
10  presence?
11      A. I don't recall.
12      Q. Going on to the next page, we have an
13  employee warning notice for Mr. Hunt. Is that your
14  handwriting anywhere on page 331?
15      A. I don't think any of this -- no, it's not my
16  handwriting.
17      Q. Do you recognize the handwriting?
18      A. I don't recognize handwriting.
19      Q. What about the signature of the supervisor?
20      A. There is no signature.
21      Q. It says "Signature of supervisor who issued
22  the warning." Do you see that?
23      A. Yeah, I don't recognize that.
24      Q. Is that Mr. Goff?
25      A. I don't know.

BOB MILLER
October 31, 2013                                      Job No. 15254

Page 42

1   to tell the jury that prior to July the 10th of 2007
2   you gave Mr. Garza oral warnings, right?
3           MS. WHITE: Objection. Form.
4       A. I'm not going to tell you I did but I'm
5   saying this is a written one and this was -- to
6   explain the form if this was even a second warning or
7   a third, the "X" would be marked in the second or the
8   third. It wouldn't be three "X's" down there to get
9   the -- shown on this form. It shows what form this
10  is. There could have been previous warnings and
11  previous documents.
12      Q. (By Mr. Costea) Let's see what you're
13  stating there. Employer's statement. "Disruptive
14  behavior. Threats to fellow employee coworker
15  Galvan Oswaldo," right?
16      A. Yes.
17      Q. Give me the facts. What happened, please?
18      A. I can only recall the name that there was
19  words and some threatening behavior from Jose to
20  Mr. Oswaldo and I don't recall but I do recall the
21  incident of the two gentlemen that their personalities
22  conflict and there was some things and that's all I
23  can tell you that I recall.
24      Q. Did you give a warning to Mr. Oswaldo as
25  well?

Page 43

1       A. I don't recall.
2       Q. And what threats did Mr. Garza convey to
3   Mr. Oswaldo?
4       A. I don't know. I can't recall exactly if
5   I -- it would strictly be speculation. I don't
6   recall.
7       Q. Well, was it words? Was it actions? Was it
8   like taking a hammer?
9           MS. WHITE: Objection. Form.
10      Q. (By Mr. Costea) Mr. Miller --
11      A. I don't recall.
12      Q. -- let me be frank with you.
13      A. I have 60, 80 employees --
14      Q. I understand.
15      A. -- and things and this is four or five years
16  ago. I just don't recall every detail of every day.
17      Q. You understand that I will call you to
18  testify in trial?
19      A. I understand.
20      Q. And you understand that today is my chance
21  to know what you know?
22      A. Yes.
23      Q. And if you are going to change your
24  testimony and give a whole bunch of facts in front of
25  the jury about the questions I'm asking today it's

Page 44

1   going to be a problem. You understand that?
2       A. No. I can only tell you what I can
3   remember.
4       Q. So I want to give you the opportunity, if
5   you don't recall, you don't recall and we are going to
6   close this subject. You don't recall any specific
7   threats that Mr. Garza displayed towards Mr. Oswaldo,
8   whether it was actions, whether it was words?
9       A. I don't recall.
10      Q. Now, if I go by this document, it seems that
11  Mr. Garza signed it, didn't he?
12      A. Yes.
13      Q. And it looks like you gave it to him on July
14  the 11th, right?
15      A. Yes.
16      Q. Going on to the next page of that same
17  exhibit. You gave Mr. Garza a corrective action
18  notice on April the 24th, 2009, correct?
19      A. Yes.
20      Q. When was the last time that you -- that you
21  saw or that you read this corrective action report?
22      A. The last time?
23      Q. Yes.
24      A. I would venture to say it was 4-27-09.
25      Q. And that was approximately, what, about a

Page 45

1   month or so before you left your employment with the
2   company?
3       A. Yes.
4       Q. Now, you are saying that -- in the
5   description of the incident, you say that "On April
6   the 13th of 2009 Mr. Garza was alleged to have used
7   racial language to a coworker." Who was that
8   coworker?
9       A. As best I can recall, there was some
10  comments made to Mr. Hunt.
11      Q. Who told you about those comments?
12      A. I don't recall the individual.
13      Q. And how do you know it was on April the
14  13th, 2009?
15      A. The individual that would have reported the
16  incident would have told me. This could have been
17  most anybody.
18      Q. You're saying that this is the second time
19  that Jose has been disruptive and harassing his
20  coworkers. When was the first time?
21      A. Well, the first time would have been on the
22  previous page on 7-10-07.
23      Q. Of 2007. And you're saying his coworkers in
24  the plural and that was Mr. Oswaldo Galvan and the
25  second coworker was Mr. Hunt, right?

12 (Pages 42 to 45)

Page 46

1  A. Yes.
2  Q. Any other coworkers that Mr. Garza allegedly
3  was disruptive or he was harassing?
4  A. I don't recall any names or any incidents.
5  Q. Now, you indicate on this corrective action
6  report that -- well, strike that.
7        Somebody indicates on this corrective
8  action report that Mr. Garza refused to sign the
9  corrective action notice, right?
10 A. Yes.
11 Q. Is that your handwriting?
12 A. The "X"?
13 Q. No. Where it says "Employee refused to
14 sign," do you see that?
15 A. Yes. No, that's not my handwriting.
16 Q. Whose handwriting is that?
17 A. I don't know.
18 Q. And I recognize a witness -- the witness'
19 signature is Bill Butler; is that correct?
20 A. That is correct.
21 Q. So I take it that he witnessed the fact that
22 you gave this corrective action document to Mr. Garza;
23 is that right?
24 A. Yes, he did.
25 Q. Do you recall Mr. Garza -- anything that

Page 47

1  Mr. Garza said back to you when you gave him this
2  corrective action report? "I disagree" or, you know,
3  "This is bologna," anything along those lines?
4  A. I don't recall what he said.
5  Q. Fair enough. Did he make any comments back
6  to you about Mr. Hunt?
7  A. I don't recall.
8  Q. Did he make any complaints about Mr. Hunt?
9  A. Did he?
10 Q. Yes.
11 A. Yeah. I recall that he made a complaint
12 about Mr. Hunt one time about his sexual harassment.
13 He poked him with a stick or something in them or
14 poked him -- not with a stick but I remember poking
15 him with something.
16 Q. Now, is that something that Mr. Garza told
17 you on the 27th of April?
18 A. Is the what?
19 Q. Is that something that Mr. Garza told you on
20 April the 27th?
21 A. No, I -- no, I don't think that was the
22 date.
23 Q. Now, I see that -- I see that your
24 signature -- the dates corresponding to your signature
25 is 4-27-2009, right?

Page 48

1  A. Yes.
2  Q. So I suppose that the corrective action
3  report reflecting the incident on April 24th of 2009
4  was actually given to Mr. Garza on the 27th of April
5  of 2009, right?
6  A. The form was filled out on the 24th, and he
7  was brought in and -- on the 27th.
8  Q. Fair enough. So as of the 27th of April of
9  2009, Mr. Garza you're saying had not yet complained
10 to you about Mr. Hunt poking him with something?
11 A. No, I'm not saying that.
12 Q. Well, I'm trying to figure out --
13 A. I don't know when he did. I don't recall
14 the date. I remember the incident.
15 Q. You recall the incident because you
16 witnessed it yourself?
17 A. No.
18 Q. Somebody told you about it?
19 A. There was a complaint. Now, whether Jose --
20 I don't even recall whether Jose -- I'm sure Jose
21 filed the complaint or reported the incident.
22 Q. Well, I'm trying to make sure I understand
23 what the testimony is and I apologize -- at least I am
24 confused. I asked you whether or not Mr. Garza
25 himself complained to you about Mr. Hunt. And you

Page 49

1  said that he did complain about Mr. Hunt poking him
2  with a stick.
3  A. Well, let me rephrase. Not a stick. I
4  remember him saying that he was poked in the buttocks
5  area.
6  Q. With what? With a hand, with a finger, with
7  a tool?
8  A. I don't recall and a little explanation I
9  guess --
10 Q. That's fine. Go ahead.
11 A. -- if I may. If Jose is working with
12 Mr. Hunt, when there's two different groups. So it's
13 an instance where they've been brought together to
14 work due to the workload for some reason, either to
15 expedite a delivery of a particular object or lack of
16 work in a different group. They normally didn't work
17 together but on the draw works, a draw works is some
18 10 or 12 foot wide 25 or 30 foot long and you could
19 have as many as six, eight guys or even ten possibly
20 working on this draw works if you're trying to
21 expedite delivery and you have pipe, you have pieces
22 and different things and tools, and it wouldn't be
23 uncommon for you to be bent over doing something, me
24 over here, me turn around and poke. So, you know, the
25 only deal is that there is an incident, I investigated

13 (Pages 46 to 49)

BOB MILLER
October 31, 2013                                Job No. 15254

### Page 50

1    the incident, and found that it was the fact that it
2    was poked. Now, I can't recall all the details; but I
3    do recall this incident.
4        Q.  And I appreciate the explanation and I think
5    it's going to take us in the right direction but I'm
6    trying to figure out: Did you first find out about
7    this incident from Mr. Garza himself.
8        A.  I would -- I'm only speculating; but I'm
9    sure that he is the individual, I would think, that
10   would report the incident.
11       Q.  To you?
12       A.  Yes.
13       Q.  Now, did he --
14       A.  He would either -- let me back up here
15   because the company, NOV, put in computers on the
16   floor and I don't recall exactly what year, whether
17   that was 2008 but I know it was not -- shortly before
18   I left. There was computers on the floor in the
19   building. They were accessible to anybody to go
20   online and file a complaint against anybody for
21   anything. And he could have used that form and I
22   could be taking actions based on this information
23   or -- I don't recall who informed me of the incident.
24       Q.  Fair enough.
25       A.  So there's multiple ways this could have

### Page 51

1    been brought to my attention.
2        Q.  Could have been conveyed to you. Fair
3    enough.
4        A.  Yes.
5        Q.  Then let me ask you the next follow-up
6    question: As of April 24th of 2009, had you already
7    been aware of this allegation from Mr. Garza?
8        A.  I would say yes.
9        Q.  As of April the 13th of 2009, have you
10   already been aware of that allegation?
11           MS. WHITE: Objection. Form.
12       A.  Of April the 13th? I don't know the
13   significance of that date.
14       Q.  (By Mr. Costea) You're saying that on April
15   the 13th Garza was alleged to have used racial
16   language.
17       A.  Oh, excuse me. I think I recall that it was
18   maybe at the same time that there were some words
19   exchanged between these two gentlemen that that might
20   be the incident for at the same time of the poking or
21   whatever that there was words exchanged.
22       Q.  I see. So your understanding is that when
23   Mr. Garza was poked Mr. Garza responded with racial
24   comments?
25       A.  Yes.

### Page 52

1           MS. WHITE: Objection. Form.
2        Q.  (By Mr. Costea) No problem. Now, if you
3    don't mind going back to -- grab Exhibit No. 1 and go
4    to page 330. Now, we are looking at the corrective
5    action report that you gave to Mr. Hunt on the month
6    before on March 24th. Now, was it the poking
7    incident -- and I'm not saying this to you to change
8    your testimony, I'm just trying to jog your memory.
9    Was it the poking incident that caused you to give
10   Mr. Hunt the corrective action report where you talk
11   about horseplay and inappropriate behavior?
12          MS. WHITE: Objection. Form.
13       A.  No. I don't recall.
14       Q.  (By Mr. Costea) It was something
15   different.
16       A.  I just don't recall what this incident was.
17       Q.  No problem. So after the -- I'm going to
18   refer to this as the poking incident that you
19   described to me. So after the poking incident was
20   brought up to your attention, I think you said that
21   you investigated it?
22       A.  Yes.
23       Q.  And was it substantiated?
24       A.  I would say, yes, that to explain it could
25   be any -- any of the people working on the draw

### Page 53

1    works. In our investigation we would look for
2    witness, people to witness and/or even the individual
3    himself but I don't recall the details now.
4        Q.  And upon the incident being substantiated,
5    did you recommend that Mr. Hunt be disciplined,
6    reprimanded?
7        A.  I don't recall.
8        Q.  Now, was your investigation completed by
9    April 24th, 2009?
10       A.  Yes.
11       Q.  Whom did you speak with to investigate the
12   poking incident?
13       A.  I don't recall. It's strictly speculation,
14   but the first action would be the group leader to see
15   if they were aware of the incident and any individuals
16   that might have been working in the area.
17       Q.  And who was the group leader?
18       A.  William Goff was the group leader over the
19   draw works.
20       Q.  Is the name Rudy Lopez familiar to you?
21       A.  Rudy Lopez, yes, I recall the name.
22       Q.  Do you recall what his job position was in
23   2009?
24       A.  I'm trying to recall. I'm trying to
25   visualize the guy. Whether Rudy is in the draw works,

14 (Pages 50 to 53)

Electronically signed by Lana Sholders (101-225-766-0482)                                    ec3a642c-01f7-450e-b0bd-fa15c5e264d3

Page 54

1  I don't recall. I don't recall where he was. I
2  visually don't see the gentleman. The name I know.
3     Q. As of -- going back to exhibit -- page 2 of
4  Exhibit No. 3, I think it's that one that you have in
5  front of you. As of April 27 --
6     A. Which page?
7     Q. Page 2.
8     A. 146?
9     Q. Yes, sir. As of April 27, 2009, have you
10 informed Mr. Butler about the complaint from
11 Mr. Garza -- well, about the poking incident?
12    A. I would say that I had spoken to Mr. Butler
13 prior to the 27th or of the 27th of the -- and it
14 could have even -- I'm speculating now. I don't
15 recall whether he was -- I would have probably used
16 his expertise in the investigation, but I can't recall
17 it.
18    Q. That's fine. It's probably best not to
19 speculate if you don't know.
20    A. I just don't know.
21    Q. No problem. Now --
22    A. I know that I talked to Bill and brought him
23 in to witness this. Now, whether that was on the 27th
24 or whether it was the day before but I know that at
25 some point I told Bill of what we had, gave him the

Page 55

1  facts, and anything -- when I look and see this form
2  as being a termination form, that's pretty extreme and
3  I would have had Bill for counseling and all before I
4  did anything. So there was discussion between he and
5  I.
6     Q. Now, did you speak with Mr. Hunt himself
7  about the poking incident?
8     A. Yes.
9     Q. Did he acknowledge, did he admit?
10    A. I don't recall.
11    Q. You don't recall anything he said in
12 response?
13    A. No. I'm sorry.
14    Q. Going on to the next page of that same
15 document of that same exhibit, we have another
16 corrective action notice that was given to Mr. Garza,
17 this one on May the 1st of 2009, right?
18    A. Yes.
19    Q. And this document reflects a date of
20 incident of May the 1st of 2009, right?
21    A. Yes.
22    Q. And then the type of warning or action taken
23 against Mr. Garza was a suspension/final warning,
24 right?
25        MS. WHITE: Objection. Form.

Page 56

1     Q. (By Mr. Costea) Do you see that box being
2  checked?
3     A. Let me read the document here a minute.
4     Q. Absolutely. Go ahead, please.
5     A. After reading this, I recall several of
6  these incidents.
7     Q. Did you --
8     A. I forget your question.
9     Q. I'm sorry, sir?
10    A. What was your question?
11    Q. Yes, sir. Let me see if I can put this in
12 context. The corrective action report which appears
13 in Exhibit No. 3 and it's Bates stamped 147 at the
14 bottom of the page, did you fill out this form
15 yourself?
16    A. I don't recall whether I filled this one out
17 or whether it was filled out by somebody else.
18    Q. Now, look at the witness signature at the
19 bottom of that page. It says Meredith Black, right?
20    A. Yes.
21    Q. Is that person familiar to you, known to
22 you?
23    A. Yes.
24    Q. Was she employed with NOV back in May of
25 2009?

Page 57

1     A. Yes.
2     Q. What was her job?
3     A. She was HR with corporate.
4     Q. Meaning she was not HR at FM 529?
5     A. Correct.
6     Q. And I suppose that she was present when
7  you -- when this corrective action report was given to
8  Mr. Garza, correct?
9     A. Yes.
10    Q. Do you know why she was physically present
11 at the 529 location when this document was given to
12 Mr. Garza?
13    A. The severity of the corrective action I
14 would have involved all the expertise I could get.
15    Q. Did you suggest that Mr. Garza be suspended?
16    A. I don't recall that I did.
17    Q. And so you cannot tell me whether or not
18 somebody else came up with the suggestion that he be
19 suspended, right?
20    A. I cannot.
21    Q. In the body of the corrective action report
22 under "Description of incident," there's an allegation
23 that "After further investigation, your allegation of
24 sexual assault has not been substantiated." Now, that
25 portion of that document, did you write those

BOB MILLER
October 31, 2013                                Job No. 15254

Page 58

1  sentences or somebody else wrote the sentences?
2      A.  I don't recall.
3      Q.  Now, when Mr. Garza was brought in to be
4  given this corrective action document, other than
5  yourself and Ms. Black and Mr. Garza, was anybody else
6  present?
7      A.  I don't recall.
8      Q.  And according to this document, Mr. Garza
9  refused to sign it, right?
10     A.  Yes.
11     Q.  Did you tell Ms. Black that you investigated
12 the poking incident and it was substantiated?
13         MS. WHITE:  Objection.  Form.
14     A.  I don't recall that I told her that.  I
15 don't recall.
16     Q.  (By Mr. Costea)  Now, the first sentence
17 under "Description of incident" talks about an
18 allegation of sexual assault, right?
19     A.  Yes.
20     Q.  Do you know whether or not this is different
21 from the poking incident that you and I talked about
22 earlier today or is it the same thing?
23     A.  I only recall one incident.
24     Q.  The poking?
25     A.  Poking.

Page 59

1      Q.  Because of the way this document is phrased,
2  I apologize but I have to ask you follow-up
3  questions.  Did Mr. Garza other than the poking
4  incident complain to you about Mr. Hunt quote
5  "sexually assaulting him"?
6      A.  I want to think there was some words, but I
7  don't recall.  It wasn't just a poke.  I think there
8  was some words, but I don't recall.
9      Q.  Now, did you yourself create any memos, any
10 documents concerning your investigation and what you
11 were told about the poking incident like?
12     A.  I would think that I had some form of
13 written -- of my documents to support this action but
14 I don't recall that I do.  I just think that I would
15 have done so.
16     Q.  Like a memo, a report of investigation?
17     A.  Yeah, investigation, individuals, and things
18 of that nature.  I mean, I had my personal files that
19 I kept that was not always necessarily for everybody
20 else.
21     Q.  What do you mean personal files?  On
22 workers?
23     A.  Yeah.  It's just like if I -- when I wanted
24 to refer to give somebody an increase, I might put
25 things in the note at times and things that people do

Page 60

1  but I don't -- there's certain requirements that are
2  corporate and then I had some things that I would
3  keep.  You know, if I talked to you today about some
4  of your actions, I might write a note, drop it in your
5  file so that when it comes up again, you know, I've
6  talked to you before about this.  It's got to stop and
7  then that may become a written deal.
8      Q.  Fair enough.
9      A.  I mean, it was a tool.  It was designed to
10 help the individuals.
11     Q.  Sure.  And where did you keep those
12 folders?  In your office?
13     A.  Yes.
14     Q.  And you left them behind when you left?
15     A.  Yes.
16     Q.  Can you give us some details about the
17 folders like, I don't know, like a file cabinet?
18     A.  It would have been in a file cabinet,
19 employees' names, and the folders and I can tell you
20 that I did tell Jack that "Here's the personnel
21 files.  You can do with them as you please.  They're
22 my files."
23     Q.  You said Jack Landis?
24     A.  Yes.
25     Q.  So when you left and he took over, you

Page 61

1  showed him where you kept these folders that you kept
2  on employees?
3      A.  Yes.
4      Q.  And said "Here they are"?
5      A.  I did not destroy them.
6      Q.  What did Mr. Landis say in response?
7      A.  I don't recall his comments.
8      Q.  Do you have a distant recollection that you
9  created or kept a folder on Mr. Garza?
10     A.  I had a folder on all employees.
11     Q.  On all of them?
12     A.  Yes.
13     Q.  And we appreciate your testimony.  You're
14 trying to lay hands on just about everything that was
15 created during this period of time about incidents, so
16 on and so forth.  So we appreciate that.
17         There's an allegation on the same page
18 the last sentence says that "Kicking chairs in the
19 lunchroom, further acts of aggression, or any other
20 inappropriate acts or comments made in jest will lead
21 to your immediate termination."  Did anyone bring up
22 to your attention the fact that Mr. Garza was alleged
23 to have kicked chairs in the lunchroom?
24     A.  Yes.
25     Q.  Did you actually see him kick chairs in the

16 (Pages 58 to 61)

BOB MILLER
October 31, 2013                                    Job No. 15254

Page 62

1  lunchroom?
2      A.  I did not see.
3      Q.  How large was the lunchroom?
4      A.  Had multiple lunch rooms.  As best I recall,
5  this was a small room that was approximately two
6  thirds the width of this office here maybe that he
7  would take his lunch break.
8      Q.  With other coworkers?
9      A.  With other workers.
10     Q.  The same sentence talks about acts of
11 aggression.  Are you aware of any acts of aggression
12 by Mr. Garza?
13     A.  Yes.
14     Q.  Go ahead.
15     A.  What I term aggression was that it wasn't
16 uncommon for him to make comments to individuals
17 about, you know, "I can get you fired or this or that
18 if you don't leave me alone or give me the tool" or,
19 you know, just whatever the case was he would often
20 make comments to people.
21     Q.  Yeah, off the wall comments I understand but
22 I'm talking about acts of aggression meaning
23 physically aggressive or threatening somebody with, I
24 don't know, a tool, a knife, a stick.
25         MS. WHITE:  Objection.  Form.

Page 63

1      Q.  (By Mr. Costea)  That's what I'm looking
2  for.
3      A.  I don't know that I can recall anyone
4  telling me that he's picked up a tool or anything that
5  you're asking about.
6      Q.  And do you know whether or not when he would
7  tell employees "I'm going to get you fired" whether or
8  not he made that comment, you know, jokingly?
9      A.  I know he made the comment, and I don't
10 think he was joking because he was known to stop
11 Richard almost any time he came through the plant and
12 like he was to represent that he was buddy buddy.
13     Q.  Like Richard Urquhart?
14     A.  Yes.
15     Q.  Did Mr. Garza convey to you that other
16 employees were doing the same thing to him like
17 telling him "Hey, I'm going to get you fired" or that
18 "Hey, I'm going to get you fired" was a common
19 comment that employees made in the work place?
20     A.  No.  The only ones that I can recall that it
21 came from him that he was the one that utilized that
22 statement.
23     Q.  Was he --
24     A.  That I'm aware of.
25     Q.  Was he and Mr. Urquhart, were they friends?

Page 64

1      A.  I wouldn't say friends.  I think Richard
2  respected him as an employee and if he was walking
3  through the shop and somebody wanted to talk about the
4  projects or something, he would stop.  Richard was a
5  hands on type individual with what was going on on the
6  production floor and it wasn't uncommon for him to
7  walk over to an individual and say "How is your
8  project going?  You've got any problems or anything
9  else?"  He's just doing diligence.
10     Q.  How do you know that Mr. Urquhart respected
11 Mr. Garza?
12     A.  How do I know that he respected --
13     Q.  Respected Mr. Garza?
14     A.  When you say that, I guess only thing I'm
15 thinking is he respected him as an employee doing his
16 job but I had conversation with Richard myself about
17 these comments that he was using him as a threat to
18 individuals and Richard told me that he would go talk
19 to him himself.
20     Q.  Now, Mr. Urquhart I understand was replaced
21 by -- no, I'm sorry, Mr. Urquhart was still there when
22 you left in the summer or May of 2009, right?
23     A.  Yes, he was there; but he was due to leave
24 shortly.
25     Q.  Same deal, retirement?

Page 65

1      A.  No.  I don't -- I don't know.  I don't know
2  his deal.
3      Q.  No problem.  I think that's all I have about
4  that document.
5          (Exhibit No. 4 marked.)
6      Q.  (By Mr. Costea)  We are looking at a
7  document -- Exhibit No. 4, a document which by looking
8  at it it seems it's a performance evaluation on
9  Mr. Garza with a date of July 28th of 2005, right?
10     A.  Yes.
11     Q.  And the evaluator that's identified in this
12 document is Bill Butler, right?
13     A.  Yes.
14     Q.  Now, I see that -- well, strike that.
15         Do you recall this form being in use to
16 review performance evaluations at NOV back in 2005?
17     A.  I don't recall this form.
18     Q.  You don't.  Okay.  Did you do evaluations on
19 your employees, performance evaluations?
20     A.  Yes.
21     Q.  And you don't recall having seen a form such
22 as this one?
23     A.  This -- no, I don't recall seeing this one
24 for the form that I filled out.  I don't recall, but I
25 don't remember.

17 (Pages 62 to 65)

BOB MILLER
October 31, 2013
Job No. 15254

Page 66

1    Q. No problem.
2    A. I don't know that I didn't.
3        (Exhibit No. 5 marked.)
4    Q. (By Mr. Costea) We are looking at another
5  performance evaluation on Mr. --
6    A. Now I see the top of it. I can't say I've
7  seen the form, but I know what it is now.
8    Q. Tell me, please.
9    A. Mr. Butler conducted forklift training
10 classes and evaluated the people in order to give them
11 a license to operate the forklifts.
12   Q. Oh, I see.
13   A. I never did qualify as a forklift.
14   Q. It's not a performance evaluation?
15   A. No. It's for a license to operate the
16 forklift.
17   Q. Thank you very much for pointing that out to
18 me. I will pass that -- I mean I will put that to the
19 side.
20       (Exhibit No. 6 marked.)
21   Q. (By Mr. Costea) We are now looking at
22 Exhibit No. 6, and it seems to me that Exhibit No. 6
23 is a performance evaluation. Am I right or wrong
24 about that?
25   A. It's a performance evaluation.

Page 67

1    Q. Does this document help you remember whether
2  or not you did it?
3    A. To remember whether I did this one?
4    Q. Yes.
5    A. I don't recall that I did because group
6  leaders were required to fill out for their
7  individuals -- for their employees.
8    Q. On page 1 do you recognize the handwriting
9  at the top where it says "Department draw works
10 assembly cell"?
11   A. Do I recognize who wrote it?
12   Q. The handwriting.
13   A. I don't recognize the handwriting.
14   Q. What about the name Jose Garza, that's not
15 your handwriting either?
16   A. No, not mine.
17   Q. Do you recall having done any performance
18 evaluations on Mr. Garza?
19   A. I don't recall whether I did. I think this
20 form was implemented toward the end of my employment
21 and prior to that as you saw earlier the notes, emails
22 that I would do was the form of evaluations and
23 progressive deals. I don't recall exactly how long
24 this form was used but each supervisor -- when I say
25 supervisor, group leaders were to evaluate their

Page 68

1  individuals because they knew best how they performed.
2    Q. Okay.
3        (Exhibit No. 7 marked.)
4    Q. (By Mr. Costea) Mr. Miller, I have a copy
5  of your business card in Exhibit No. 7 given to me by
6  defense counsel and you're identified in that business
7  card as manufacturing manager, right?
8    A. Yes.
9    Q. Was that your official job title? Is there
10 a difference between --
11   A. Well, let me explain.
12   Q. Yes. Go ahead.
13   A. I believe corporate carried it as a
14 production manager. I worked at multiple plants and
15 the cards in those facilities, it was considered
16 manufacturing manager, different ones and I think this
17 is a card but I want to believe that their records may
18 reflect production manager but I don't know exactly
19 what was in their files.
20       (Exhibit No. 8 marked.)
21   Q. (By Mr. Costea) We are looking at Exhibit
22 No. 8. It's a safety meeting and training report, the
23 first page February 12, 2008. This document is signed
24 by a Brenda Waters. Is that name familiar to you?
25   A. Yes.

Page 69

1    Q. Do you recall what her job position was with
2  NOV back in February of 2007?
3    A. She was assistant to Mr. Butler.
4    Q. Next page, please. We have a training
5  report of August 20th, 2007 on work place violence.
6  The trainer's name is identified as Joel Cantu. Is
7  that name familiar to you?
8    A. Yes. Joe came in after Brenda as one of
9  Mr. Butler's assistants.
10   Q. Mr. Miller, that's all I have. I'm done
11 with my documents. I don't think I have anymore
12 questions for you. I want to thank you very much for
13 being here today unless she's got questions for you.
14       MS. WHITE: I don't have any
15 questions. Defense doesn't have any questions at this
16 time.
17       MR. COSTEA: Mr. Miller, again, thank
18 you. Pass the witness.
19       THE WITNESS: Glad to assist.
20       (Deposition concluded at 11:40 a.m.)
21
22
23
24
25

18 (Pages 66 to 69)

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)

ec3a642c-01f7-450e-b0bd-fa15c5e264d3

BOB MILLER
October 31, 2013
Job No. 15254

### Page 70

```
 1    WITNESS' CHANGE/CORRECTION PAGE
 2       DEPOSITION OF BOB MILLER
 3         TAKEN OCTOBER 31, 2013
 4    PAGE/LINE  CHANGE          REASON
```

### Page 71

```
 1       WITNESS' SIGNATURE PAGE
 2       DEPOSITION OF BOB MILLER
 3         TAKEN OCTOBER 31, 2013
 4
 5    I, BOB MILLER, have read the foregoing deposition
 6    and hereby affix my signature that same is true and
 7    correct, except as noted above.
 8
 9              _____
              BOB MILLER
10    THE STATE OF _____)
11    COUNTY OF _____)
12
13    Before me,_____, on this day personally
14    appeared BOB MILLER, known to me (or proved to me
15    under oath or through _____) (description of
16    identity card or other document) to be the person
17    whose name is subscribed to the foregoing instrument
18    and acknowledged to me that they executed the same for
19    purposes and consideration therein expressed.
20
21    Given under my hand and seal of office on this _____
22    day of _____, _____.
23
24          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
25
```

### Page 72

```
 1    COUNTY OF HARRIS  )
 2    STATE OF TEXAS    )
 3         REPORTER'S CERTIFICATE
 4    I, LANA SHOLDERS, Certified Shorthand Reporter in and
 5    for the state of Texas, hereby certify that this
 6    transcript is a true record of the testimony given by
 7    the witness named herein, after said witness was duly
 8    sworn by me.
 9
10    I further certify that I am neither attorney nor
11    counsel for, related to, nor employed by any of the
12    parties to the action in which this testimony was
13    taken. Further, I am not a relative or employee of
14    any attorney of record in this cause, nor do I have a
15    financial interest in the action.
16
17    Certified to by me this the 15th day of November,
18    2013.
19
20        Lana Sholders
21    LANA SHOLDERS, Texas C___
      Expiration Date: 12-31-14
22    Firm Registration # 530
      FOX Reporting
23    4550 Post Oak Place, Suite 201
      Houston, Texas 77027
24    Phone 713.622.1580
      Fax 281.768.5540
25    www.fox-reporting.com
```

19 (Pages 70 to 72)

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                    ec3a642c-01f7-450e-b0bd-fa15c5e264d3