BILL BUTLER
October 8, 2013                         Job No. 15141

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA              )
                           )
VS.                        ) C.A: H-4:12-CV-03532
                           ) JURY
NATIONAL OILWELL VARCO,)
LP                         )

*********************************************

ORAL DEPOSITION OF

BILL BUTLER

OCTOBER 8, 2013

VOLUME 1

*********************************************

ORAL DEPOSITION of BILL BUTLER, produced as a witness
at the instance of the Plaintiff, and duly sworn, was
taken in the above-styled and numbered cause on the
8th day of October, 2013, from 12:50 p.m. to 2:47
p.m., before Lana Sholders, CSR in and for the State
of Texas, reported/recorded by machine shorthand, at
the offices of Ogletree, Deakins, Nash, Smoak &
Stewart, P.C., 400 Dallas, Suite 3000, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure.



X REPORTING
3) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                     Job No. 15141

---

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:
MR. PETER COSTEA
Attorney at Law
Three Riverway, Suite 1800
Houston, Texas 77056
Phone 713.337.4304
Fax 713.659.5302
Email costealaw@yahoo.com

FOR THE DEFENDANT:
MS. CHRISTINE M. WHITE
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
701 Poydras Street, Suite 3500
New Orleans, Louisiana 70139
Phone 504.648.3840
Fax 504.648.3859
Email christine.white@ogletreedeakins.com

---

**Page 3**

INDEX

1
2  Appearances.................................  2
3  BILL BUTLER:
4     Examination by Mr. Costea.................  4
5  Signature and Changes.........................  91-92
6  Reporter's Certificate Page....................  93
7
8              EXHIBITS
9
10  NO.    DESCRIPTION            PAGE
11   1   Copy of Business Cards          4
12   2   Statements                     29
13   3   Affidavit of Facts             45
14   4   Employee Warning Notice/Application
         for Employment                 87

---

**Page 4**

1              BILL BUTLER,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. BUTLER:
5     Q. Please state your full name.
6     A. Billy Joe Butler.
7        (Exhibit No. 1 marked.)
8     Q. (By Mr. Costea)  Mr. Butler, I'm showing to
9  you a document that's been marked as Exhibit No. 1;
10 and it is a photo copy of two business cards.  One is
11 a business card for Bill Butler.  The other one is for
12 Bob Miller and the top business -- well, do you
13 remember -- I mean, the top business card, that's a
14 copy of a business card that at some point you had
15 during your employment with National Oilwell Varco?
16    A. Yes.
17    Q. And your job is identified in that business
18 card as being a human resources manager, right?
19    A. Correct.
20    Q. And the location listed on your business
21 card is 11919 FM 529, right?
22    A. Correct.
23    Q. And right beneath your job title, it states
24 "Rig Solutions," right?
25    A. Yes.

---

**Page 5**

1     Q. What's the relevance of Rig Solutions?
2     A. It's one of the divisions of National
3  Oilwell.
4     Q. So according to this business card, it seems
5  that you've been employed by National Oilwell Varco at
6  some point as human resources manager.  When was that?
7     A. I'm not certain when I became the HR
8  manager.
9     Q. How long were you an HR manager?
10    A. For National Oilwell Varco?
11    Q. Yes, sir.
12    A. I believe it was December of 2006 until
13 January of 2011.
14    Q. What was your job with NOV after January,
15 2011?
16    A. After?
17    Q. Yes.
18    A. I'm a human -- I'm a health and safety
19 specialist.  Health, safety and environmental
20 specialist.
21    Q. Was that a promotion over your HR manager
22 prior position?
23    A. Pardon me?
24    Q. Was that a promotion over your HR manager
25 position?

2 (Pages 2 to 5)

BILL BUTLER
October 8, 2013                    Job No. 15141

---

Page 6

1      A.  No.
2      Q.  Just a totally different position?
3      A.  Yes.
4      Q.  Following January of 2011, where did you
5  work out of?  What location?  What address?
6      A.  After January of 2011?
7      Q.  Yes, sir.
8      A.  I worked at 12950 West Littleyork.
9      Q.  Do you still work there?
10     A.  Yes, I do.
11     Q.  Same position?
12     A.  Health and safety environmental specialist,
13  yes.
14     Q.  Great.  What was your job with NOV before
15  December of 2006?
16     A.  I was the health and safety manager.
17     Q.  At what plant?  What location?
18     A.  The 11919 FM 529.
19     Q.  How long have you worked for NOV in all?
20     A.  I started September the 17th, 2001.
21     Q.  And you've been continuously employed by NOV
22  until today?
23     A.  Yes.
24     Q.  And what was the name of the company in
25  September of 2001?

---

Page 7

1      A.  It was National Oilwell, Incorporated, I
2  believe.
3      Q.  And when you started out with National
4  Oilwell, Inc., what was your job, job title?  Were you
5  in HR?
6      A.  I was the health and safety environmental
7  manager when I started.
8      Q.  So between 2001 and now, for about how many
9  years were you working in HR?
10     A.  Before 2001?
11     Q.  Between 2001 and today, for how many years
12  have you worked in HR?
13     A.  From December of '06 to January of 2011.
14     Q.  Fair enough.  Thank you.  What is the year
15  of your birth, sir?
16     A.  December 10th, 1949.
17     Q.  Do you have formal training in HR matters
18  like taking college courses, maybe a college degree in
19  HR, anything like that?
20     A.  Yes, I did.
21     Q.  Go ahead.  Tell me what you have, please.
22     A.  I was the journeyman -- let me see.
23  Journeyman career counselor through the Department of
24  Labor.  I got that in -- I'm not sure which year.  I
25  was a military recruiter from 1985 to 1996.  And then

---

Page 8

1  in '97 I went to work for a roadway construction
2  company as a -- the title was hiring
3  coordinator/safety coordinator.
4      Q.  What company was that?
5      A.  J.D. Abrams, A-b-r-a-m-s.
6      Q.  So you have worked for the federal
7  government at some point in the past?
8      A.  I'm retired military, yes.
9      Q.  So from December, 2006 all the way to
10  January of 2011, you worked at the FM 529 location?
11     A.  Correct.
12     Q.  You know Mr. Garza, correct?
13     A.  Yes.
14     Q.  Tell me about the HR office at FM 529.  On
15  average how many employees did you have in that
16  office?
17         MS. WHITE:  Objection.  Form.
18     Q.  (By Mr. Costea)  How many employees worked
19  in human resources?
20     A.  There was myself and an assistant.
21     Q.  Okay.
22     A.  At the time.
23     Q.  Right.  What was his name or her name?
24     A.  My assistant's name?
25     Q.  Yes.

---

Page 9

1      A.  I had several.
2      Q.  In 2000 -- let's say 2006, who was your
3  assistant?
4      A.  A lady named Brenda Waters.
5      Q.  Is Brenda still employed with NOV?
6      A.  No.
7      Q.  In 2007 do you remember the name of the
8  assistant?
9      A.  I do not.
10     Q.  What about 2008?
11     A.  I'm not sure of the years.  I remember some
12  of the names.  I'm not sure of the dates.
13     Q.  If you cannot coordinate the names and the
14  years, that's fine.  Give me the names then that you
15  recall.
16     A.  I had a lady by the name of Lisa Hubbard.
17     Q.  Okay.
18     A.  And then she was moved to a different
19  department; and I hired a lady named Sabrina Carr,
20  C-a-r-r c.
21     Q.  In January, 2011 when you left your position
22  as HR manager, who replaced you in that position?
23     A.  I'm not sure of the name.
24     Q.  Let me show you some paperwork here.  Go
25  ahead.

---

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                    Job No. 15141

Page 14

1    NOV have an employee handbook?
2        A.  They did not.
3        Q.  You know what an employee handbook is,
4    right?
5        A.  Yes.
6        Q.  Like a booklet which contains the written
7    rules and policies of the employer, tardiness, you
8    know, disciplinary actions, harassment, reporting it,
9    and so on and so forth?
10       A.  Yes.
11       Q.  Now what you have in front of you is -- like
12   we already established is NOV's Nondiscrimination
13   Anti-Harassment Policy and you will see that it has an
14   effective date of 2-12 of 1998?  Right at the top.
15       A.  2-12-88?
16       Q.  Yes.  Mr. Butler, do you see that date?
17       A.  Yes.
18       Q.  Effective date 2-12-1988.  And then it has a
19   revision date of 4-20-1998, right?
20       A.  Yes.
21       Q.  Do you know whether or not the sexual
22   harassment policy -- well, strike that.
23               This Nondiscrimination and
24   Anti-Harassment Policy was updated since April 20th of
25   1999.

Page 15

1               MS. WHITE:  Objection.  Form.
2        A.  I do not know.
3        Q.  (By Mr. Costea)  In the sexual harassment
4    training that you provided to employees at FM 529, did
5    you indicate to them that same sex harassment was
6    against the law?
7        A.  Yes.
8        Q.  And the video materials that were shown to
9    the employees, did they contain that admonishment that
10   same sex harassment is against the law?
11       A.  Yes.
12       Q.  Forbidden?  The policy that you have right
13   there in front of you, Exhibit No. 6, Landis Exhibit
14   No. 6, have you seen this document before?  And it
15   might be useful for you to go through every page of
16   the document.  The exhibit has about four pages.
17       A.  Yes.
18       Q.  You have seen it before, right?
19       A.  Yes.
20       Q.  Did Exhibit 6, either the entire exhibit or
21   parts of it, was any of this material given to
22   employees in the sexual harassment training that you
23   provided?
24       A.  I believe it was.
25       Q.  Between 2006 and 2011, did NOV have like a

Page 16

1    hot line where employees could call in and lodge
2    complaints?
3        A.  Yes.
4        Q.  How do you call that hot line?  Ethics line
5    or what --
6        A.  I believe it was the ethics.
7        Q.  And how are the employees advised of the
8    existence of this ethics hot line?
9        A.  It was on posters.
10       Q.  And where would the posters be placed?
11       A.  There were several.  There was one in the
12   break room.  There was one outside of the HR office.
13   There was one in every break room.  There was one
14   outside the HR office, and then they were given a copy
15   on the date of hire.
16       Q.  Were there also sexual harassment posters in
17   the break room and different places around the plant?
18       A.  There was a poster in reference to sexual
19   harassment and work place violence.
20       Q.  Where was that poster placed?
21       A.  Same thing.  I had a bulletin board outside
22   our HR office and in the break rooms.
23       Q.  Was that poster still in place as of
24   January, 2011 when you left --
25       A.  Yes.

Page 17

1        Q.  -- the plant?
2        A.  Yes.  I actually left October of 2010.  I
3    went on a leave of absence.
4        Q.  Thank you.
5        A.  My position I was transferred January 4th,
6    2011.
7        Q.  Thank you for letting me know.  So
8    physically speaking from October, 2010 to January,
9    2011, you were no longer at the FM 529 plant?
10       A.  In an official capacity, no.
11       Q.  Right.
12       A.  I was still assigned the position, still on
13   the payroll filling that position.  Nobody took my
14   spot.  What happened is I broke both feet October of
15   2010.  So I had both feet in casts.
16       Q.  Sorry to hear that.
17       A.  Me too.
18       Q.  Well, I hope you are doing okay now.
19       A.  Yes.
20       Q.  I tell you what, let's go ahead and look at
21   Document 1 now.  You have in front of you Exhibit No.
22   1, and do you remember having seen page 1 and page 2
23   of that exhibit?
24       A.  You mean this is page 2?
25       Q.  Yeah.  The entire document that you have in

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)

6a955d7e-eb27-4a49-8626-a9d0a95b34f5

**Page 18**

1 front of you is known as an exhibit.
2    A.  Okay.
3    Q.  And the exhibit has two pages.  So I'm
4 asking you:  Do you recall having seen either page 1
5 or page 2 of this exhibit before today?
6    A.  Yes.  I received it.
7    Q.  The first page of this exhibit is
8 notification from the Equal Employment Opportunity
9 Commission to Bill Butler HR manager at NOV FM 529
10 location advising you that Mr. Garza had filed a
11 charge of discrimination, correct?
12    A.  Yes.
13    Q.  And I would imagine that charges of
14 discrimination coming from the EEOC are fairly
15 familiar to you?
16    MS. WHITE:  Objection.  Form.
17    Q.  (By Mr. Costea) I mean you've seen them
18 before, right?  This is not the first one you've ever
19 seen?
20    A.  This is the first one I've ever seen with
21 National Oilwell Varco.
22    Q.  Fair enough.  The first one and the only
23 one?
24    A.  Yes.
25    Q.  So once you received the notification from

**Page 19**

1 the EEOC that Mr. Garza had filed a complaint of
2 discrimination, did you actually read the document?
3    A.  Yes.
4    Q.  And you see that the EEOC indicates on page
5 1 of Exhibit No. 1 in box No. 3, it asks the company
6 to provide a statement to respond to the charge by
7 June the 8th of 2009, right?
8    A.  Correct.
9    Q.  Was a response filed, to your knowledge?
10    A.  I believe there was.
11    Q.  And when you got to -- when you received
12 this charge from the EEOC, what was the first thing
13 that you did?
14    A.  I called the HR director for Rig Solutions.
15    Q.  And who was that person?
16    A.  Jeff Dodd.
17    Q.  And what did you tell him?
18    A.  This I had received this, and I don't
19 remember if I faxed or emailed it to him.  I sent him
20 a copy of this.
21    Q.  Did you tell him about anything about the
22 charge or about Mr. Garza?
23    A.  No.
24    Q.  So you sent it on to him, right?
25    A.  Yes.

**Page 20**

1    Q.  Did you have any involvement whatsoever in
2 responding to the charge?
3    A.  No.
4    Q.  Like providing statements, affidavits,
5 anything along those lines?
6    A.  Not to my -- that I remember, no.
7    Q.  Let's look at page 2 of Exhibit No. -- of --
8 yes, of Landis Exhibit No. 1.  Do you recall having
9 received the charge of discrimination, Mr. Garza's
10 charge of discrimination as well?
11    A.  Do I -- do you mean if I remember receiving
12 this?
13    Q.  Yes.
14    A.  Yes.
15    Q.  Did you tell anyone at the plant at 529 that
16 Mr. Garza had filed a charge of discrimination?
17    A.  I do not remember.
18    Q.  And I apologize for being so tedious, but I
19 need to ask you in greater detail.  Did you tell
20 Mr. Miller that Mr. Garza had filed a charge of
21 discrimination?
22    A.  I do not remember.
23    Q.  Did you tell Mr. Landis?
24    A.  Mr. Landis was not there.
25    Q.  I understand.  At some point Mr. Landis came

**Page 21**

1 on board?
2    A.  Yes.
3    Q.  Did you tell him ever?
4    A.  I do not remember.
5    Q.  What about Mr. Warren?
6    A.  I do not remember.
7    Q.  What about Mr. Rudy Lopez?
8    A.  I do not remember.
9    Q.  Let me ask you a broader question.  Other
10 than Mr. Dodd you said, right?
11    A.  Yes.
12    Q.  Did you tell anyone at NOV that Mr. Garza
13 had filed a charge of discrimination?
14    A.  I believe I also had spoke to
15 Mr. Lon Allchin.
16    Q.  To who?
17    A.  Lon, L-o-n.  Last name is Allchin,
18 A-l-l-c-h-i-n.
19    Q.  A-l?
20    A.  A-l-l-c-h-i-n.
21    Q.  C-h-i-n.
22    A.  Yeah, one word.
23    Q.  Allchin?
24    A.  Allchin.
25    Q.  Was he an employee of NOV?

6 (Pages 18 to 21)

BILL BUTLER
October 8, 2013                                        Job No. 15141

## Page 22

1    A.  Yes.
2    Q.  In what position?
3    A.  He was HR at the corporate office. He
4  worked directly for Mr. Dodd. He was like Mr. Dodd's
5  second hand or second in command for Mr. Dodd.
6    Q.  Did you tell your assistant that Mr. Garza
7  had filed this charge of discrimination?
8    A.  I do not remember.
9    Q.  One name that comes up in the charge of
10  discrimination is a Mr. Richard Urquhart. Do you see
11  his name in the second paragraph kind of like in the
12  middle of the paragraph?
13    A.  Yes.
14    Q.  Did you tell Mr. Urquhart that Mr. Garza had
15  filed a charge of discrimination?
16    A.  I do not remember.
17    Q.  Did you read the charge of discrimination
18  when you received it?
19    A.  Yes.
20    Q.  And did the facts identified in the charge
21  of discrimination ring a bell for you in May of 2009?
22    MS. WHITE: Objection. Form.
23    Q.  (By Mr. Costea) In other words, did they
24  sound familiar? Did you know about any of these facts
25  before you actually received this charge?

## Page 23

1    MS. WHITE: Objection. Form.
2    A.  Yes.
3    Q.  (By Mr. Costea) What facts in this EEOC
4  charge of discrimination were you aware of before you
5  actually received this charge of discrimination from
6  the EEOC?
7    A.  I was aware that a coworker had made a
8  complaint about Mr. Garza using racial words towards
9  him, and I was also aware when we asked Mr. Garza
10  about that is when he mentioned about the sexual
11  assault.
12    Q.  By whom?
13    A.  Not sexual harassment but he said he was
14  sexually assaulted.
15    Q.  By whom?
16    A.  A coworker, the one that had made the
17  original complaint on the using the derogatory terms,
18  racial terms towards him.
19    Q.  Do you remember that person's name?
20    A.  I believe it was a Mr. Hunt.
21    Q.  Steve Hunt?
22    A.  I think his first name was Steve.
23    Q.  Have you ever met Mr. Hunt?
24    A.  Well, I knew who Mr. Hunt was. I knew most
25  of the employees there.

## Page 24

1    Q.  Have you yourself directly spoken with
2  Mr. Hunt about Mr. Garza?
3    A.  The day that Mr. Hunt made the complaint,
4  yes.
5    Q.  What about Mr. Garza, did you speak with
6  Mr. Garza about this charge of discrimination that you
7  have in front of you?
8    A.  Later I was -- I became aware of it. I
9  didn't speak to Mr. Garza at that time. Mr. Miller
10  did.
11    Q.  Well, let me rephrase my question: Did you
12  speak with Mr. Garza about the charge of
13  discrimination that you have in front of you?
14    A.  He asked me if I -- he came into my office
15  and asked if I had received it several days after I
16  received it.
17    Q.  So Mr. Garza came to you several days after
18  you got it?
19    A.  After I got this discrimination letter, yes.
20    Q.  Did you get the charge? I mean, did you get
21  the complaint?
22    A.  Yeah. He asked me if I received it.
23    Q.  What did you tell him?
24    A.  I said, yes, I did.
25    Q.  Now, when you received this charge of

## Page 25

1  discrimination, did you put a "received" stamp on it
2  in your office? I mean, would you date -- do you date
3  documents when you receive the mail in your office?
4    A.  Normally the people that open the mail, I
5  think they do now. I don't know if they did it that
6  day or not.
7    Q.  Tell me about the conversation that you had
8  with Mr. Garza when he came into the office and asked
9  you if you had received the charge?
10    A.  He just asked if I had received it. I said,
11  yes, I did.
12    Q.  Anything else?
13    A.  I think I told him that I sent it to our
14  corporate office.
15    Q.  And I apologize for insisting, but do you
16  recall anything else that he said or that you said?
17    A.  Not at that time, no.
18    Q.  Did you have more than one conversation with
19  him about the EEOC charge of discrimination?
20    A.  No, sir, not to my knowledge.
21    Q.  Before today when was the last time that you
22  saw this charge, that you looked at this charge of
23  discrimination?
24    A.  I reviewed with my attorney last week.
25    Q.  Fair enough. Please go to document No. 2 in

7 (Pages 22 to 25)

## Page 26

1  that same stack. And we are going to look at Landis
2  Exhibit No. 2. Do you recognize that exhibit as being
3  a copy of the performance evaluation given to
4  Mr. Garza according to the date identified in the
5  document April 26, 2007?
6      A.  Yes.
7      Q.  Do you know if Mr. Garza received a
8  performance evaluation in 2006, 2008, 2009?
9      A.  I do not know.
10     Q.  How frequently were the employees supposed
11 to be evaluated as far as their performance was
12 concerned? Annual basis, every two years? What was
13 the rule?
14     A.  I believe it was annually. I didn't do the
15 evaluations.
16     Q.  And if I ask --
17     A.  Except for the one person that worked for
18 me.
19     Q.  Yes. And if I asked you do you know who did
20 this evaluation --
21     A.  Pardon me?
22     Q.  Do you know who did Mr. Garza's evaluation?
23     A.  It looks like this particular one was done
24 by Mr. Miller's handwriting.
25     Q.  So you recognize his --

## Page 27

1      A.  I'm just guessing that it's Mr. Miller's.
2  It doesn't say it on there. But he normally did the
3  evaluations for his employees.
4      Q.  Let's go to document No. 3. Have you seen
5  any of the documents in Exhibit No. 3 before today?
6      A.  I don't remember seeing the first page.
7      Q.  What about the second page?
8      A.  Yes.
9      Q.  You have?
10     A.  Yes. I was not in HR when he got hired back
11 in April, 2006 for the first page.
12     Q.  Right. Okay. Thank you for clarifying
13 that. And then what about the document of April 25,
14 2008?
15     A.  I was in HR then. So I assume that I saw
16 that.
17     Q.  So am I to understand then that you would be
18 informed of employee performance and employee raises?
19     A.  They would turn in a request for a raise and
20 this sheet here was normally the justification to get
21 the -- because all of the raises or increases had to
22 be approved at our corporate office and this was a
23 letter was just an extra incentive to get an approval.
24     Q.  Correct. And where was the corporate
25 office? You gave me --

## Page 28

1      A.  10000 Richmond.
2      Q.  10000?
3      A.  Yes.
4      Q.  I have in my notes I have an address of 2000
5  Richmond but that's 10000?
6          MS. WHITE:  10.
7      Q.  (By Mr. Costea)  I think I took it down
8  wrong.
9      A.  Yeah, it's 10000 Richmond.
10     Q.  10000. And the corporate office is still
11 there, right?
12     A.  The corporate office for Rig Solutions is
13 still there, yes.
14     Q.  So I think now I understand. In 2009, were
15 employees at the 529 -- at FM 529 plant given raises?
16     A.  I don't remember. I know we had a freeze at
17 one time, but I'm not sure of the dates.
18     Q.  What about 2010?
19     A.  No, I don't remember the dates for the
20 freeze.
21     Q.  And you left in January of 2011. So I
22 guess --
23     A.  I left in October -- I actually left
24 October, I think, 17th of 2010.
25     Q.  So then if I pressed on and asked you do you

## Page 29

1  know if raises were given at the plant in 2011 and
2  2012 --
3      A.  Oh, I wouldn't have -- I would have no idea.
4      Q.  Have you -- I won't ask you what you got,
5  but have you received raises between 2009 and now?
6      A.  Yes. Well, I received a raise this year;
7  and I think I received one last year. Whether I got
8  one in '9 or 2010, I do not know. There was a freeze
9  that I did not get a raise for a while.
10     Q.  Yes. Okay. Let's go ahead and look at
11 another document now which is not in that stack.
12         (Exhibit No. 2 marked.)
13     Q.  (By Mr. Costea)  And this document,
14 Mr. Butler, is labeled as Butler Exhibit No. 2; is
15 that correct?
16     A.  Yes.
17     Q.  And I'll represent to you the documents I
18 have in this exhibit are documents given to me in the
19 course of this litigation by defense counsel. So it's
20 going to be a bit tedious but bear with me and if you
21 need a break, let me know but I need to go through
22 these statements almost sentence by sentence, okay?
23     A.  Okay.
24     Q.  The first two pages of this exhibit appear
25 to be notes that apparently you drafted or somebody

8 (Pages 26 to 29)

Electronically signed by Lana Sholders (101-225-766-0482)

6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                      Job No. 15141

Page 30

1   drafted on your behalf because on page 2 of that
2   exhibit I see your name, right?
3       A.  Correct.
4       Q.  Next to your name we have a date of
5   4-29-2009, right?
6       A.  Yes.
7       Q.  Now, did you yourself type this document or
8   somebody typed it up for you?
9       A.  I typed this document.
10      Q.  Did you type it at work during working
11  hours?
12      A.  Yes.
13      Q.  And did you do so on April the 29th of 2009?
14      A.  I think that might have been the date that I
15  completed it, yes.
16      Q.  So you might have started it the day before?
17      A.  Well -- pardon me?
18      Q.  You might have started it the day or a
19  couple of days before?
20      A.  Correct.
21      Q.  Did you also write a handwritten statement?
22      A.  I do not remember.
23      Q.  Did somebody ask you to write, to type up
24  this statement?
25      A.  I do not remember.

Page 31

1       Q.  Let's look at the events that you identify
2   in your statement.
3       A.  Okay.
4       Q.  In the first line on page 1 of the exhibit
5   you state that Mr. Bob Miller advised you or told you
6   on April 20th, 2009 that Mr. Hunt wanted to make a
7   complaint about an employee using racist remarks
8   against him.  I understand Mr. Miller was Mr. Garza's
9   supervisor in April, 2009?
10      A.  Yes.  Mr. Hunt and Mr. Garza both worked for
11  Mr. Miller.
12      Q.  Before April 20th of 2009, did you know
13  anything about Mr. Hunt?
14          MS. WHITE:  Objection.  Form.
15      A.  I just knew who he was.
16      Q.  (By Mr. Costea)  Sir?
17      A.  I just knew who he was.  I knew most of the
18  employees that worked there just from being in HR and
19  safety prior to that.
20      Q.  Right.
21      A.  I didn't have conversations, personal
22  conversations with him.
23      Q.  I apologize for being blunt concerning some
24  of my questions; but given the nature of this case, I
25  have to ask you those questions.

Page 32

1       A.  Sure.
2       Q.  Were there any rumors in the work place that
3   Mr. Hunt was a homosexual?
4       A.  Not to my knowledge.
5       Q.  I understand that at some point there was a
6   complaint made against Mr. Hunt by Mr. Garza, right,
7   and we talked about that, right?
8       A.  Yes.
9       Q.  Other than Mr. Garza, do you recall any
10  other complaints about Mr. Hunt that reached you or
11  your office?
12      A.  I do not.
13      Q.  So as far as you know prior to October,
14  2010, the only written documentation concerning any
15  complaints against Mr. Hunt were only with respect to
16  Mr. Garza's complaint, right?
17      A.  Correct.
18      Q.  In the next sentence you state that you and
19  Bob had sat down with Mr. Hunt to hear his allegation,
20  right?
21      A.  Yes.
22      Q.  Can you please describe Mr. Hunt for me?
23      A.  I don't understand.
24      Q.  Well, let's start with his race.  What is
25  his race?

Page 33

1       A.  I believe he's Caucasian.
2       Q.  Is he a big man?
3       A.  The best I remember, yes.
4       Q.  The best you recall he's a big man?
5       A.  Yeah.  The best I remember, yes.
6       Q.  Have you ever used -- have you ever heard
7   him use vulgarity?
8           MS. WHITE:  Objection.  Form.
9       A.  I don't remember.
10      Q.  (By Mr. Costea)  Did anyone complain to you
11  that Mr. Hunt had a foul mouth?
12      A.  Pardon me?
13      Q.  Did anyone complain to you or indicate to
14  you that Mr. Hunt had a foul mouth?
15      A.  I do not remember anyone making the
16  complaint.
17      Q.  To your knowledge, is Mr. Hunt still
18  employed with NOV?
19      A.  If he's still employed?
20      Q.  Right.
21      A.  I have no idea.
22      Q.  So Mr. Hunt comes to your office along with
23  Mr. Miller and complains that Mr. Garza had called him
24  a --
25      A.  Actually Mr. Miller called me and asked me

9 (Pages 30 to 33)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                           Job No. 15141

**Page 34**

1   to come to his office.  Mr. Hunt was in Mr. Miller's
2   office.
3       Q.  So you went to his office?
4       A.  I went to Mr. Miller's office because I --
5   Mr. Hunt had made an allegation about Mr. Garza to
6   Mr. Miller.  Mr. Miller brought me in to listen to the
7   allegation.
8       Q.  Right.  And the allegation or one of them
9   was that Mr. Garza had called Mr. Hunt a stupid
10  Americano, right?
11      A.  That was what he said.
12      Q.  The last sentence of the first paragraph,
13  you indicate that Rudy Lopez was not here to confirm
14  Mr. Hunt's allegation and in one of the prior
15  sentences, you state that Mr. Hunt stated to you or in
16  your presence that Mr. Lopez had heard the comment,
17  the racial comment that Mr. Garza had made to him,
18  right?
19      A.  Correct.
20      Q.  Did you at some point later on have any
21  communications with Mr. Lopez to confirm whether or
22  not Mr. Garza had called Mr. Hunt a stupid American?
23      A.  I do not know.
24      Q.  Your next paragraph states that the
25  following day on April 21st Mr. Garza was brought in.

**Page 35**

1   He was brought in where?  Your office?
2       A.  Mr. Miller's office.
3       Q.  Mr. Miller.  So this time it was you,
4   Mr. Miller, and Mr. Garza, right?
5       A.  Yes.
6       Q.  And the rest of the paragraph is fairly self
7   explanatory.  And your next paragraph states that on
8   April 27th Mr. Miller asked you to come to his office
9   because he was going to give Mr. Garza a written
10  reprimand concerning the use of racial comments and he
11  wanted you to be a witness.  Do you recall having gone
12  to Mr. Miller for that purpose?
13      A.  Yes.
14      Q.  And I think that we have that reprimand
15  somewhere.  And that's going to be Exhibit No. 4 in
16  that -- yes, in that stack.  And I would like for you
17  to go to page 2 of that exhibit.  And you will see a
18  corrective action -- page 2.  You see a corrective
19  action given to Jose Garza by Mr. Miller with a date
20  given to him on 4-29-09, correct?
21      A.  Correct.
22          MS. WHITE:  Objection.  Form.
23          MR. COSTEA:  Is the date wrong?
24          MS. WHITE:  I think so, yeah.
25          MR. COSTEA:  4-29-09?

**Page 36**

1           MS. WHITE:  I think it's 27.
2           MR. COSTEA:  4-27-09.  Okay.
3       Q.  (By Mr. Costea)  And the witness signature,
4   is that your signature, Mr. Butler?
5       A.  Yes.
6       Q.  So was this the document that was given to
7   Mr. Garza on the 27th that he refused to sign?
8       A.  Yes.
9       Q.  Did Mr. Garza explain why he refused to sign
10  this document?
11      A.  No, he did not.
12      Q.  Did Mr. Garza use any profanity or any
13  improper language in -- during this meeting?
14      A.  I don't remember him using profanity.
15      Q.  Did you have any part in actually completing
16  this form?
17      A.  Pardon me?
18      Q.  Did you have any role, any part whatsoever
19  in writing this corrective action report for
20  Mr. Garza?
21      A.  The only thing that I wrote was the employee
22  refused to sign.
23      Q.  All right.
24      A.  And I corrected the date to 4-27, but I did
25  not type the form.

**Page 37**

1       Q.  Correct.  Now, in the description of the
2   incident portion, the second line, the second sentence
3   says quote "This is the second time that Jose has been
4   disruptive and harassing his coworkers."  When was the
5   first time?  Do you know?
6       A.  I do not know.
7       Q.  Was the first incident or the first time
8   discussed with Mr. Garza on 4-27-09?
9       A.  For the first time?
10      Q.  No.  Was the first incident -- that sentence
11  says "This is the second time Jose has been
12  disruptive."
13      A.  I do not remember.
14      Q.  So you do not know whether or not the first
15  incident was discussed with Mr. Garza on 4-27-09 as
16  well?
17      A.  I do not remember.
18      Q.  Flip to the first page, please.  On page 1
19  we have an employee warning notice to Mr. Garza with a
20  date of 7-10-2007.  You recall having seen that
21  document before?
22      A.  Yes.
23      Q.  When do you recall having seen it?
24      A.  I don't remember.
25      Q.  Were you present when this document was

10 (Pages 34 to 37)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                    Job No. 15141

---

Page 38

1  given to Mr. Garza?
2      A.  I was not.
3      Q.  This employee warning notice states
4  "Disruptive behavior, threats to fellow employee
5  coworker Galvan Oswaldo."  Do you know that person?
6      A.  I vaguely remember the name.
7      Q.  Do you know anything about this incident
8  between him and Mr. Oswaldo?
9      A.  I do not know.
10     Q.  Do you know if Mr. Oswaldo was also given a
11 warning notice as well?
12     A.  I do not know.
13     Q.  Well, I'm talking about July, 2007.  You
14 don't know.  Okay.
15     A.  This is a form Mr. Miller completed.
16     Q.  Completed, okay.  Now, going back to your
17 statement, Mr. Butler.
18     A.  Okay.
19     Q.  Which is Butler Exhibit No. 2.  We were now
20 focusing on the paragraph which starts "On Monday,
21 April 27th."
22     A.  Okay.
23     Q.  So we covered the portion in your statement
24 where Mr. Garza was given a reprimand and then it says
25 "Mr. Garza refused to sign and stated" quote "That he

---

Page 39

1  wanted to file sexual assault charges on Mr. Hunt
2  since he was being written up."  Tell me exactly what
3  you recall Mr. Garza saying to you.
4      A.  The best I remember is Mr. Garza made the
5  statement that if he was getting written up he wanted
6  Mr. Hunt to be written up for sexual assault.
7      Q.  Let me ask you:  As of 4-27-09 when
8  Mr. Garza was given the corrective action, had it
9  actually been established that Mr. Garza had used
10 racial language towards Mr. Hunt specifically calling
11 him a stupid American?
12     A.  Mr. Miller did the investigation and told me
13 it was.
14     Q.  Did he tell you with whom, who confirmed --
15 who --
16     A.  He did not.
17     Q.  Did you ask?
18     A.  I don't remember asking.
19     Q.  Now, in looking at the sexual harassment
20 policy, I think it states that management has an
21 obligation to report sexual harassment.
22     A.  Yes.
23     Q.  What about supervisors, do they also have
24 the obligation to report sexual harassment?
25     A.  I believe all levels of -- I believe all

---

Page 40

1  levels of employees have the responsibility to report.
2      Q.  What about team leaders, do they have an
3  obligation to report the harassment?
4      A.  I believe all of us.
5      Q.  Okay.  Fair enough.  So if an employee like
6  Mr. Garza complains about sexual harassment to his
7  team lead, his team lead has an obligation to evaluate
8  that to carry on the complaint to the higher level or
9  maybe your office?
10         MS. WHITE:  Objection.  Form.
11     Q.  (By Mr. Costea)  Sir?
12         MS. WHITE:  Go ahead and answer.  You
13 can answer.
14     A.  I believe he has an obligation to bring it
15 further up either to his boss or to the HR or to the
16 ethics hot line.
17     Q.  (By Mr. Costea)  Well, who is "he" in this
18 sentence?
19     A.  Pardon me?
20     Q.  Who is "he"?
21     A.  You said team leader.
22     Q.  Right.  So the team leader, if the team
23 leader becomes aware of a sexual harassment incident,
24 he or she has an obligation to --
25     A.  To run it up to either his supervisor, at

---

Page 41

1  the time that would have been Mr. Miller, or to HR or
2  to the ethics hot line.
3      Q.  Now, you indicate in parenthesis in the one,
4  two, the third paragraph "Note Mr. Garza has never
5  mentioned the sexual harassment until today."
6      A.  Correct.
7          MS. WHITE:  Objection.  Form.
8          MR. COSTEA:  What did I read wrong?
9          MS. WHITE:  Sexual assault.
10     A.  Yeah.  He didn't say sexual harassment.  He
11 said sexual assault.
12     Q.  (By Mr. Costea)  I'm sorry.  I apologize.
13 "Sexual assault until today"?
14     A.  Yes.  That's correct.
15     Q.  So I take it that before April 27th, 2009
16 you had not been aware that Mr. Garza was -- had any
17 issues with Mr. Hunt concerning sexual harassment or
18 sexual assault?
19     A.  Correct.
20     Q.  The next paragraph states "On Tuesday, April
21 28th, Mr. Garcia came," that's actually Mr. Garza,
22 right, not Garcia?
23         MS. WHITE:  I think he's right here.
24     Q.  (By Mr. Costea)  You see the line which says
25 "On Tuesday, April 28th" --

---

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)          6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                    Job No. 15141

Page 42

1    A. Yes, I do.
2    Q. -- "Jose Garcia came to my office telling me
3  it was unfair to being written up."
4    A. Yes.
5    Q. And my question is: Was Mr. Garcia -- I'm
6  sorry, not Garcia, Garza asked to come to your office
7  or he volunteered to go to your office?
8    A. He volunteered to come to my office.
9    Q. Towards the end of that paragraph, you say
10 that later on that same day April 28th,
11 Richard Urquhart told you to get a note pad and
12 Bob Miller and come to his office.
13   A. Correct.
14   Q. And I guess you complied with that, right?
15   A. Yes.
16   Q. And the next seen you said Mr. Urquhart
17 asked the two of you what you knew about Mr. Garza's
18 sexual assault allegation and you told him what you
19 knew, right?
20   A. Correct.
21   Q. Did Mr. Urquhart tell you how he had become
22 aware that Mr. Garza was making allegations of sexual
23 assault against Mr. Hunt?
24   A. Mr. Garza had approached Mr. Urquhart.
25   Q. Do you know what date?

Page 43

1    A. It was --.
2    Q. 27th, 28th?
3    A. I believe it was the 28t, I believe. To my
4  knowledge, no one knew of the sexual assault until the
5  27th when Mr. Garza mentioned it because of he was
6  getting written up.
7    Q. In 2009 did you keep a business calendar?
8    A. Did I keep a business calendar?
9    Q. Did you keep a business calendar in 2009?
10   A. I don't understand the question.
11   Q. Do you have a calendar at work, a work
12 calendar?
13   A. I have a calendar, yes.
14   Q. Is it a business calendar where you --
15   A. Make notes?
16   Q. -- notes about events in the work place,
17 appointments, so on and so forth, meetings?
18   A. I keep a -- back then I kept some notes and
19 a little calendar like this.
20   Q. Okay. Do you still have your 2009 calendar?
21   A. Oh, no. Oh, no.
22   Q. I understand. Did you write any, any
23 handwritten notes about any conversations you had with
24 Mr. Garza or maybe others about Mr. Garza or his
25 allegations or Mr. Hunt, anything like that?

Page 44

1    A. I don't remember. I do not believe I did.
2    Q. And that same paragraph you indicate in the
3  last line that Mr. Urquhart asked you to investigate
4  and document Mr. Garza's complaint, right?
5    A. Asked me and Mr. Miller. I believe he asked
6  us both.
7    Q. Fair enough. No problem. Was Mr. Garza
8  present for this meeting with Mr. Urquhart?
9    A. I do not believe so.
10   Q. So then you say that on Wednesday, April the
11 27th you asked Mr. Garza to come to your office,
12 right?
13   A. I think the date is wrong here because I
14 think it should have been if Tuesday was the 28th, I
15 think I might have miss typed it because Wednesday
16 should have been the 29th if that's going correct.
17   Q. Well, it's either 29th or maybe Tuesday the
18 28th, whatever. Anyway you asked Mr. Garza to come to
19 your office?
20   A. Yes.
21   Q. And you asked him to give you a full account
22 of when, where, and so on and so forth and --
23   A. Who witnessed and details of the assault,
24 yes.
25   Q. Yes, sir. Thank you. And then you explain

Page 45

1  Mr. Garza came back to you with a notarized statement,
2  right?
3    A. Correct.
4    Q. I would like to ask you: You are saying
5  that at 9:30 a.m. Mr. Garza came back and asked
6  whatever. How do you know it was 9:30 a.m.?
7         MS. WHITE: Objection. Form.
8    A. I don't remember.
9    Q. (By Mr. Costea) And how do you know that he
10 came back at 11:20 p.m. -- I'm sorry, a.m.?
11   A. Because I looked at my watch.
12   Q. Now, if you typed your statement on the
13 29th, that means that was a Wednesday, right?
14   A. Pardon me?
15   Q. It means that you wrote this statement, the
16 date next to your signature or your name is 4-29-09,
17 right?
18   A. Yes.
19   Q. So that means the 29th must have been a
20 Wednesday?
21   A. Yes.
22   Q. So the same day that Mr. Garza brought you
23 back the notarized statement?
24   A. Yes.
25        (Exhibit No. 3 marked.)

12 (Pages 42 to 45)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

Page 46

1    Q.  (By Mr. Costea) Mr. Butler, we are now
2  looking at Butler Exhibit No. 3; and I would like for
3  you to go through each page of that exhibit and tell
4  me if you recognize the affidavit that Mr. Garza
5  brought to you on the 29th of April of 2009.
6         MS. WHITE: Counselor, do you want to
7  direct him? I don't mind but are you directing him to
8  this particular document?
9    A.  Which page?
10    Q.  (By Mr. Costea) Well, I would like for you
11  to go through each page of that document and tell me
12  if you recognize the affidavit that Mr. Garza brought
13  to you.
14         MS. WHITE: Okay. I'm sorry.
15    A.  This looks like the document.
16    Q.  (By Mr. Costea) Well, which page of the
17  document? And by the way, Mr. Butler, you will see
18  that those documents have numbers at the bottom of the
19  page and the attorney is going to point out to you.
20  You see numbers?
21         MS. WHITE: These.
22    A.  Okay.
23    Q.  (By Mr. Costea) That's going to help us
24  tremendously in this deposition in our conversation.
25  You're pointing to document Bates stamped 129, right?

Page 47

1    A.  To what?
2    Q.  The document --
3    A.  The --
4    Q.  Go to the notarized statement that Mr. Garza
5  brought to you.
6    A.  Okay.
7    Q.  And that document document has a number at
8  the bottom of the page. It says 129, right?
9    A.  Yes.
10    Q.  So, again, I'm trying to establish: Is this
11  the affidavit or the notarized statement that
12  Mr. Garza brought back to you on April 29th, 2009?
13    A.  To my knowledge, this is the paper he
14  brought to me.
15    Q.  Did you have any conversations or any
16  communications with him about this notarized
17  statement?
18    A.  I do not believe so.
19    Q.  Did you -- did he actually give it to you?
20    A.  I do not remember.
21    Q.  Did you at some point read it?
22    A.  Yes.
23    Q.  Did you read it on the 29th?
24    A.  If that's the day I received it, yes.
25    Q.  After April the 29th, 2009, do you recall

Page 48

1  having had any conversations with Mr. Garza about his
2  allegations of sexual assault/sexual something,
3  harassment, so on and so forth by Mr. Hunt?
4    A.  I do not believe I had a conversation with
5  him.
6    Q.  Now, Mr. Urquhart was the plant manager, I
7  think?
8    A.  I think that was a title we gave him. I
9  think his actual title was director of plant
10  operations or something like that. He's actually the
11  in more laymen's terms the facility manager or plant
12  manager.
13    Q.  So he was over the whole plant, the whole
14  facility at 529?
15    A.  Correct.
16    Q.  From what I understand, he's gone?
17    A.  I believe he sill works for the company. I
18  believe he's been transferred to Minnesota.
19    Q.  Do you know who replaced him in his
20  position?
21    A.  A gentleman by the name of Anirban,
22  A-n-i-r-b-a-n Batergy.
23    Q.  Did you go back to Mr. Urquhart at some
24  point to report to him concerning your investigation
25  into Mr. Garza's complaint of sexual harassment/sexual

Page 49

1  assault?
2    A.  Ask it again, please.
3    Q.  Did you go back to Mr. Urquhart to report on
4  your investigation of Mr. Garza's complaint about
5  Mr. Hunt?
6    A.  I let Mr. Urquhart know that the corporate
7  office was investigating.
8    Q.  What do you mean the corporate office?
9    A.  I had asked the corporate office to do an
10  investigation on it.
11    Q.  So you yourself did not do the
12  investigation?
13    A.  On the sexual assault?
14    Q.  Right.
15    A.  Correct.
16    Q.  Who did the investigation in corporate?
17    A.  I called Mr. Allchin and Jeff Dodd and
18  Mr. Allchin sent a lady by the name of Meredith and I
19  believe her name at the time was Black who was
20  co-equal of Mr. Allchin. They both worked directly
21  for Mr. Dodd. I think Mr. Allchin was busy, and so he
22  sent Meredith Black out.
23    Q.  And these three individuals, they were in
24  the corporate HR?
25    A.  Yes.

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                    Job No. 15141

Page 50

1    Q.  How did you communicate with them about
2 Mr. Garza?  By phone, in person, by email?
3    A.  I believe it was by phone.
4    Q.  When did you -- whom did you call?
5 Mr. Allchin, Mr. Dodd, or Ms. Black?
6    A.  I'm not sure.  I believe I called Mr. Dodd,
7 but I may have called Mr. Allchin.
8    Q.  And --
9    A.  I know I did not call Ms. Black.
10   Q.  Yes, sir.  Thank you.  When did you call
11 them?  On the 28th, the 29th because on the 28th you
12 got your instructions from Mr. Urquhart?
13   A.  Probably would have been the afternoon of
14 the 28th.
15   Q.  What did you tell them, Mr. Allchin or
16 Mr. Dodd?
17   A.  Basically that had a complaint of a sexual
18 assault.
19   Q.  Did you give names?  Garza and hunt?
20   A.  I'm not sure if I gave the name of
21 Jose Garza or not.
22   Q.  Did you tell them that Mr. Urquhart had
23 asked you to investigate?
24   A.  I'm not sure if I told them Mr. Urquhart
25 asked me.  Mr. Urquhart didn't ask me to call the

Page 51

1 corporate office.
2    Q.  I understand.  But he asked you to
3 investigate it?
4    A.  Right.
5    Q.  And you passed that assignment on to the
6 corporate HR?
7    A.  To the corporate office, yes.
8    Q.  And I'm not implying anything wrong with
9 that.  I'm just trying to develop the facts.
10   A.  I passed it along because I thought that was
11 a serious charge.
12   Q.  I was going to ask you that.  So you passed
13 that on.  You think that you called them the afternoon
14 of the 28th?
15   A.  I believe it was the afternoon of the 28th,
16 yes.
17   Q.  And then at some point Ms. Black came on
18 site to talk with folks?
19   A.  Yes.
20   Q.  Do you recall when she came on site, the
21 28th or the 29th?
22   A.  I don't think it was the same day.  I don't
23 know if it was the 29th or a day or two after that.
24 I'm not sure.
25   Q.  Was it the same week though?

Page 52

1    A.  To my knowledge, yes.
2    Q.  And with whom did Ms. Black speak?
3    A.  She met with Mr. Hunt, she met with
4 Mr. Garza, she met with Mr. Miller, she met with
5 several of the other people, Mr. Lopez and several of
6 the coworkers of Mr. Garza and Mr. Hunt.
7    Q.  All right.
8    A.  And she -- I was not present for any of
9 those.
10   Q.  I was going to ask you that question.
11   A.  I wanted it to be a complete and unbiased
12 third set of eyes on this.
13   Q.  I understand.  So do you know if Ms. Black
14 wrote, kept any notes, drafted anything?
15   A.  To my knowledge, yes, she made notes.
16   Q.  Handwritten notes?
17   A.  Handwritten notes.
18   Q.  I'm sorry?
19   A.  To my knowledge, she made handwritten notes.
20   Q.  Do you know whether or not she wrote a
21 report of her investigation?
22   A.  I never saw a report.
23   Q.  Did you have any conversations with her
24 about her findings?
25   A.  She eventually had verbally told me that she

Page 53

1 felt his allegation was unfounded and recommended the
2 write-up of the suspension.
3    Q.  Ms. Black recommended that Mr. Garza be
4 suspended?
5    A.  I believe so.
6    Q.  Because she concluded that his sexual
7 harassment complaint was unfounded?
8          MS. WHITE:  Objection.  Form.
9    Q.  (By Mr. Costea)  Well, did it cross your
10 mind at that point in time that you were dealing here
11 with an unlawful retaliation?
12         MS. WHITE:  Objection.  Form.
13   Q.  (By Mr. Costea)  Were you concerned about
14 that?
15   A.  No, I was not.
16   Q.  Do you know the exact title for Ms. Black's
17 position back in 2009?  I know she was in HR.
18   A.  I don't know.  I do not know her title.
19   Q.  Now, did she make that recommendation to you
20 in the presence of a third person such as Mr. Miller?
21   A.  I do not know.  I do not remember.
22   Q.  Please go in document No. 4, go to Exhibit
23 No. 3.
24   A.  Of Landis?
25   Q.  Yes, sir.  Thank you.

14  (Pages 50 to 53)

Electronically signed by Lana Sholders (101-225-766-0482)
6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                            Job No. 15141

Page 54

1       MS. WHITE: I think he said page 3.
2       Q.   (By Mr. Costea) Yes, sir.  Page 3.  Page 3
3   is a corrective action document on Mr. Garza with a
4   date of May the 1st, 2009, right?
5       A.   Yes.
6       Q.   And I now think I understand.  The witness
7   signature is Meredith Black, the person that you and I
8   have been talking about, right?
9       A.   Yes.
10      Q.   Were you present when this corrective action
11  report was given to Mr. Garza?
12      A.   I was.
13      Q.   You were?
14      A.   Yes.
15      Q.   So it was you, Mr. Black, and Mr. Miller,
16  right?
17      A.   And Mr. Garza.
18      Q.   And Mr. Garza.  Do you know who actually
19  drafted or typed up the description of incident
20  portion of this write-up?
21      A.   I believe it was Ms. Black.
22      Q.   And how do you know that?
23      A.   I believe she asked me to use my computer
24  and I stepped out of the room.
25      Q.   And did she do that on May the 1st of 2009?

Page 55

1       A.   I believe that was the date, yes.
2       Q.   So then the 29th, you called her on the 28th
3   which was -- and you're welcome to look at your
4   statement here.  I'm trying to develop a time line.
5       A.   Okay.
6       Q.   So you called her up the afternoon of --
7       MS. WHITE: I'm sorry.  Finish.
8       Q.   (By Mr. Costea) You called her up or
9   Mr. Dodd -- you called the HR corporate office the
10  afternoon of April 28th, right?
11      A.   Yeah.  I don't think I called Ms. Black
12  because I think I spoke to Mr. Dodd, Mr. Allchin.
13  Mr. Allchin normally handled the investigations, the
14  majority of them for Mr. Dodd.  Mr. Allchin was busy
15  because Ms. Black showed up to do the investigation.
16      Q.   And I appreciate you stopping me and
17  correcting me.
18      A.   Okay.
19      Q.   Just --
20      A.   I know I didn't speak to Ms. Black about
21  this.
22      Q.   Perfect.  I'm trying to get accurate facts.
23  And, again, if I ask you the same question twice,
24  forgive me and don't even answer the question if I ask
25  you the same question twice but I cannot take down

Page 56

1   every answer that you give me.
2       A.   Right.  Mr. Allchin and Ms. Black were, I
3   guess, ranked the same.  Like I said they both worked
4   directly for Mr. Dodd.
5       Q.   I may have asked you this question.  It's
6   not in my notes, but did Ms. Black show up on the 29th
7   to start the investigation?
8       A.   I do not remember.
9       Q.   But anyway between the afternoon of the 28th
10  and the 1st of May of 2008 -- 2009, the
11  investigation into the sexual assault allegation by
12  Mr. Garza was complete?
13      A.   Yes.  She was out for a couple of days.
14      Q.   Who was out?
15      A.   She was out there for a couple of days
16  interviewing --
17      Q.   Folks?
18      A.   -- the various people in the department.
19  Because she interviewed for two days I know for a
20  fact.
21      Q.   And you said that she interviewed you as
22  well.  And I guess she was taking notes as you were
23  talking?
24      A.   Yes.
25      Q.   So tell me about this write-up or actually

Page 57

1   it's called suspension final warning it's called.  So
2   she asked you to leave the office so she can use your
3   computer to write this write-up?
4       A.   Correct.  Well, I don't remember if she
5   asked me to leave the office.  I remember leaving the
6   office, walking out so she could have free use of my
7   desk and my computer.
8       Q.   Your computer.  Was that the morning of May
9   the 1st?
10      A.   I do not recall if it was morning or
11  afternoon.
12      Q.   And do you remember how long it took her to
13  draft this suspension/final warning?
14      A.   I do not remember that.
15      Q.   And I guess she instructed you to call
16  Mr. Garza in for a meeting?
17      A.   No.  What happened is Mr. -- she had
18  Mr. Miller bring Mr. Garza into Mr. Miller's office
19  and she asked me to go down with her and be present.
20      Q.   Now, have you seen different versions of
21  this corrective action report of May 1st, 2009?
22      A.   Different version?
23      Q.   Yes.
24      A.   I don't know what you mean.
25      Q.   Like, you know, maybe a draft of this

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                    Job No. 15141

---

**Page 58**

1  suspension/final warning?
2      A.  I don't remember seeing any draft.
3      Q.  Anything different, okay.  Now, what about
4  the suspension of three days 5-4, 5-5, and 5-6, who
5  came up with those dates?
6      A.  Ms. Black.  Well, Ms. Black decided on the
7  three days.  I think Mr. Miller decided those specific
8  days.
9      Q.  According to our chronology here, Wednesday
10  was the 29th, Thursday was the 30th, and Friday was
11  the 1st of May.  So May the 4th would have been a
12  Monday, May the 5th a Tuesday, and May the 6th a
13  Wednesday, right?
14      A.  I don't have the calendar what it is.  It
15  would normally be three consecutive days.
16      Q.  In looking at this document, let's see what
17  was I was going to ask you?  You know what,
18  Mr. Butler, I apologize.  In light of our conversation
19  right now, I want to ask you:  Did you inform
20  Ms. Black that you have received a -- the charge of --
21  Mr. Garza's charge of discrimination from the EEOC?
22      A.  I don't think I had received it by that
23  time.
24      Q.  No.  No.  Once you got it, once you received
25  it, did you call her up to tell her you had

---

**Page 59**

1  received --
2      A.  I don't believe I called Ms. Black.  I
3  believe I told Mr. Dodd.
4      Q.  Just the corporate office.  And I apologize
5  for my follow up, but do you recall any conversations
6  with Ms. Black about the charge of discrimination?
7      A.  No, I don't.  I do not.
8      Q.  So Mr. Garza is brought in; and he refuses
9  to sign, right?
10      A.  Correct.
11      Q.  Was he at all, I don't know, impolite,
12  screaming, yelling, vulgar when he was given this --
13  faced with this write-up?
14      A.  I don't remember.  I believe he was somewhat
15  upset.
16      Q.  Did he say anything?
17      A.  I don't remember what was said.
18      Q.  Did Ms. Black take any notes during this
19  meeting with Mr. Garza?
20      A.  When he was presented this corrective
21  action?
22      Q.  Right.
23      A.  I don't believe she took any notes at that
24  time.
25      Q.  Now, please go to your Exhibit No. 3.

---

**Page 60**

1      A.  On mine?
2      Q.  Yes, sir.  Which is the written affidavit
3  page 129, the notarized statement that Mr. Garza gave
4  you.
5      A.  Wait a minute.  I'm having trouble finding
6  it.
7      Q.  No, sir, it's in a different.  It's Exhibit
8  3 right there?
9          MS. WHITE:  Look at this number.
10      A.  129, okay.
11      Q.  (By Mr. Costea)  Did you give that notarized
12  statement to Ms. Black or a copy of it as part of her
13  investigation?
14      A.  I do not remember.
15      Q.  In the --
16      A.  I believe I sent this to the corporate
17  office.  Whether Mr. Dodd gave it to her or not, I
18  don't -- I don't remember giving it to her.
19      Q.  Do you recall having communicated by email
20  with the corporate office concerning Mr. Garza?  I
21  asked you about Mr. Urquhart asking you to do an
22  investigation.  Now I'm asking you about communicating
23  by email with corporate office.
24      A.  I don't remember.
25      Q.  Are you receiving any emails from them?

---

**Page 61**

1      A.  I don't remember.
2      Q.  You don't remember.  All right.  Now, in the
3  body of the notarized statement, Mr. Garza states
4  towards the end of the statement, he says "Mr. Hunt
5  also had a similar behavior with Miguel Gutierrez,
6  another coworker, and this incident was reported
7  directly to Will Goff."  Do you know anything about
8  any sexual assault, sexual harassment by Mr. Hunt on
9  Mr. Miguel Gutierrez?
10      A.  No, sir.
11      Q.  Do you know Mr. Gutierrez?
12      A.  Yes.
13      Q.  Is he still working with the company?
14      A.  I do not know.
15      Q.  That's right.  You left October, 2010.  I
16  think that's all I have about that exhibit.  Let's
17  continue to look at documents in Exhibit No. 2.
18      A.  Which number?
19      Q.  Yes, sir, in that exhibit.  So we are done
20  with your statement.  Well, no.  Let's see, on 4 -- I
21  want to focus on the second page, the last sentence of
22  your statement.  On 4-29 Mr. Garza asked you if
23  Mr. Hunt had been written up and you told him that
24  privacy act prevents you from discussing other
25  people's disciplinary issues with him, right?

---

16 (Pages 58 to 61)

Electronically signed by Lana Sholders (101-225-766-0482)                6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                              Job No. 15141

---

Page 62

1      A.  I did tell him that.
2      Q.  What privacy act is that?
3      A.  Privacy act of 1974.  I don't discuss
4  disciplinary actions with any employees referring to
5  another employee at any time.
6      Q.  We'll have to look it up.  Privacy act of
7  1974.
8      A.  I think that's what it is.
9      Q.  Thank you very much, sir.  Now, in your
10 communications with Ms. Black, was any thought given
11 to giving Mr. Hunt a reprimand or some form of
12 disciplinary action?
13     A.  From me?
14     Q.  From the company?  From you, from her?
15     A.  I have no idea of any disciplinary action
16 that would have been done to Mr. Hunt on this.  Like I
17 said, she did an independent investigation.  I was not
18 present for what was said and who said what.  She is
19 the one that determined after her investigation that
20 she thought it was unfounded and it was in retaliatory
21 to being written up.
22     Q.  Going on to another page in that exhibit and
23 it's document 215.  We have a statement from
24 William Goff.  I'm able to read William Goff; and that
25 name is familiar to you, right?

Page 63

1      A.  There was two William Goffs.  There was a
2  senior and a junior.
3      Q.  Do you know which one this one is?
4      A.  I would assume it was probably the senior
5  because he was a lead man.  He was like a foreman or
6  whatever.  I'm just guessing.
7      Q.  Did he write this statement in your
8  presence?
9      A.  I don't know if -- I don't think he wrote it
10 in my presence but when I -- when I received it, I
11 wrote his name under it so I would know who that
12 signature was.
13     Q.  You said that you wrote his name on this
14 document?
15     A.  I put William -- looks like he put Willie
16 something.  I wrote William Goff under it.
17     Q.  So under the date 4-30-09, the name
18 William Goff, that's your handwriting?
19     A.  Correct.
20     Q.  What about the second half of that document
21 William Goff and some handwritten statements, whose
22 handwriting is that?
23     A.  On where?  Down at the bottom?
24     Q.  Yes.
25     A.  I'm not sure.

Page 64

1      Q.  That's not your handwriting, right?
2      A.  No.  I normally print.  Not very well.
3      Q.  Then going on to document 216 in that same
4  exhibit, we have a handwritten document and I'm able
5  to understand the signature more or less Rudy Lopez.
6  Is that what your understanding is?
7      A.  Yes.
8      Q.  And the name -- I'm sorry, the written
9  statement "team lead person," is that your handwriting
10 or somebody else's?
11     A.  That's somebody else's.
12     Q.  Do you recognize it?
13     A.  I do not.
14     Q.  Going on to page 217, we have a statement
15 from Miguel Gutierrez or it's -- it seems to indicate
16 it's a statement from Miguel Gutierrez where he
17 indicates that about a month and a half two months
18 prior Mr. Hunt called him Miguela.  Did you know
19 anything about that incident before April 30th of
20 2009?
21     A.  No, I did not.
22     Q.  What about another incident that
23 Mr. Gutierrez identifies in that same paragraph where
24 he states that Mr. Hunt quote "Pulled his overalls
25 back exposing his breasts"?  Anyone told you about

Page 65

1  that?
2      A.  No.
3      Q.  Now, who was Mr. Gutierrez's lead man in
4  April of 2009?
5      A.  I'm not sure.  Mr. Miller had several -- he
6  had I think three lead people:  Rudy Lopez,
7  William Goff, and I think a Henry Casianes.  I'm not
8  sure which one was his lead man.
9      Q.  This paragraph states that after the second
10 incident, it says "We went immediately into
11 Will Goff's office" and I presume that's Mr. Hunt
12 along with Mr. Gutierrez, whatever, Mr. Gutierrez is
13 not here to explain the statement to us.  But my
14 question for you is:  Did Mr. Goff tell you
15 approximately a month and a half or two months before
16 April 30th, 2009 that Mr. Gutierrez had complained to
17 him about Mr. Hunt?
18     A.  No.  I told you while ago I did not hear
19 about this until April 30th.
20     Q.  Well, do you think that Mr. Goff should have
21 informed you of this these incidents?
22     A.  That would just be my speculation.
23     Q.  Well, based upon the sexual harassment
24 policy of the employer.
25     A.  I think Mr. Goff should have told either

17 (Pages 62 to 65)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                    Job No. 15141

## Page 66

1    Mr. Miller, myself, or called the ethics line, yes.
2        Q.   And if they had called you, what would you
3    have done?
4        A.   I probably would have found out if the
5    investigation if it was true or not.
6        Q.   Does it seem -- upon reading this statement,
7    did it seem odd to you that a man would pull his
8    overalls back to expose his chest or his breasts to
9    another man?
10       A.   Do I -- ask that again.
11       Q.   That's pretty odd, isn't it?
12       A.   I would say so.
13       Q.   Especially in the work place?
14       A.   Probably anywhere.
15       Q.   Well, okay.  I know it's tedious; but I need
16   to find out what you know, sir.  Bottom of the page
17   217, it says "Team leader assembly area."  Is that
18   your handwriting?  I guess not?
19       A.   It is not.
20       Q.   And you do not know whose it is?
21       A.   I do not know who it is.
22       Q.   Okay.
23       A.   I believe these notes are actually from
24   Meredith Black's investigation.  I'm not sure.
25       Q.   Let's go on to page 218.

## Page 67

1        A.   Like I said, I don't normally do cursive
2    handwriting.  I normally print.  So I know it's not my
3    handwriting.
4        Q.   We're going on to page 218 and 219.  And I
5    would venture to say that the notes on those two pages
6    are not yours, right?
7        A.   No.
8        Q.   And you don't recognize the handwriting?
9        A.   No.
10       Q.   You think it might be Ms. Black?
11       A.   I'm thinking that 218 and 219 might be
12   Mr. Miller's, but I'm just speculating.
13       Q.   Mr. Miller?
14       A.   Yes.  It could be Ms. Black's.  I don't
15   know.  It's not mine.
16       Q.   Well, have you seen Mr. Miller take notes
17   during any meetings that you had with him and with
18   Mr. Garza?
19       A.   I don't remember.
20       Q.   Okay.  Let's jump to document No. 7.
21       A.   This is the one?
22       Q.   Yes, sir.  Same question.  Have you seen
23   Exhibit No. 7 before?
24       A.   I do not remember seeing this, no.
25       Q.   Have you seen forms such as this one Job

## Page 68

1    Skills Inventory for Employees of National Oilwell
2    Varco?
3        A.   I'm not sure.  It looks like one that they
4    used when I first started with the company but I
5    can't -- I never used it myself when I was in HR.
6        Q.   Do you know who fills out these forms?  Is
7    it the employee or their supervisor?
8        A.   I do not know.
9        Q.   Please look at the line that says "List any
10   additional education or training" and I'm focusing on
11   that line and it says "Two years college law school."
12   Do you see that?
13       A.   Yes.
14       Q.   Kind of odd, isn't it?
15       A.   Yes.
16       Q.   Did Mr. Garza have two years of law school
17   as of January of 2006?
18           MS. WHITE:  Objection.  Form.
19       A.   I have no idea.  Once again, this is before
20   I came into -- got into HR.
21       Q.   (By Mr. Costea) Let's go on to document --
22   Butler Exhibit 4.  That's the document you just
23   touched.  That one.
24       A.   Butler or Landis 4?
25       Q.   Landis 4.  I'm sorry.  Going on to the next

## Page 69

1    page which is page Bates stamped 193.  It's a
2    corrective action statement or report for Mr. Garza
3    with a date of August the 13th of 2009, right?
4        A.   Yes.
5        Q.   Have you seen this document before?
6        A.   Yes.
7        Q.   Did you see this document around August of
8    2009?
9        A.   I don't remember the date.
10       Q.   Were you present when this corrective action
11   statement was given to Mr. Garza?
12       A.   I do not remember.
13       Q.   Are you familiar with the incident
14   identified in this corrective action report?
15       A.   I do not remember.
16       Q.   Going on to the last page of that document,
17   Mr. Butler, in looking at that form, it has a date of
18   10-28-2009.  It's a termination --
19       A.   Yes.
20       Q.   -- report for Mr. Garza and the reason for
21   termination it says "The employee was terminated due
22   to several acts of insubordination to supervisors,"
23   right?
24       A.   Yes.
25       Q.   And that's your signature?

18 (Pages 66 to 69)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                Job No. 15141

| Page 70 |
| --- |

1    A. Yes.
2    Q. The date next to your signature is 10-28-09?
3    A. Correct.
4    Q. And I take it that you are the one that
5 filled out this form?
6    A. Yes.
7    Q. Including the reason for the termination?
8    A. Yes.
9    Q. As of 10-28-2000, can you identify for me
10 the several acts of insubordination to supervisors
11 that Mr. Garza had committed which you allege here
12 resulted or prompted his termination?
13    A. The -- I do not recall all of.
14    Q. I tell you what. Let's work our way
15 backwards.
16    A. Okay.
17    Q. I'm looking at the write-up or the
18 corrective action report of August the 13th of 2009.
19 Is that an insubordination document? The
20 insubordination box is not checked, right?
21    A. No.
22    Q. The prior corrective action report of May
23 1st, 2009, does not reflect insubordination, does it?
24    A. No.
25    Q. The prior write-up of April 24th, 2009 does

| Page 71 |
| --- |

1 not reflect insubordination, right?
2    A. No.
3    Q. The previous write-up of July the 10th of
4 2007 does have the box insubordination checked, right?
5    A. Yes.
6    Q. So did you know as of October 28th, 2009
7 that Mr. Garza had an insubordination document placed
8 in his personnel file dating back to July the 10th of
9 2010?
10    A. I'm sorry. Ask that again.
11    Q. As of October 28th, 2009, did you know that
12 Mr. Garza had an insubordination document placed in
13 his personnel file dating back to June -- I'm sorry,
14 July 10th of 2007?
15        MS. WHITE: Objection. Form.
16    A. I do not remember.
17    Q. (By Mr. Costea) Do you recall then -- I
18 apologize; but I need to know what acts of
19 insubordination Mr. Miller -- I'm sorry, Mr. Garza had
20 committed that resulted in his termination.
21    A. I do not remember.
22    Q. Is the statement "Employee was terminated
23 because of several acts of insubordination to
24 supervisors" accurate at the time that you put that in
25 the termination report?

| Page 72 |
| --- |

1    A. To my knowledge, yes.
2    Q. Now, who made the decision to fire
3 Mr. Garza?
4    A. Mr. Jeff Dodd.
5    Q. When did he make that decision in relation
6 to 10-28-09? I tell what you, let's not really tax
7 your memory. Let's go ahead and look at Landis
8 Exhibit 5 which is right there. We'll get to Mr. Dodd
9 in one second. I'll represent to you that Exhibit 5,
10 again, is a compilation of documents that defense
11 counsel has given to me in the course of this
12 litigation. And I will just go to the second page of
13 Exhibit 5. Just go to the second page, sir, that is
14 statement -- well, that statement I'll represent to
15 you Mr. Landis testified earlier today is his
16 statement and his name appears in that -- on that
17 page, right?
18    A. Correct.
19    Q. He indicates in his statement that at about
20 3:30 p.m. on Tuesday, October 27th, 2009 Mr. Garza
21 stopped him on the shop floor and demanded that he be
22 moved from draw works to the mud pump assembly. And
23 then some events happened; and then right towards the
24 end of that paragraph, it states that "At that point
25 we asked Mr. Garza to join us at the office of

| Page 73 |
| --- |

1 Bill Butler." Do you see that?
2    A. Yes.
3    Q. Do you recall on the 28th -- 27th of October
4 of 2009 Mr. Jack Landis, Kevin Warren, Rudy Lopez, and
5 Mr. Garza coming to your office?
6    A. I don't remember Mr. Lopez being there. I
7 do remember Mr. Landis and Mr. Garza and Mr. Warren.
8    Q. Thank you very much for clarifying that.
9    A. Mr. Lopez may have been there, but I don't
10 remember.
11    Q. So you remember these three -- distinctly
12 these three individuals coming to your office?
13    A. Yes.
14    Q. What were you told?
15    A. That Mr. Garza had allegedly finished his
16 work task and was standing around. Mr. Warren asked
17 him to do some housekeeping issues, basically clean up
18 the shop floor and Mr. Garza refused to pick up the
19 broom.
20    Q. Now, did these three individuals come to see
21 you together or only Mr. Warren came to see you along
22 with Mr. Landis first?
23    A. To my knowledge, all three came at the same
24 time.
25    Q. Did Mr. Garza say anything?

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                                Job No. 15141

---

Page 74

1    A.  That -- I don't remember the exact words but
2  basically he wasn't going to sweep.
3    Q.  Did the name of Mr. -- did Mr. Steve Hunt's
4  name come up in that conversation?
5    A.  Not to my knowledge.
6    Q.  Now, in the body of that statement, it
7  states that Mr. Garza indicated that Mr. Garza was not
8  comfortable working with Steve Hunt.  Did anyone
9  mention that to you?
10   A.  No, I don't even know if they were still
11 working together at that time.  I don't know.  But,
12 no.
13   Q.  Sir?
14   A.  No.  No one said that.
15   Q.  Okay.
16   A.  Mr. Garza never came back after the initial
17 complaint and complained about Mr. Hunt to me.
18   Q.  I'm just trying to figure out what you were
19 told on the 27th of October of 2009.  Let's see.
20 Maybe it's in here.  Mr. Butler, yes, we do have your
21 statement.  If you'll go to page 134.
22   A.  Okay.
23   Q.  Now it's easier on you and me.  All right.
24 You typed up your statement on April 30th, 2009?
25        MS. WHITE:  Objection.  Form.

Page 75

1    Q.  (By Mr. Costea)  Is that what it says at the
2  top October 30th, 2009?
3    A.  I see October 30th, yes.
4    Q.  And that was two days after you issued the
5  termination -- you wrote -- you signed the termination
6  report, right?
7    A.  Yes.
8    Q.  Well, let's develop the facts, the sequence
9  of events based upon your statement.  You indicate
10 that on October 27th, '09 Mr. Warren, Mr. Landis, and
11 Mr. Garza came to your office at 3:45 p.m. and
12 indicated Mr. Warren stated Mr. Garza would not do the
13 work task that he was assigned and you told me about
14 that so far.
15   A.  No.
16   Q.  Sir?
17   A.  No, there's nothing wrong with that so far.
18 I think that's accurate.
19   Q.  Sir?
20   A.  I believe that was accurate to what
21 happened.
22   Q.  Right.  And then in that same paragraph, you
23 say that Mr. Garza said that he did not like using a
24 broom and that he wanted to transfer to a
25 different work area, right?

Page 76

1    A.  Yes.
2    Q.  Did he -- so he did say in your presence
3  that he wanted to move out?
4    A.  He wanted a different supervisor than
5  Mr. Warren.
6    Q.  Well, no.  It says he wanted to transfer to
7  a different location, right?
8    A.  That's what that would have meant.
9    Q.  Did Mr. Garza state in your presence why he
10 wanted to transfer to a different work area?
11   A.  I don't remember.  I don't think so.
12   Q.  And then you say that you asked Mr. Garza to
13 step out of the office and you called a person by the
14 name of Anirban Banerjee?
15   A.  Correct.
16   Q.  Is that how you pronounce that name?
17   A.  Yes.
18   Q.  That's A-n-i-r-b-a-n, last name
19 B-a-n-e-r-j-e-e.  And you say that Mr. Anirban asked
20 you to suspend Mr. Garza for the rest of the afternoon
21 and the next day until we had had a chance to speak
22 with Jeff Dodd and you told me about that.  So did you
23 alone speak with Mr. Dodd or in the presence of
24 Mr. Anirban?
25   A.  That day?

Page 77

1    Q.  Well, whenever you spoke with Mr. Dodd.  Did
2  you speak with him more than once on the 27th, 28th?
3    A.  Prior to October 27th or 28th?
4    Q.  Well, you said that you -- I'm getting back
5  to your testimony just a short while ago that Mr. Dodd
6  recommended that Mr. Garza be fired, right?
7    A.  Yes.  I believe it was a conference call
8  that we had Mr. Banerjee, Mr. Miller present, and
9  myself.
10   Q.  A phone conference?
11   A.  With Mr. Dodd.
12   Q.  The three of you?
13   A.  The three of us with Mr. Dodd.
14   Q.  Do you recall approximately how long that
15 conference, that phone conference was?
16   A.  I do not.
17   Q.  So I take it then for a fact that Mr. Landis
18 was not present for that conference?
19   A.  Yeah, Mr. Landis --
20   Q.  Was not?
21   A.  -- Mr. Banerjee and myself.
22   Q.  Oh, I see.  Mr. Landis was also there for
23 the phone conference?
24   A.  Yes.  Mr. Landis, Mr. Banerjee, and myself
25 was on the phone with Jeff Dodd.

---

20 (Pages 74 to 77)

Electronically signed by Lana Sholders (101-225-766-0482)                                6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                              Job No. 15141

---

Page 78

1    Q.  Okay.  Four folks.  Did Mr. Landis recommend
2  that Mr. Garza be fired?
3    A.  I do not remember.
4    Q.  Did you recommend that he be terminated?
5    A.  I did not.
6    Q.  Did Mr. Anirban recommend that Mr. Garza be
7  fired?
8    A.  I do not remember.
9    Q.  The four of you, who first talked about
10 terminating Mr. Garza?
11   A.  I do not remember.
12   Q.  Did you write a report -- well, strike
13 that.
14         In the -- that same paragraph you say
15 that you brought Jose back to your office with Kevin
16 and Jack still present and you told him that he was
17 being verbally suspended for the rest of the day,
18 right, until you spoke with corporate HR?
19   A.  Yes.
20   Q.  After you told him that, that was when the
21 conference with Mr. Dodd occurred, right?
22   A.  I think it was the following day, I believe.
23   Q.  And you are right.  I apologize.  It's in
24 your next paragraph, the second paragraph on that
25 page.  Let me ask you about the second sentence.  "It

Page 79

1  was decided that with the several instances
2  documenting insubordination in the past and Mr. Garza
3  had never corrected his disruptive behavior that
4  employment termination was appropriate" and I
5  apologize, Mr. Butler, but, again, this is the second
6  time we find in a document where you reference several
7  instances of documented insubordination by Mr. Garza
8  and unfortunately I have to ask you in light of this
9  statement:  What were those, if you know?
10   A.  I do not remember.
11   Q.  And you are saying that those instances are
12 documented, right?  Right?
13   A.  I do not remember.
14   Q.  Now, let me ask you then:  In this phone
15 conference that you had with Mr. Dodd, the four of
16 you, did you look at any documents?
17   A.  I do not understand.
18   Q.  Well, did you tell Mr. Dodd, for instance,
19 "Hey, I'm looking up in his personnel file and he has
20 several instances of documented insubordination"?
21   A.  I do not remember having that phone
22 conversation with Mr. --
23   Q.  What about Mr. Dodd, did he say "By the way
24 I'm looking in his personnel file" or "I'm looking in
25 his electronic personnel file and I'm seeing here that

Page 80

1  he's been documented as being insubordinate in the
2  past"?
3    A.  I do not remember.
4    Q.  In light of your testimony so far,
5  Mr. Butler, I need to conclude and, you know, don't
6  feel bad about this, would you agree with me that the
7  statement "several instances documenting
8  insubordination in the past" is a false statement?
9         MS. WHITE:  Objection.  Form.
10   A.  I do not.
11   Q.  (By Mr. Costea)  You do not?
12   A.  No.
13   Q.  But you cannot factually substantiate it for
14 me, correct?
15         MS. WHITE:  Objection.  Form.
16   Q.  (By Mr. Costea)  You cannot tell me when,
17 where, and how and so on and so forth?
18   A.  I cannot.
19   Q.  All right, sir.  I appreciate that.  And
20 then the second part of that sentence says quote
21 "Mr. Garza had never corrected his disruptive
22 behavior" and I want to talk with you about that.
23 What was his disruptive behavior?  I know that he
24 received a suspension on May the 1st, 2009.  You
25 remember that document, right?

Page 81

1    A.  Yes.
2    Q.  Is that what you're talking about that that
3  type of disruptive behavior continued after May the
4  1st of 2009?
5    A.  There were several instances that was not
6  documented.
7    Q.  Thereafter?
8    A.  Yes.
9    Q.  Can you explain -- can you give me -- can
10 you give me those facts, those instances?
11   A.  I know he spoke to Mr. Dodd several times
12 because Mr. Garza had came in and he wasn't happy with
13 his work assignment and Mr. Dodd just basically said,
14 "Hey, we've got you to do a job."  I know Mr. Garza
15 left the facility one time at lunchtime without
16 clocking out which is against company policy.  And
17 Mr. Dodd told him he has to follow the rules and just
18 like the other employees that we value his service and
19 his expertise but we have a job to do.
20   Q.  Right.  I am focusing on disruptive
21 behavior, sir, not on him going to lunch without
22 clocking out.
23   A.  Well, when he tells the lead person he's not
24 going to do a job in front of the coworkers, I figure
25 that is an insubordination.

21 (Pages 78 to 81)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                    Job No. 15141

---

Page 82

1  Q. Okay. I'm asking about disruptive
2  behavior.
3     A. I think that's very disruptive.
4     Q. So it's insubordination, and it's disruptive
5  as well?
6     A. I believe so.
7     Q. Okay. Can you tell me between May the 1st,
8  2009 and October 27th, 2009 other than this incident
9  of quote insubordination, what else did he do to
10 display disruptive behavior in the work place?
11    A. I had several employees tell me that he
12 threatened to get them fired.
13    Q. Well, I need names.
14    A. Rudy Lopez was one of them.
15    Q. Who else?
16    A. Kevin Warren was one of them.
17    Q. Sir, go ahead.
18    A. I think Rudy Lopez was one of them. I think
19 Kevin Warren was one of them.
20    Q. Kevin Moore?
21    A. Kevin Warren, W-a-r-r-e-n.
22    Q. I need the other names.
23    A. I think Miguel Gutierrez. I don't know
24 of -- I can't think of any other names off hand. It's
25 been years ago.

---

Page 83

1     Q. Did you -- and, again, I am asking you:
2  This happened between May the 1st, 2009 and October --
3     A. To my knowledge, that's when it happened.
4     Q. And how do you know it happened during that
5  window?
6     A. To my knowledge, that's the best I remember.
7     Q. Did you -- did you document?
8     A. I do not believe I did.
9     Q. Why not?
10    A. I wasn't present to hear. It would have
11 been third party.
12    Q. Sir?
13    A. It would have been a third party complaint.
14    Q. What do you mean?
15    A. I didn't hear Mr. Garza threaten employees.
16    Q. Well, your testimony was Mr. Lopez came to
17 you and said "Mr. Garza is threatening to get me
18 fired"?
19    A. He had threatened him, yes.
20    Q. With getting him fired?
21    A. Yes.
22    Q. Do you recall the statements that we have
23 looked at?
24    A. Like I said, I don't know if it's before May
25 1st or after May 1st.

---

Page 84

1     Q. You recall the written record that we have
2  in front of us indicates that incidents of that nature
3  happened before May the 1st of 2009?
4     A. I cannot say.
5     Q. So you cannot say that these incidents
6  happened after May the 1st of 2009?
7     A. I cannot say.
8     Q. In the same paragraph in the middle of the
9  paragraph, the last paragraph, Mr. Butler, it states
10 that Jose said he wanted a copy of his termination so
11 he could file for unemployment benefits.
12    A. Correct.
13    Q. And I see your response. Did you tell him
14 that the company would fight unemployment?
15    A. No, I did not.
16    Q. Was Ms. Black at all involved in the
17 conversations leading up to Mr. Garza's termination?
18    A. I do not know.
19    Q. Now, I see that you gave a statement about
20 the events leading up to his termination, Mr. Lopez
21 gave a statement about the events leading up to his
22 termination, Mr. Warren, Kevin Warren did provide a
23 statement and Mr. Landis provided a statement. Was
24 Mr. Garza asked to provide his written version of what
25 actually transpired during the last two or three days

---

Page 85

1  of his employment with the company?
2     A. I do not know.
3     Q. Did you ask Mr. Landis to write a report of
4  what happened?
5     A. I don't remember asking him.
6     Q. Did you ask Mr. Warren to write a statement
7  about what happened?
8     A. I'm not sure. I don't remember asking him.
9     Q. Did you ask Mr. Lopez to write a statement
10 about what happened?
11    A. I do not remember asking him.
12    Q. Please go the page 1, 2, 3, 4 of Exhibit No.
13 5.
14    A. Which page?
15    Q. It's Kevin Warren's statement.
16    A. What number is it?
17    Q. 132.
18    A. Okay.
19    Q. The top of the page says "Kevin Warren's
20 statement concerning conversation with Jose S. Garza."
21 The date at the top is October 29, 2009, right?
22    A. Yes.
23    Q. Do you know whether or not Mr. Warren
24 himself typed up this document?
25    A. I have no idea.

---

22 (Pages 82 to 85)

FOX REPORTING
(713) 622.1580

BILL BUTLER
October 8, 2013                                    Job No. 15141

Page 86

1    Q.  Do you know whether or not your secretary
2    was the one that actually typed up these statements?
3        A.  I do not know.
4        Q.  Fair enough.  Now, you will see that
5    Mr. Kevin Warren signed this statement on October
6    27th, 2009, right?
7        A.  I see that.
8        Q.  How is it possible for Mr. Warren to sign a
9    statement -- this statement on 10-27-2009 when this
10   document appears to have been typed up on October
11   29th, 2009?
12         MS. WHITE:  Objection.  Form.
13       A.  I have no idea.
14       Q.  (By Mr. Costea)  I think that's all I have
15   about this statement, Mr. Butler.  I don't have that
16   much longer for you, Mr. Butler; but you're welcome to
17   take a break if you need one.  Do you need a break?
18       A.  No, I'm fine.
19       Q.  Okay, sir.  Thank you.  Please go to Butler
20   Exhibit 3 and I'll represent to you that what you have
21   in front of you, sir, on the first page, page 1 and
22   page 2 of Exhibit No. 3 is a typed up statement.  I
23   think it's even sworn.  It is a sworn statement by
24   Mr. Garza.  It says "Affidavit of facts."  The first
25   line he says "Yesterday," which was October 27th, "I

Page 87

1    requested my team leader Kevin Warren to change either
2    my coworker Steven Hunt or me to another group" and so
3    on and so forth.  And then the last -- in the last
4    sentence of that paragraph, he states that "Some
5    minutes later he," meaning Mr. Warren "sent someone
6    for me and we went to the HR offices with
7    Mr. Bill Butler."  Do you see that?
8        A.  Yes.
9        Q.  So it seems that like -- it jives with your
10   recollection that on the 27th you met with Mr. Warren
11   and others and Mr. Garza.  But then in the next line
12   if you will please follow with me it says "That is
13   when Mr. Warren requested my termination papers."  And
14   I want to ask you:  Did Mr. Warren request on the 27th
15   in the meeting that we already talked about that
16   Mr. Garza be terminated?
17       A.  I don't remember.  I do not believe so.
18         (Exhibit No. 4 marked.)
19       Q.  (By Mr. Costea)  Mr. Butler, we are looking
20   at Butler Exhibit No. 4 and page 1 doesn't really
21   belong to this exhibit but that's the way I stapled it
22   by mistake but I want to focus your attention on the
23   next page which is an employment application by
24   Mr. Garza.  And if you will go, please, to actually
25   the first page -- the first page of the application,

Page 88

1    it identifies a date for the employment application of
2    1-5-2006.  You were not at the 529 plant in January of
3    2006, right?
4        A.  I was there.
5        Q.  You were?
6        A.  In the health and safety environmental.  I
7    started in 2001.
8        Q.  You were not in HR?
9        A.  I was not in HR until December of 2006.
10       Q.  Now, you have to trust me on this one.  I'll
11   represent to you that there has been testimony that
12   Mr. Garza began his employment with National Oilwell
13   in September of 2005.  Okay?
14       A.  That's quite possible.
15       Q.  Fair enough.  And maybe you can explain to
16   me why the gap between the date of his hire and the
17   date of his employment application?  How does that
18   work?
19       A.  I believe that him and his brother had
20   started out as a temporary worker.
21       Q.  So Mr. Garza had a brother that worked at
22   National Oilwell?
23       A.  He alleged it was his brother.
24       Q.  Okay.  Have you seen him?  You know his
25   name?

Page 89

1        A.  I know his name.
2        Q.  What's his name?
3        A.  Normand, N-o-r-m-a-n-d.
4        Q.  Garcia?
5        A.  Garza.
6        Q.  Garza.  They claim to be brothers?
7        A.  They claim to be brothers.
8        Q.  Is Normand still working there?
9        A.  No.
10       Q.  What happened to him?
11       A.  Terminated in 2005.
12       Q.  He was fired, his brother?
13       A.  Yes.  He was terminated.
14       Q.  In '05?
15       A.  In '05.  I don't know what month.
16       Q.  Well, you say that they worked together at
17   NOV?
18       A.  Yes, they did -- I'm sorry.  He was
19   terminated in '08.
20       Q.  '08?
21       A.  Yes, '08.
22       Q.  Normand?
23       A.  Normand.
24       Q.  Okay.  I don't think I have anymore
25   questions about documents.  But I need to look at my

23 (Pages 86 to 89)

Electronically signed by Lana Sholders (101-225-766-0482)                    6a955d7e-eb27-4a49-8626-a9d0a95b34f5

BILL BUTLER
October 8, 2013                              Job No. 15141

---

**Page 90**

1   notes and hopefully we'll be done.
2       A.  I'd just like to clarify the reason it was
3   probably temporary is they try them out for like a 60
4   or 90-day period to see if they work out and then
5   before they make them a full-time employee with
6   benefits.
7       Q.  If they have the skills?
8       A.  It's like a probationary period.
9       Q.  Fair enough.  Thank you.
10      A.  I can go on record saying Mr. Jose Garza was
11  unhappy we terminated his brother.
12      Q.  He was unhappy with him being fired?
13      A.  Very.
14      Q.  That's not unusual, is it, for somebody to
15  be unhappy with being fired?
16      A.  I'm not sure it was his brother.  They
17  claimed to be brothers.
18          MR. COSTEA:  I pass the witness.  I
19  don't have anymore questions for you, sir.  Thank your
20  for your patience with me.
21          MS. WHITE:  Defense will reserve any
22  questions until the time of trial.
23          (Deposition concluded at 2:47 p.m.)
24
25

---

**Page 91**

1           WITNESS' CHANGE/CORRECTION PAGE
2            DEPOSITION OF BILL BUTLER
3             TAKEN OCTOBER 8, 2013
4   PAGE/LINE  CHANGE        REASON
5   _____  _____      _____
6   _____  _____      _____
7   _____  _____      _____
8   _____  _____      _____
9   _____  _____      _____
10  _____  _____      _____
11  _____  _____      _____
12  _____  _____      _____
13  _____  _____      _____
14  _____  _____      _____
15  _____  _____      _____
16  _____  _____      _____
17  _____  _____      _____
18  _____  _____      _____
19  _____  _____      _____
20  _____  _____      _____
21  _____  _____      _____
22  _____  _____      _____
23  _____  _____      _____
24  _____  _____      _____
25  _____  _____      _____

---

**Page 92**

1           WITNESS' SIGNATURE PAGE
2            DEPOSITION OF BILL BUTLER
3             TAKEN OCTOBER 8, 2013
4
5       I, BILL BUTLER, have read the foregoing
6   deposition and hereby affix my signature that same is
7   true and correct, except as noted above.
8
9           _____
                BILL BUTLER
10  THE STATE OF _____)
11  COUNTY OF _____)
12
13  Before me,_____, on this day personally
14  appeared BILL BUTLER, known to me (or proved to me
15  under oath or through _____) (description of
16  identity card or other document) to be the person
17  whose name is subscribed to the foregoing instrument
18  and acknowledged to me that they executed the same for
19  purposes and consideration therein expressed.
20
21  Given under my hand and seal of office on this _____
22  day of _____, _____.
23
24          _____
                NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
25

---

**Page 93**

1   COUNTY OF HARRIS )
2   STATE OF TEXAS   )
3
4           REPORTER'S CERTIFICATE
5   I, LANA SHOLDERS, Certified Shorthand Reporter in and
6   for the state of Texas, hereby certify that this
7   transcript is a true record of the testimony given by
8   the witness named herein, after said witness was duly
9   sworn by me.
10
11  I further certify that I am neither attorney nor
12  counsel for, related to, nor employed by any of the
13  parties to the action in which this testimony was
14  taken.  Further, I am not a relative or employee of
15  any attorney of record in this cause, nor do I have a
16  financial interest in the action.
17
18  Certified to by me this the 28th day of October, 2013.
19
20      Lana Sholders
21  LANA SHOLDERS, Texas CSR
    Expiration Date: 12-31-14
22  Firm Registration # 530
    FOX Reporting
23  4550 Post Oak Place, Suite 201
    Houston, Texas  77027
24  Phone  713.622.1580
    Fax  281.768.5540
25  www.fox-reporting.com

---

24 (Pages 90 to 93)

FOX REPORTING
(713) 622.1580