Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA                )
                             )
VS.                          ) C.A: H-4:12-CV-03532
                             ) JURY
NATIONAL OILWELL VARCO,      )
LP                           )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

MEREDITH BLACK

OCTOBER 31, 2013

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of MEREDITH BLACK, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 31st day of October, 2013, from 11:55 a.m. to 12:54 p.m., before Lana Sholders, CSR in and for the State of Texas, reported/recorded by machine shorthand, at the offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 400 Dallas, Suite 3000, Houston, Texas, pursuant to the Federal Rules of Civil Procedure.

PLAINTIFF'S EXHIBIT 16

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                4fc25702-f2a1-461f-8dc7-34a038caeda3

MEREDITH BLACK
October 31, 2013                             Job No. 15254

Page 2

APPEARANCES:

FOR THE PLAINTIFF:
MR. PETER COSTEA
Attorney at Law
Three Riverway, Suite 1800
Houston, Texas 77056
Phone 713.337.4304
Fax 713.659.5302
Email costealaw@yahoo.com

FOR THE DEFENDANT:
MS. CHRISTINE M. WHITE
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
701 Poydras Street, Suite 3500
New Orleans, Louisiana 70139
Phone 504.648.3840
Fax 504.648.3859
Email christine.white@ogletreedeakins.com

Page 3

INDEX
Appearances.................................. 2
MEREDITH BLACK:
    Examination by Mr. Costea.............. 4
Signature and Changes..................... 47-48
Reporter's Certificate Page............... 49

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Charge of Discrimination | 41 |
| 2 | Response to Charge of Discrimination | 42 |
| 3 | Policy Statement | 42 |

Page 4

            MEREDITH BLACK,
having been first duly sworn, testified as follows:
            EXAMINATION
BY MR. COSTEA:
    Q.  Please state your full name.
    A.  Meredith Lynn Bruce.
    Q.  Have you gone by last name Black?
    A.  Yes.
    Q.  How long have you gone by Bruce?  Since when?
    A.  October of last year.
    Q.  In 2009 were you known as Meredith Black?
    A.  Yes.
    Q.  And in 2008 as well?
    A.  Yes.
    Q.  2010?
    A.  Yes.
    Q.  How are you employed right now?
    A.  What do you mean?
    Q.  I don't know.  Are you employed anywhere?
    A.  Am I employed?
    Q.  Right.
    A.  Yes.
    Q.  Where?
    A.  National Oilwell Varco.

Page 5

    Q.  Where do you office, at what location, what address?
    A.  10000 Richmond Avenue.
    Q.  Is that a manufacturing location?  What is it?
    A.  No.
    Q.  What is it?
    A.  It is the corporate office for Rig Solutions.
    Q.  What is Rig Solutions?  A division of NOV or how does Rig Solution fit within the company?
    A.  Yes, it is a division of NOV.
    Q.  And what is your current job with NOV?
    A.  Senior HR manager.
    Q.  How long have you had that title?
    A.  For approximately five years.
    Q.  So back in 2008, 2009 you had the same job title?
    A.  Yes.
    Q.  And how long have you worked for NOV in all?
    A.  14 years.
    Q.  So that puts us back in 1999?
    A.  Yes.
    Q.  I take it -- well, strike that.
        Do you have any college education in

2 (Pages 2 to 5)

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                    4fc25702-f2a1-461f-8dc7-34a038caeda3

Page 6

1  human resources?
2     A. I have college education.
3     Q. In human resources?
4     A. Not in human resources.
5     Q. What was your terminal college degree?
6     A. Psychology. Bachelor of arts.
7     Q. Did you take any HR courses in college?
8     A. Not that I recall.
9     Q. When did you graduate from college?
10    A. 1993.
11    Q. And between '93 and '99, what did you do? How were you employed?
12    
13    A. For two years I worked for a staffing agency as a recruiter. Then I started work as an HR assistant for an insurance company.
14    
15    
16    Q. And next it was NOV?
17    A. I actually went to work for Baylor Company.
18    Q. Baylor Company?
19    A. Which was purchased by National Oilwell.
20    Q. In 1999 or so?
21    A. I went to work for Baylor in '99. National purchased Baylor around 2000, I believe.
22    
23    Q. Baylor?
24    A. 2001.
25    Q. Baylor what?

Page 7

1     A. Baylor Company.
2     Q. And you worked for Baylor in HR?
3     A. Correct.
4     Q. Do you know what Title VII is?
5     A. The discrimination act.
6     Q. Right.
7     A. Yes.
8     Q. Do you know what sexual harassment is?
9     A. In what context?
10    Q. Do you have posters at work which tell employees that sexual harassment is against Title VII?
11    
12    A. Do we have posters?
13    Q. Yes.
14         MS. WHITE: Objection. Form.
15    A. What --
16    Q. (By Mr. Costea) Do you know what a poster is?
17    
18    A. Yes, I know what a poster is. I'm not sure if you're referring to pictures or what type of posters.
19    
20    
21    Q. Posters, postings in the work place telling employees that sexual harassment is against the law or violates --
22    
23    
24    A. We have harassment --
25    Q. -- violates Title VII?

Page 8

1          MS. WHITE: Objection. Form.
2              Go ahead and answer.
3     A. We have postings on harassment.
4     Q. (By Mr. Costea) Does it say sexual harassment?
5     
6     A. Yes.
7     Q. Have you seen such postings at 529 FM location?
8     
9     A. At what time? Recently?
10    Q. 2008, 2009.
11    A. I don't recall.
12    Q. What about right now?
13    A. I don't know.
14    Q. So you don't recall having seen any sexual harassment postings at FM 529?
15    
16    A. No.
17    Q. Where do you see these postings currently? Where are they on display?
18    
19    A. At my office we have common areas where we have those types of postings.
20    
21    Q. Have you inquired whether or not the FM 529 location has sexual harassment postings?
22    
23    A. Are you asking if I have inquired?
24    Q. Yes.
25    A. No, I have not.

Page 9

1     Q. You've been there a couple of times?
2     A. Yes.
3     Q. Now, have you taken seminars or courses in human resources?
4     
5     A. Yes.
6     Q. Where? Do you take them at, I don't know, colleges, universities?
7     
8     A. I have taken a course at Rice for my certification, and I have continuing education. Most recently was at an HR Houston conference here in town.
9     
10    
11    Q. When did you take your course at Rice?
12    A. I'm sorry. Can you repeat that?
13    Q. When did you take your course at Rice?
14    A. It was approximately three years ago.
15    Q. You said you took that course for certification purposes?
16    
17    A. Yes.
18    Q. What certification was that?
19    A. Senior HR professional, SPHR.
20    Q. SPHR. Okay. So you have had this certificate for about three years?
21    
22    A. Yes.
23    Q. So that puts us back in, what, 2010 or so?
24    A. It was -- I sat for my test in December. It will be three years ago. So, yeah.
25

MEREDITH BLACK
October 31, 2013                                    Job No. 15254

Page 10

1   Q.  Yes.
2   A.  I'm doing calculations in my head.
3   Q.  December, 2013?
4   A.  It was December three years ago.
5   Q.  2010?
6   A.  Yes.
7   Q.  How many hours did you get at Rice? Was it
8   two hours, three hours?
9   A.  It was a six-week course. It was not a
10  typical college course. It was a preparatory course.
11  One night per week.
12  Q.  Was that the first HR course that you have
13  taken?
14  A.  A course like that, yes.
15  Q.  Did you receive any training in sexual
16  harassment in that course, the Rice course?
17  A.  No.
18  Q.  Have you taken any courses, any classes
19  outside of NOV dealing specifically with sexual
20  harassment?
21  A.  Not specifically.
22  Q.  Have you taken any courses outside of NOV
23  dealing with Title VII, discrimination, retaliation,
24  issues of that nature?
25  A.  I have taken basic continuing education

Page 11

1   classes which that has been a part of.
2   Q.  Since when have you taken CLE courses?
3   A.  What type of course? Specific to sexual
4   harassment or --
5   Q.  Well, you keep on telling me about CLE.
6   A.  Well, I mentioned I had a continuing
7   education most recently at our HR Houston which was
8   just a few months ago.
9   Q.  So you're taking the CLE's to keep your
10  certification alive?
11  A.  Correct.
12  Q.  How many hours a year?
13  A.  60 credits for three years.
14  Q.  Is that 60 credits, is that 60 hours?
15  A.  Yes. One credit is one hour typically.
16  Q.  Now prior to December of 2010, have you
17  taken -- I guess you haven't taken any CLE's, right,
18  because you didn't have to?
19  A.  No. I had taken not for my certification
20  but I have attended other courses.
21  Q.  Dealing with HR matters?
22  A.  Yes.
23  Q.  Please tell me about the office in which you
24  work. Is it known as the HR office, human resources?
25  What's the name of it?

Page 12

1   MS. WHITE: Objection. Form.
2   A.  My department or the actual action building,
3   the office.
4   Q.  (By Mr. Costea) Yes, your department.
5   A.  My department is Human Resources for Rig
6   Solutions.
7   Q.  Human Resources?
8   A.  Human Resources for Rig Solutions.
9   Q.  For Rig Solutions, okay. How many employees
10  are there in that department?
11  A.  At that office or in the department as a
12  whole?
13  Q.  In the department as a whole.
14  A.  Outside of my specific office?
15  Q.  For the whole -- well, I'm talking about
16  HR.
17  A.  Maybe 25.
18  Q.  About 25 employees, okay. Who is in charge
19  of the office right now?
20  A.  Jeff Dodd is our HR director.
21  Q.  Does he know that you are here today?
22  A.  Yes, he does.
23  Q.  How long has he been the HR director?
24  A.  Approximately six years.
25  Q.  And I take it he's your boss, your immediate

Page 13

1   boss?
2   A.  Yes.
3   Q.  You report to him directly?
4   A.  Yes, I do.
5   Q.  Have you communicated with him in writing
6   concerning Mr. Garza and his employment with NOV?
7   A.  Not that I recall.
8   Q.  Have you communicated with him verbally
9   about Mr. Garza and his employment at NOV?
10  A.  At any time or --
11  Q.  At any time, yes.
12  A.  Yes.
13  Q.  Have you created any memos, any reports
14  concerning Mr. Garza and his employment at NOV?
15  A.  Not that I recall.
16  Q.  Have you done any investigations concerning
17  any allegations by Mr. Garza about his coworkers or
18  investigations of allegations or complaints by
19  Mr. Garza's coworkers against Mr. Garza?
20  A.  Yes.
21  Q.  One or more than one?
22  A.  One.
23  Q.  Do you remember when that was?
24  A.  Not exactly but around in 2009.
25  Q.  Tell you what, let's go ahead and look at

4 (Pages 10 to 13)

FOX REPORTING
(713) 622.1580

MEREDITH BLACK
October 31, 2013                                   Job No. 15254

Page 14

1  some paperwork so we won't stretch everyone's memory
2  too much. And we are going to start with Mr. Miller
3  Exhibit No. 3. Before I ask questions about that
4  document, I want to ask you something else. Have you
5  looked at any paperwork to refresh your recollection
6  about the events that involved Mr. Garza three, four
7  years ago?
8       A.  Yes.
9       Q.  What did you look at?
10      A.  I looked at some notes that had been given
11 to our attorneys from the investigation.
12      Q.  Handwritten notes?
13      A.  Handwritten and some typed.
14      Q.  Did you review any testimony that has been
15 provided in this case before today?
16      A.  No.
17      Q.  Let's in Exhibit No. -- In butler -- I'm
18 sorry, Miller Exhibit No. 3, let's look at page 2. I
19 take it, Ms. Black that -- I'm sorry, Ms. Bruce, that
20 you have testified before under oath?
21      A.  No.
22      Q.  This is your first one?
23      A.  Yes.
24      Q.  First time. Okay. Don't be nervous. We
25 refer to these documents as exhibits.

Page 15

1       A.  Sure.
2       Q.  It's a fancy name for a piece of paper. But
3  I also want to point out to you as a reference that
4  these documents have numbers at the bottom of the
5  page. The page you're looking at right now has a --
6  the number at the bottom of the page is 146, right?
7       A.  Yes.
8       Q.  So we are then on the same page. Let's
9  start with this document. It's a corrective action
10 report for an employee by the name of Jose Garza with
11 a date of April 24th of 2009, right?
12      A.  Yes.
13      Q.  Have you seen this document prior to the
14 time that Mr. Garza was terminated by NOV?
15      A.  I don't recall. I don't recall this
16 document.
17      Q.  If you say you don't recall, I guess I have
18 to just move on. Well, actually I might come back to
19 it. Let's go on to the next page Bates stamped 147,
20 same exhibit. It's a corrective action report taken
21 against Mr. Garza. The date of the incident is May
22 the 1st of 2009; and I seem to recognize your name
23 right at the bottom of the page where it says
24 Meredith Black, right?
25      A.  Yes.

Page 16

1       Q.  Is that your signature?
2       A.  Yes, it is.
3       Q.  You recall having -- actually having signed
4  this page, right?
5       A.  Yes.
6       Q.  In what context? What happened?
7       A.  At the conclusion of my investigation.
8       Q.  So you did an investigation in -- right at
9  the end of April or early May, 2009?
10      A.  Yes.
11      Q.  What did you investigate?
12      A.  I was asked to go investigate in response to
13 a complaint by Mr. Garza.
14      Q.  A complaint by Mr. Garza against whom?
15      A.  Mr. Hunt.
16      Q.  Have you ever seen Mr. Hunt?
17      A.  Have I seen Mr. Hunt?
18      Q.  Yeah, in person.
19      A.  One time.
20      Q.  Did you actually talk with him?
21      A.  Yes.
22      Q.  How did you find out that Mr. Garza was
23 complaining about Mr. Hunt?
24      A.  Jeff came to my office and asked me if I
25 could go to the facility and do an investigation for

Page 17

1  the complaint.
2       Q.  That's Mr. Jeff Dodd?
3       A.  Yes.
4       Q.  Now, in relation to 5-1-2009, do you recall
5  when he told you that?
6       A.  I'm sorry?
7       Q.  In relation to 5-1 and that's the date of
8  this write-up.
9       A.  Okay.
10      Q.  Do you recall when he asked you to go out
11 and do an investigation?
12      A.  Not the specific day but maybe one or two
13 days prior.
14      Q.  Prior, okay.
15      A.  I went immediately.
16      Q.  So I take it -- well, strike that.
17          So am I to understand that the first
18 source from which you heard or became aware that
19 Mr. Garza was complaining about Mr. Hunt was from
20 Mr. Dodd?
21      A.  Yes.
22      Q.  And he communicated his request for you to
23 investigate in writing or verbally?
24      A.  In writing -- I'm sorry. Strike that.
25          It was verbally.

5 (Pages 14 to 17)

Electronically signed by Lana Sholders (101-225-766-0482)                4fc25702-f2a1-461f-8dc7-34a038caeda3

MEREDITH BLACK
October 31, 2013
Job No. 15254

Page 18

1  Q. Fair enough. Fair enough. What was the
2  first thing that you did after he asked you to go out
3  there and do the investigation?
4  A. I don't specifically recall immediately
5  after. I mean, do you mean in regards to taking
6  action on this investigation?
7  Q. Precisely. You made phone calls, you showed
8  up unannounced, you asked people to line up people for
9  you to interview? Just what did you do?
10 A. I don't remember if I went out that
11 afternoon or if it was the following morning
12 specifically. I don't recall specifically what I did.
13 Q. Did Mr. Dodd give you any details about the
14 specific allegations that Mr. Garza was making against
15 Mr. Hunt?
16 A. No, not that I recall.
17 Q. Did he indicate anything along the lines of
18 sexual assault, sexual harassment, anything like that?
19 A. Not that I -- I don't specifically recall
20 other than he asked me to go in regards to a claim.
21 Q. Did you do any preparatory work in
22 preparation of the investigation such as looking up
23 anything online like Mr. Garza's personnel file if it
24 was available online, anything like that?
25 A. I did not look up anything online.

Page 19

1  Q. So you just showed up and started talking
2  with folks, right?
3         MS. WHITE: Objection. Form.
4  Q. (By Mr. Costea) You showed up at the plant,
5  FM 529, and started talking with folks, right?
6  A. I did go, yes, I did.
7  Q. Who was your point of exact at FM 529?
8  A. Bill Butler was the HR manager at the time.
9  Q. So I suppose that you had a conversation
10 with him about Mr. Garza's allegations?
11 A. Brief.
12 Q. What did he tell you?
13 A. Basically that he had received an affidavit
14 and he had spoken to him and that he -- I'm trying to
15 remember.
16 Q. Had spoken to --
17 A. He had spoken to Mr. Garza. He had been
18 given the complaint and, I mean, not much detail.
19 That was the basics.
20 Q. Did Mr. Butler show you any documents?
21 A. Yes.
22 Q. Like statements?
23 A. Yes.
24 Q. Affidavits?
25 A. He had -- he had typed up his statement and

Page 20

1  had also received statements from some other named
2  employees.
3  Q. I am going to show you a document. I don't
4  think I have -- well, maybe it's in this stack; but I
5  don't have a separate exhibit here today. I'm showing
6  to you a document that's Bates stamped 129. Just
7  confirm the number in the front of the page.
8  A. Yes.
9  Q. And this -- it's a one-page document. It's
10 an Affidavit of Fact by Jose Garza with a date of --
11 at least the document reflects a date of April 29th,
12 2009, right?
13 A. Correct.
14 Q. Is that the affidavit that Mr. Butler
15 referenced in his conversation with you?
16 A. Yes.
17 Q. Did he show you a copy of that affidavit?
18 A. Yes.
19 Q. Now, in relation to the 29th of April --
20 well, strike that.
21         I suppose you showed up for your
22 investigation the following day on the 30th?
23 A. Possibly. I don't recall the date.
24 Q. I tell you what, let me take a short detour
25 here. Did you keep a business calendar in 2009?

Page 21

1  A. Yes.
2  Q. I'm trying to refresh your recollection. Do
3  you recall whether or not you jotted down in your
4  calendar that you went out, on what day, whom you
5  spoke with the investigation, so on and so forth?
6  A. I don't recall keeping that on my calendar.
7  Q. I see. Do you still have your 2009 business
8  calendar?
9  A. It would be online. I don't have -- I don't
10 have a written calendar.
11 Q. Right.
12 A. No.
13 Q. But the one that you have online, do you
14 still have it, 2009?
15 A. I assume it's in Outlook. I don't know if
16 you can go back that far. I don't know.
17 Q. I'm just trying to lay hands on as many
18 relevant documents. It's really not imputing
19 anything. I'm dealing with paper all the time. So
20 then it seems you went out at the earliest on the 30th
21 of April, 2009, right?
22 A. Yes.
23 Q. How long was the investigation? A day or
24 two days?
25 A. Yes. I don't recall specifically. It was

6 (Pages 18 to 21)

MEREDITH BLACK
October 31, 2013                                Job No. 15254

Page 22

1  one or two days.
2      Q.  Now, if you just keep that document right
3  there and look at the document that's in Miller
4  Exhibit No. 3, document 147. The date of the incident
5  is May the 1st of 2009, right?
6      A.  Yes.
7      Q.  So it seems to me that as of May 1st of 2009
8  you had already completed the investigation?
9      A.  Yes.
10     Q.  Can you give me the names of the individual
11 that you spoke with?
12     A.  I spoke with Bill Butler.
13     Q.  Yes.
14     A.  I spoke with -- and I may have to refer to
15 this because I spoke to the named in here.
16     Q.  Take your time. Mr. Garza?
17     A.  So Rudy Lopez, Miguel Gutierrez,
18 William Goff. I spoke to them.
19     Q.  And I'm going to give you some names.
20 Again, please don't change your testimony. I'm giving
21 you the names to see if it refreshes your
22 recollection. Did you speak with Mr. Miller,
23 Bob Miller as part of your investigation?
24     A.  I don't recall.
25     Q.  No problem. But you did speak with

Page 23

1  Mr. Garza?
2      A.  I don't recall.
3      Q.  So I guess then you relied upon the
4  affidavit to get the facts?
5      A.  Yes. I was given the affidavit.
6      Q.  Fair enough.
7      Q.  Did you speak with Mr. Hunt?
8      A.  No.
9      Q.  You said you spoke with him once?
10     A.  No, not --
11     Q.  Not at that time?
12     A.  -- at this investigation.
13     Q.  Did you take notes as you were talking with
14 them?
15     A.  Yes.
16     Q.  I think we came across some notes. Let me
17 see if I can find them somewhere. When you think you
18 have all the documents with you, it turns out that you
19 don't. But can I please have that transcript back?
20 Thank you. I would like for you to look at documents
21 218 through 219.
22     A.  Okay.
23     Q.  Are those the notes that you took during the
24 investigation that you did back in late April of 2009?
25     A.  Yes.

Page 24

1      Q.  I'll represent to you all I have is two
2  pages. Is that all the notes that you have taken
3  during the investigation?
4          MS. WHITE: Objection. Form.
5      A.  These are my notes.
6      Q.  (By Mr. Costea) Do you recall your notes
7  being longer than two pages?
8      A.  Not that I recall.
9      Q.  At the conclusion of the investigation, you
10 say you don't recall actually having put together a
11 report, right?
12     A.  No report.
13     Q.  But what you did was -- well, you did. I do
14 not know who did; but we know that on May the 1st of
15 2009 this corrective action report was given to Garza,
16 right?
17     A.  I know this 147 was given to him.
18     Q.  147, okay. Do you know who actually drafted
19 this corrective action report?
20     A.  Yes.
21     Q.  Who did it?
22     A.  I typed it up with -- after consulting with
23 Jeff Dodd.
24     Q.  Let me ask you about the form itself. I
25 guess you accessed this form online?

Page 25

1      A.  Well, it's on our HR drive.
2      Q.  Where did you draft this corrective action
3  report? At 529 or your corporate office?
4      A.  At 529.
5      Q.  529. Okay. In the HR office?
6      A.  Yes.
7      Q.  Did they give you the blank form, or how did
8  you get a hold of it?
9      A.  It's a Word document on our human resources
10 drive.
11     Q.  Right. Okay. Now, tell me how -- tell me
12 about how you and Mr. Dodd came up to phrase this
13 corrective action report. Whose language is this? Is
14 this yours, or is it his?
15     A.  What do you mean by language?
16     Q.  Well, it says "After further investigation,
17 your allegation of sexual assault has not been
18 substantiated." Whose wording is that? Is it yours,
19 or is it his?
20     A.  I don't recall specifically. We consulted
21 on the form. I don't recall who specifically said
22 which sentence.
23     Q.  Okay. It was only you and Mr. Dodd, nobody
24 else?
25     A.  Yes. Mr. Butler was in the office.

7 (Pages 22 to 25)

Page 26

1  Q. Did he provide any input?
2  A. No.
3  Q. Was he in the office while you and Mr. Dodd
4  were communicating about the wording of the corrective
5  action report of May 1, 2009?
6  A. Yes, he was.
7  Q. And I suppose you were talking with Mr. Dodd
8  by phone --
9  A. Yes.
10 Q. -- about the wording of this? Was it the
11 morning of May the 1st?
12 A. I don't recall the time.
13 Q. About how long did it take you and Mr. Dodd
14 to put together this document?
15 A. I don't recall specifically. We had a phone
16 call and we discussed how we were going to complete
17 the form and I don't recall the length of time.
18 Q. Did you communicate with him by email about
19 this form such as drafting -- I'm sorry, emailing
20 drafts of this form back and forth?
21 A. No, not that I recall.
22 Q. Now, this document references at the top a
23 date of incident of May 1st, 2009. What happened on
24 May 1st of 2009? What was the incident that happened
25 on that day?

Page 27

1  A. I don't recall an incident. I believe it
2  was the date of the form -- this was completed.
3  Q. So no incident actually occurred on May the
4  1st of 2009?
5  A. Well, what do you mean by incident?
6  Q. Meaning that on May 1st, 2009 Mr. Garza, for
7  instance, violated policy or engaged in some
8  inappropriate conduct in the work place, was late for
9  work, you know, left early? Was he insubordinate,
10 disrespectful, violated some company policies?
11 A. Not on that date. This was at the
12 conclusion of the --
13 Q. Investigation?
14 A. -- investigation.
15 Q. Under reason for action, you checked
16 "other," right?
17 A. Yes, "other" is checked.
18 Q. And what was that "other"? I'm asking
19 because it's not explained, right?
20 A. Well, the description below.
21 Q. So the "other" -- the reason for this action
22 would be the conclusion of the investigation?
23     MS. WHITE: Objection. Form.
24 A. Can you rephrase that?
25 Q. (By Mr. Costea) The reason for the action

Page 28

1  is "other" and I'm trying to figure out what the
2  "other" was. I'm trying to figure out your state of
3  mind.
4  A. Well, there is -- we refer to the
5  description where there were --
6  Q. Okay. I think I understand.
7  A. -- two things listed.
8  Q. Fair enough. And then the next box says
9  "Type of warning." It says suspension/final warning,
10 right?
11 A. Yes, it does.
12 Q. Who came up with that type of disciplinary
13 action?
14 A. It was a joint decision.
15 Q. Between you and Mr. Dodd?
16 A. Yes.
17 Q. Let's see what the body of the corrective
18 action report states. "After further investigation
19 your allegation of sexual assault has not been
20 substantiated." I want to ask you about the qualifier
21 "further investigation." Am I to understand that
22 before May the 1st, 2009 somebody else investigated or
23 began an investigation into Mr. Garza's allegations
24 against Mr. Hunt?
25 A. I did not conduct one prior.

Page 29

1  Q. Did someone because it says "further
2  investigation." The word "further" to me implies that
3  somebody had conducted an investigation before you?
4  A. I'm not aware of anyone conducting one prior
5  to this -- these two days.
6  Q. Okay. "Your allegation of sexual assault
7  has not been substantiated," right? Where did you
8  come up with the terminology with the term "sexual
9  assault"?
10 A. I don't recall specifically.
11 Q. Could you please go to the affidavit? Do
12 you have it there? Or I think it's here.
13 A. In this booklet?
14 Q. Yeah. I think it's in that booklet. Was
15 that the allegation that Mr. Garza made under oath on
16 April 29th, 2009?
17 A. He alleges sexual harassment and being
18 poked.
19 Q. Does it say in his affidavit "sexual
20 assault"?
21 A. I do not see the word "assault"
22 specifically.
23 Q. Where did you derive that then for your
24 corrective action report --
25     MS. WHITE: Objection. Form.

8 (Pages 26 to 29)

Page 30

1  Q. (By Mr. Costea) -- that he alleged sexual
2  assault?
3      MS. WHITE: Objection. Form.
4  A. I don't recall how we chose the word.
5  Q. (By Mr. Costea) Okay. Do you have -- what
6  is sexual assault in your mind?
7  A. Under what circumstances?
8  Q. Well, you use that term here.
9  A. To me sexual assault is when someone has
10 been physically touched or hurt or poked.
11 Q. Sexually?
12 A. Yes.
13 Q. So am I to understand that you were
14 investigating an allegation of sexual assault?
15 A. We did not start the investigation with
16 believing anything was sexual assault.
17 Q. And you state -- I'm sorry, the corrective
18 action report states in the next line "In fact, we
19 have found the allegation of sexual assault to be
20 border line false and feel it could be seen as
21 retaliation for your previous write-up." I want to
22 focus first on the comment that the allegation of
23 sexual assault was false. In what respect was it
24 false? What did you discover with respect to his
25 affidavit, and I would like for you to go through that

Page 31

1  affidavit and tell me what did you actually discover
2  to be false?
3  A. We did not feel he was sexually assaulted or
4  harassed.
5  Q. Well, he talks about being poked. I mean
6  he's factual in his affidavit, is he not?
7  A. Yes.
8  Q. I'm not talking about conclusions. I'm
9  talking about facts. Did your investigation reveal
10 that Mr. Garza had been poked by Mr. Hunt?
11 A. May I look at the --
12 Q. Well, I'm just looking at his -- well,
13 strike that. I mean, you are welcome to look at
14 anything you wish.
15 A. We did, in fact, find that he had been
16 poked.
17 Q. He had been poked?
18 A. Yes.
19 Q. Who told you that?
20 A. Here. We were told by Rudy Lopez in his
21 interview and William -- will Goff as well.
22 Q. Told you that he had been -- that -- well,
23 strike that.
24    Did they actually tell you that they
25 saw Mr. Hunt poke?

Page 32

1  A. No, they did not.
2  Q. How was it substantiated then, the
3  allegation that Mr. Garza was poked by Mr. Hunt?
4  A. I was told that Mr. Garza reported being
5  poked to his lead person Rudy.
6  Q. And for that reason you believed that the
7  poking incident had occurred?
8  A. Yes.
9  Q. So it was not that you based your conclusion
10 upon talking with someone that actually witnessed the
11 poking incident?
12 A. I don't recall speaking to someone who saw
13 that.
14 Q. Did Mr. Lopez tell you when the -- when
15 Mr. Garza reported the poking incident to him?
16 A. He did.
17 Q. I'm sorry?
18 A. He did. I don't recall specifically. I
19 would have to reference my notes.
20 Q. You are welcome to look at your notes to
21 refresh your recollection. Let's see. What exhibit
22 is that? The affidavit is Exhibit 3.
23 A. 129.
24 Q. Go ahead and go to your notes. Do your
25 notes --

Page 33

1  A. He had told him it was several days prior.
2  I don't recall specifically how many.
3  Q. Now, you say -- let's go ahead and focus on
4  the corrective action report. You say that "The
5  allegation was border line false and could be seen as
6  retaliation for your prior previous write-up." What
7  previous write-up are you talking about? And you are
8  welcome to go in that exhibit -- no, go in the
9  other -- the opposite direction. Go to the second
10 page.
11 A. This was in retaliation for this write-up
12 146.
13 Q. 146. Which is an allegation that Mr. Garza
14 had used racial language towards a coworker?
15 A. Yes.
16 Q. Who was that coworker?
17 A. My understanding it was Mr. Hunt.
18 Q. And the next line you state "This type of
19 retaliation will not be tolerated." So I take it that
20 you believed that Mr. Garza was complaining about
21 Mr. Hunt including the poking incident because
22 Mr. Hunt had reported him allegedly using racial
23 language in speaking with him, right?
24 A. Can you rephrase the question?
25 Q. The retaliation that you reference in the

MEREDITH BLACK
October 31, 2013
Job No. 15254

Page 34

1  corrective action report is you believe that Mr. Garza
2  somehow made up the allegation of sexual harassment
3  against Mr. Hunt because he had been written up in
4  response to Mr. Hunt's complaint that Mr. Garza used
5  racial language?
6      A.  No, I did not believe he made it up.
7      Q.  Well, what type of retaliation then are you
8  talking about?
9      A.  I believe he --
10     Q.  I'm trying to figure out what was the
11 retaliation.
12     A.  No. I'm trying to come up with the word
13 that --
14     Q.  Take your time.
15     A.  I believe he inflated the -- his allegation
16 or implication of what happened based on a prior
17 conversation he had had with his lead man Rudy Lopez.
18 From what I was told that incident was reported,
19 looked into, not -- it was taken care of and that was
20 the end of it. It was after his write-up that he then
21 said it was -- he was sexually harassed --
22     Q.  All right.
23     A.  -- by being poked.
24     Q.  Fair enough. Thank you. So what you're
25 saying is that when Mr. Garza reported the poking

Page 35

1  incident to Mr. Lopez, Mr. Lopez took care of it?
2      A.  That's what I understood.
3      Q.  And what you're saying to me is after
4  Mr. Hunt complained about the racial language,
5  Mr. Hunt -- I'm sorry, Mr. Garza brought up the issue
6  again?
7      A.  Correct.
8      Q.  And in doing so, you think that he was being
9  retaliatory?
10     A.  Yes.
11     Q.  How was the poking incident taken care of by
12 Mr. Lopez?
13     A.  He confronted -- I was told he confronted
14 Mr. Hunt with Jose. He was told it was an accident.
15 He told him make sure it didn't happen again, and that
16 was the end.
17     Q.  I think I now understand. Did it cross your
18 mind that by giving the suspension to Mr. Garza
19 because you say that you couldn't find his sexual
20 assault allegations as you phrase it substantiated
21 that by giving him this corrective action report would
22 be retaliatory on your part?
23     A.  No.
24     Q.  Now, my understanding is that I think I saw
25 somewhere in the company's policy that an employee

Page 36

1  that makes a false allegation of sexual harassment is
2  liable to be disciplined, right? You remember that?
3      A.  I don't remember seeing anything like that.
4      Q.  So Mr. Garza, I suppose, is brought in and
5  asked to sign this report, right?
6      A.  Correct.
7      Q.  And it says "Employee refused to sign."
8  Whose handwriting is that?
9      A.  I don't know. It's not my handwriting.
10     Q.  Did Mr. Garza in your presence state that he
11 was not going to sign this corrective action report?
12     A.  Yes, he did.
13     Q.  Did he say why not?
14     A.  I don't recall what he specifically said.
15     Q.  Who came up with the dates of the suspension
16 of 5-4 through 5-6?
17     A.  I suppose Jeff and I did. I'd have to look
18 at a calendar. I don't know if this was a Friday. I
19 don't know what the workweek was. We typically do it
20 immediately.
21     Q.  Did you caution Mr. Dodd that this was the
22 wrong course of action to take against Mr. Garza?
23     A.  No.
24     Q.  Did Mr. Dodd caution that this was not the
25 right thing to do?

Page 37

1      A.  No.
2      Q.  Between you and Mr. Dodd, who came up with
3  the suspension?
4      A.  I'm sorry?
5      Q.  Between you and Mr. Dodd, who came up with
6  the suspension suggestion?
7      A.  I don't recall specifically.
8      Q.  Did you or him plead for a lesser
9  disciplinary action?
10         MS. WHITE:  Objection. Form.
11     Q.  (By Mr. Costea)  Other than suspension?
12     A.  Can you repeat that?
13     Q.  Did you or Mr. Dodd consider less -- a less
14 severe penalty or disciplinary action other than
15 suspension?
16     A.  I don't recall specifically.
17     Q.  Let's look at some documents in Miller
18 Exhibit No. 1. The first one we're going to look at
19 is document 330. And I have arranged those documents
20 in chronological order; and I would like for you to go
21 to a document at the top it says "Correction action
22 report March 24th, 2009." Are you there?
23     A.  330?
24     Q.  Yes, ma'am.
25     A.  Yes.

10 (Pages 34 to 37)

MEREDITH BLACK
October 31, 2013                                   Job No. 15254

### Page 38

1   Q. Document 330 is a corrective action notice
2   on Steven Hunt with a date of March 24th, 2009 given
3   to him by Mr. Bob Miller. Have you seen this page,
4   that document before today?
5   A. No, I have not.
6   Q. Did anyone tell you in April or maybe May
7   1st, 2009 that Mr. Hunt had been issued a verbal
8   warning on March 24th, 2009 for inappropriate behavior
9   and horseplay?
10  A. I don't recall.
11  Q. When you went out there on the 30th of
12  April, did you ask Mr. Butler or, you know, anyone in
13  HR whether or not Mr. Hunt had been disciplined
14  before?
15  A. I don't specifically recall.
16  Q. Please go to page 348. Page 348 in that
17  exhibit is a training attendance sheet with a date of
18  August the 10th, 2010 for half an hour. Do you know
19  what the subject of that training was?
20  A. I do not.
21  Q. Next page, page 298. It's a memorandum to
22  all employees at FM 529 indicating that employees were
23  to attend a work place harassment on October 29th or
24  November the 1st, 2010, right?
25  A. Yes.

### Page 39

1   Q. And from what I understand if I go by the
2   next page, page 347, it looks like the -- am I to
3   understand you gave that seminar?
4   A. It looks like it.
5   Q. That sexual harassment seminar? Ma'am?
6   A. Yes, it looks like that.
7   Q. Prior to November the 1st or October 29th,
8   2010, had you given sexual harassment seminars or
9   training at NOV?
10  A. I don't recall.
11  Q. Tell me of what this one hour and 15-minute
12  seminar consisted of. You did the talking?
13  A. From my recollection we have a corporate
14  policy which is a Power Point video presentation.
15  Q. Power Point presentation. And that's video,
16  right?
17  A. Yes, it had a video or two. I can't recall
18  specifically.
19  Q. How long was the video?
20  A. I don't recall specifically. It was a total
21  of just over an hour.
22  Q. So for about an hour or so, employees were
23  just looking at a video?
24      MS. WHITE: Objection. Form.
25  A. No. It was a Power Point and video

### Page 40

1   presentation.
2   Q. (By Mr. Costea) Did you give the employees
3   any handouts, flyers?
4   A. I do not recall handouts.
5   Q. Booklets, policies?
6   A. I don't recall a hand out.
7   Q. Do you still have this Power Point material?
8   A. I don't know.
9   Q. What about the video material, do you still
10  have it?
11  A. I'd have to look. I don't know. It's a
12  corporate -- it's online now. I don't know if it's
13  the exact same one.
14  Q. Please go to page 299. Page 299 is an
15  employee data change form. The employee's name is
16  Steven Hunt, and this document reflects that he was
17  terminated; is that correct?
18  A. Yes, that's what the document states.
19  Q. And the reason for the termination is "Gross
20  misconduct terminated due to intimidating employee
21  with pocket knife at a company sponsored United Way
22  event," right?
23  A. That's what is stated.
24  Q. Were you alerted to this incident prior to
25  Mr. Hunt being actually terminated?

### Page 41

1   A. No.
2   Q. Do you know before today that Mr. Hunt had
3   been terminated?
4   A. Yes, I did.
5   Q. When did you become aware of his
6   termination?
7   A. I don't recall specifically.
8   Q. Who informed you of his termination?
9   A. I don't recall.
10  Q. Were you given the -- were you told the
11  reason for his termination?
12  A. I remember being told it was due to having a
13  pocket knife at the picnic.
14  Q. Just having a pocket knife at a picnic?
15  A. Pulling a pocket knife.
16  Q. On a coworker?
17  A. Yes.
18      (Exhibit No. 1 marked.)
19  Q. (By Mr. Costea) Ms. Bruce, we're looking at
20  Exhibit No. 1 which is a transmittal sheet for a
21  charge of discrimination from the EEOC addressed to
22  Mr. Bill Butler and the date at the bottom of the page
23  is May 7, 2009. Do you recall having seen page 1 or
24  page 2 of this exhibit?
25  A. No, I do not.

11 (Pages 38 to 41)

MEREDITH BLACK
October 31, 2013                         Job No. 15254

Page 42

1   Q. Did anyone inform you that Mr. Garza had
2   filed a charge of discrimination with the EEOC?
3   A. Yes.
4   Q. Who informed you of that?
5   A. I don't recall specifically.
6   Q. Did you assist in preparing a response to
7   the charge of discrimination to be filed with the
8   EEOC?
9   A. Not that I recall.
10      (Exhibit No. 2 marked.)
11  Q. (By Mr. Costea) You are now looking at
12  Exhibit No. 2, and I want to focus your attention on
13  page 2 of that exhibit. The last paragraph states
14  that "The EEOC has requested to interview Bill Butler,
15  Steven Hunt, Kevin Warren, Rudy Lopez, and
16  Jack Landis." Were you present for any interviews --
17  any interviews that the EEOC conducted with respect to
18  Mr. Garza's charge of discrimination?
19  A. No.
20      (Exhibit No. 3 marked.)
21  Q. (By Mr. Costea) Ms. Bruce, you're looking
22  at Exhibit No. 3 which is the nondiscrimination and
23  anti-harassment policy of National Oilwell Varco with
24  an effective date at 2-12 -- well, I mean just follow
25  with me on page 1, effective date of February the

Page 43

1   12th -- I'm sorry, 1988 and the revision date of
2   April 20th, 1998, right?
3   A. Yes.
4       MS. WHITE: Exhibit 3, I apologize the
5   interruption, Exhibit 3 has also been produced
6   confidentially subject to the protective order.
7   Q. (By Mr. Costea) Ms. Bruce, do you know
8   whether or not this policy had been updated since
9   April the 20th of 1998?
10  A. To currently or prior?
11  Q. Since --
12  A. Just any time since '98?
13  Q. Yes. In the last 15 and a half years.
14  A. Yes, I believe it has.
15  Q. When has it been updated?
16  A. I do not know specific date. This is a
17  corporate policy.
18  Q. Do you think that we can get a copy of those
19  updated policies?
20  A. Yes, I'm sure.
21  Q. You have them at your office? You have them
22  online?
23  A. Yes.
24  Q. Do you remember when the most recent recent
25  division -- I'm sorry, revision took place?

Page 44

1   A. No.
2   Q. Does NOV have an employee handbook?
3   A. No.
4   Q. Since 1999, to your knowledge, did the
5   company have an employee handbook?
6   A. No.
7   Q. When employees are hired on with the
8   company, what are they exactly given? Are they
9   given --
10  A. They're given a packet with benefit
11  information. This policy statement is in there, basic
12  information about the company. Each facility may put
13  a facility specific safety sheet, something like
14  that. I don't know what every facility gives.
15  Q. Right. Are employees required to sign off
16  on any of these documents indicating receipt --
17  A. Yes.
18  Q. -- of the policies and so on and so forth?
19  A. Yes.
20  Q. And how long has that been the case?
21  A. As long as I've worked there.
22  Q. You've been there since 1999?
23  A. 2000 under National.
24  Q. Okay. No problem. Let me see if I have
25  anything else. Let's look in this stack. Let's look

Page 45

1   at Document No. 6. Exhibit No. -- Miller Exhibit No.
2   6 is a performance evaluation on Mr. Garza. And I
3   just want to ask you about the form itself. Does NOV,
4   to your knowledge, still use this form to evaluate
5   employee performance?
6   A. It is used by our division. I'm not sure if
7   it's exactly the same due to possible updates; but Rig
8   Solutions does use this form of review, yes.
9   Q. Does it still use it today?
10  A. Yes.
11  Q. Are employees supposed to be reviewed
12  annually do you know?
13  A. Yes.
14  Q. Do you know whether or not in 2009 there was
15  an across the board salary increase for employees at
16  529?
17  A. I don't recall.
18  Q. What about in 2010?
19  A. I don't recall.
20  Q. 2011?
21  A. I don't recall.
22  Q. Fair enough. I've got to go on. 2012?
23  A. I don't recall.
24  Q. 2013?
25  A. I don't recall.

12 (Pages 42 to 45)

FOX REPORTING
(713) 622.1580

Electronically signed by Lana Sholders (101-225-766-0482)                    4fc25702-f2a1-461f-8dc7-34a038caeda3

MEREDITH BLACK
October 31, 2013                                    Job No. 15254

Page 46

1   Q.  You don't recall.  Okay.  Have there been
2   any wage freezes between 2009 and 2013 at NOV that you
3   know of?
4   A.  What do you mean by wage freeze?  For a
5   group, for a person, for a --
6   Q.  Across the board.
7   A.  Not that I recall.
8   Q.  Let's say -- go ahead, please.
9   A.  I don't remember specific dates, but we did
10  have a time where we did not have increases.
11  Q.  For about how long?
12  A.  I don't remember.  I'm sorry.
13  Q.  A year, two years?  How long was that?
14  A.  I don't remember specifically.  One and I
15  don't remember.
16  Q.  Ms. Bruce, that's all I have.  Thank you for
17  showing up here today.
18          MR. COSTEA:  I pass the witness.
19          MS. WHITE:  Defense will reserve any
20  questions for this witness until time of trial.
21          (Deposition concluded at 12:54 p.m.)
22
23
24
25

Page 47

1           WITNESS' CHANGE/CORRECTION PAGE
2            DEPOSITION OF MEREDITH BLACK
3               TAKEN OCTOBER 31, 2013
4   PAGE/LINE  CHANGE            REASON
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25

Page 48

1              WITNESS' SIGNATURE PAGE
2            DEPOSITION OF MEREDITH BLACK
3               TAKEN OCTOBER 31, 2013
4
5       I, MEREDITH BLACK, have read the foregoing
6   deposition and hereby affix my signature that same is
7   true and correct, except as noted above.
8
                    _____
9                        MEREDITH BLACK
10  THE STATE OF _____)
11  COUNTY OF _____)
12
13  Before me,_____, on this day personally
14  appeared MEREDITH BLACK, known to me (or proved to me
15  under oath or through _____) (description of
16  identity card or other document) to be the person
17  whose name is subscribed to the foregoing instrument
18  and acknowledged to me that they executed the same for
19  purposes and consideration therein expressed.
20
21  Given under my hand and seal of office on this _____
22  day of _____, _____.
23
                    _____
24                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
25

Page 49

1   COUNTY OF HARRIS )
2   STATE OF TEXAS   )
3           REPORTER'S CERTIFICATE
4   I, LANA SHOLDERS, Certified Shorthand Reporter in and
5   for the state of Texas, hereby certify that this
6   transcript is a true record of the testimony given by
7   the witness named herein, after said witness was duly
8   sworn by me.
9
10  I further certify that I am neither attorney nor
11  counsel for, related to, nor employed by any of the
12  parties to the action in which this testimony was
13  taken.  Further, I am not a relative or employee of
14  any attorney of record in this cause, nor do I have a
15  financial interest in the action.
16
17  Certified to by me this the 15th day of November,
18  2013.
19
20  _Lana Sholders_
21  LANA SHOLDERS, Texas C___
    Expiration Date: 12-31-14
22  Firm Registration # 530
    FOX Reporting
23  4550 Post Oak Place, Suite 201
    Houston, Texas 77027
24  Phone 713.622.1580
    Fax 281.768.5540
25  www.fox-reporting.com

13 (Pages 46 to 49)

FOX REPORTING
(713) 622.1580