IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE S. GARZA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-3532 |
| | § | |
| NATIONAL OIL WELL VARCO, | § | |
| L.P., | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This Title VII case is before the Court on Defendant National Oilwell Varco,

L.P.'s Motion for Summary Judgment [Doc. # 54] ("Motion"). Plaintiff Jose S. Garza

("Garza" or "Plaintiff") has filed a Response [Doc. # 57] and National Oilwell Varco,

L.P. ("NOV" or "Defendant") has filed a Reply [Doc. # 59]. Having reviewed the

parties' briefs, the applicable legal authorities, and all matters of record, the Court

**denies** NOV's Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Factual Background

The facts, taken in the light most favorable to Garza, can be summarized as

follows. NOV hired Garza in September 2005.[1] Garza worked at NOV's FM 529

---

[1]   Deposition of Jose Garza [Docs. # 57-1 and # 57-2] ("Garza Dep."), at 84:4-11. NOV
employed Garza on a contract-basis through "Magnum Staffing" for a few months
before hiring him as an employee in September 2005. *Id.*, at 84:19-85:16.

facility, a manufacturing plant within NOV's "Rig Solutions" Division, in the "Drawworks Department."[2]

While with NOV, Garza's work was overseen by various individuals.  The "team lead" immediately supervising Garza was Rudy Lopez ("Lopez").[3]  William Goff ("Goff") was the "floor lead hand" for the entire Drawworks Department for part of Garza's tenure at NOV. In or about June 2009, Goff was replaced by Kevin Warren ("Warren").[4]  Bob Miller ("Miller") was the "shop manufacturing supervisor" (or "production manager") supervising Garza.   In or about May 2009, Miller was replaced by Jack Landis.[5]  Bill Butler ("Butler") was the human resources ("HR") manager at the FM 529 plant.[6]  The FM 529 plant manager when Garza was hired was Richard Urquhart ("Urquhart").  At some time during Garza's employment at NOV, Urquhart was replaced by Anirban Banerjee ("Banerjee").[7]   Meredith Black

---

[2]     *See id.*, at 86:12-17, 96:25-97:8.  The evidence of record, as presented by the parties, does not reflect Garza's education level.

[3]     *Id.*, at 97:2, 98:13-15.   Despite a "team lead" having apparent supervisory responsibilities, NOV does consider that position to be part of management. Deposition of Jack Landis [Doc. # 57-3] ("Landis Dep."), at 8:11-13.

[4]     Garza Dep., at 97:1-2, 97:16-98:12.

[5]     *Id.*, at 96:25, 98:16-18; Deposition of Bob Miller [Doc. # 57-5] ("Miller Dep."), at 5:10-7:5.

[6]     Deposition of Bill Butler [Doc. # 57-8] ("Butler Dep."), at 4:8-5:13.

[7]     *Id.*, at 48:6-22.

("Black")[8] was a senior manager of HR for NOV's Rig Solutions Division, and Jeff Dodd ("Dodd") was HR Director for that division.

On September 4, 2008, NOV hired Steven Hunt ("Hunt") as a welder in the Drawworks Department.[9]  Hunt was not Garza's supervisor.[10]  About four or five weeks after Hunt was hired, Garza complained to Lopez about Hunt's behavior towards him.[11]  Garza complained that Hunt had touched and grabbed his chest[12] and had touched his "behind" with a scale or other tools.[13]  Garza also told Lopez that Hunt had said he wanted to have sex with him.[14]  Garza initially described Hunt's behavior as "weird."[15]  Garza asked Lopez to intercede and talk to Hunt on his behalf,

---

[8]     NOV refers to Black as "Meredith (Black) Bruce" or "Bruce."  *See, e.g.,* Memorandum in Support of Motion for Summary Judgment [Doc. # 54-1] ("Summary Judgment Memorandum"), at 6.

[9]     Garza Dep., at 96:10-15.  Hunt was terminated in 2011 for pulling a knife on another NOV employee at a company baseball game.  Landis Dep., at 14:14-20.  Prior to Hunt's arrival at NOV, Garza had been reprimanded once, in July 2007, for "disruptive behavior" and "threats to [a] fellow employee."  *See* Employee Warning Notice dated July 10, 2007 [Doc. # 54-4], at ECF-numbered page 50.

[10]    *Id.*, at 96:16-18.

[11]    Garza Dep., at 98:19-25.  Garza acknowledges that, prior to this complaint, he had not spoken to anybody in management about Hunt's behavior.  *Id.*, at 121:10-15.  Defendant disputes that Lopez was in management.

[12]    *Id.*, at 100:11-19.

[13]    *Id.*, at 101:17-102:3, 103:24-104:20.

[14]    *Id.*, at 112:13-21.

[15]    *Id.*, at 99:5-8.

saying "I don't want to play like that."[16]   Lopez laughed when confronted with Garza's allegations, and said "[L]et me talk to [Hunt]."[17]

For some months thereafter, Hunt's behavior offensive to Garza ceased.[18] Around April 2009, however, Hunt's problematic behavior towards Garza resumed.[19] Garza testifies that he complained to Lopez on April 9, 2009, about Hunt's then recent behavior.[20] Garza told Lopez that while he (Garza) was laying down under the drawworks, Hunt dropped his welding rod, and instead of picking up the rod, bent down, "touched [Garza's] ass with the hand, and . . . told [Garza] he want[ed] to make sex with [him]."[21] Garza also complained that Hunt had touched Garza's penis with the "big scale."[22] Finally, Garza complained about certain sexual advances, such as blowing kisses, that Hunt had made to him.[23]   In response to this complaint, Lopez spoke to Hunt about the incidents.   Hunt contended that the second incident (*i.e.*,

---

[16]      *Id.*, at 99:9-10, 101:6-9.

[17]      *Id.*, at 101:3-5, 105:2-4.

[18]      *Id.*, at 113:19-23, 124:20-23.

[19]      *Id.*, at 124:25-125:2.

[20]      *Id.*, at 109:15-23.

[21]      *Id.*, at 109:22-110:6.

[22]      *Id.*, at 122:13-19.

[23]      *Id.*, at 208:10-209:6.

touching Garza's penis with a big scale) was an accident.[24]

In response to Garza's complaint, Lopez also stated that he was not "the boss" and thus could not do anything about Hunt's behavior.[25]  Thus, on April 13, 2009, Garza approached Goff to complain about Hunt.  Garza described to Goff everything that Hunt had done in the same manner that he had described the behavior to Lopez.[26]  Goff responded by laughing and said, "We'll see what we can do."[27]  Goff did nothing to address the situation.[28]

About a week later, Hunt reported to Miller and Butler that Garza had called him a "stupid Americano" on April 13, 2009.[29]  Hunt also stated that he feared Garza would hit him from behind with a welding tool.[30]  On or about April 27, 2009, Garza

---

[24]     *Id.*, at 122:20-24, 123:10-14.

[25]     *Id.*, at 123:10-19.

[26]     *Id.*, at 126:15-127:7, 209:7-14.

[27]     *Id.*, at 125:18-126:9.

[28]     *Id.*, at 126:6-9.  Miller recalls investigating Garza's claim that Hunt had "poked" him in the "buttocks area" and concluded that it happened; Miller's investigation was completed by April 24, 2009.  Miller Dep., at 48:8-50:3, 52:17-53:10.

[29]     Garza Dep., at 139:4-14, 140:17-22; *see also* Jose Garza's Allegation [Doc. # 54-5], at ECF-numbered page 25 (Butler's description of the events, written on April 29, 2009).  Hunt made this allegation during a meeting with Miller and Butler on April 20, 2009.  *See* Butler Dep., at 31:4-11, 33:22-34:23.

[30]     Jose Garza's Allegation [Doc. # 54-5], at ECF-numbered page 25.

was sent to Miller's office to discuss the allegation with Miller and Butler.[31]  At that time, Garza denied—and to this day denies—making any racist comment to Hunt.[32] Miller presented Garza with a "writeup" (which NOV refers to as a "Corrective Action"), drafted on April 24 (three days before Garza met with Miller), detailing Hunt's accusation and warning Garza about the consequences of his actions.[33]  Garza refused to sign the write-up.[34]

During the April 27 meeting with Miller and Butler, Garza again raised the issue of Hunt's behavior.  Garza explained that he had already complained about Hunt to Lopez, Goff, and Butler; Garza then inquired what had happened with regard to those complaints.[35]  Butler gave Garza a piece of paper and asked him to write out the details of his complaint.[36]  Garza asserts that Butler subsequently lost his written complaint.[37]  On April 29, Garza submitted a notarized statement detailing Hunt's

---

[31]     Garza Dep., at 139:3-6, 141:3-9; Miller Dep., at 48:2-7.

[32]     Garza Dep., at 139:15-20, 140:17-22, 141:23-25.

[33]     *See* First Corrective Action [Doc. # 57-6], at ECF-numbered page 1.

[34]     Garza Dep., at 141:10-11, 142:2-12; First Corrective Action [Doc. # 57-6], at ECF-numbered page 1.

[35]     Garza Dep., at 144:10-20.

[36]     *Id.*, at 147:21-148:1.

[37]     *Id.*, at 148:2-7.  The details of Garza's formal complaint to Butler around this time are hazy; the Court presents them as explained by Garza.  Butler offered a slightly different, but not directly contradictory narrative.  According to Butler, after Garza
(continued...)

"sexual harassment."[38] Hunt's behavior, including his touching Garza with a welding rod and other tools, continued after April 13, 2009.[39]

On May 1, 2009, NOV suspended Garza for three work days.[40] Black conducted a one- or two-day investigation into Garza's claim, during which time she met with Lopez, Goff, and several other NOV employees.[41] She did not interview (or does not recall interviewing) Garza.[42] At the end of the investigation Black (on behalf of NOV) issued Garza a "Corrective Action" that she and Miller signed.[43] Black concluded that Garza's report of "sexual assault" was not substantiated and "borderline false," and found it an intolerable "retaliation for your previous write-

---

[37]   (...continued)
       complained about Hunt's behavior (which Butler terms Garza's "sexual assault" claim), Butler and Miller met with Richard Urquhart ("Urquhart"), the plant manager, to discuss Garza's claim.  Butler Dep., at 42:9-24.  At that meeting Urquhart instructed Butler and Miller to investigate the claim further.  *Id.*, at 44:2-6.  On April 28, Butler met with Garza and asked Garza to provide a full account detailing the claim.  *Id.*, at 44:10-45:3.  Garza brought Butler notarized statement the following day.  *See id.*, at 45:22-24.  Butler does not appear to have posed any questions to Garza orally.

[38]   *See* Affidavit of Fact [Doc. # 57-10].

[39]   Garza Dep., at 148:9-23.

[40]   *See* Second Corrective Action [Doc. # 57-7].

[41]   Butler Dep., at 51:17-53:2; Deposition of Meredith Black [Doc. # 57-14] ("Black Dep."), at 21:23-23:12.  The Court notes that Butler testifies that Black also met with Miller and Hunt; Black, on the other hand, states that she did not speak with Hunt and did not recall whether she spoke with Miller.

[42]   Black Dep., at 22:25-23:5.

[43]   *See* Second Corrective Action [Doc. # 57-7].

up."[44]   After investigation, Black found further "inappropriate acts and behavior" by Garza, specifically his "threatening tone and comments in regards to Richard Urquhart firing [Garza's] co-workers and [Garza's] inability to be fired because of [his] friendship with Richard Urquhart."[45]   Garza refused to sign the Second Corrective Action and stated, by checking a box on the form, that he disagreed with the warning given to him by NOV.[46]   Garza continues to disagree with the allegations in that Corrective Action.[47]

On May 6, 2009, the final day of his suspension, Garza filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").[48]   Landis testifies that Garza's sexual harassment complaint against Hunt was "common knowledge" at the FM 529 facility.[49]   Butler acknowledged receiving a copy of the EEOC charge and forwarding it to Dodd, HR Director for the Rig Solutions

---

[44]     *Id.*  Black is unsure why she used the word "assault" and recognizes Garza's claim as one for "sexual harassment and being poked," though Black concluded that NOV "did not feel [Garza] was sexually assaulted or harassed."  Black Dep., at 29:6-31:4.

[45]     *Id.*

[46]     *Id.*

[47]     Garza Dep., at 249:1-250:21.

[48]     *Id.*, at 169:12-15.

[49]     Landis Dep., at 20:24-21:12.

Division.[50]

After Garza returned to work following his suspension, he asked Goff to be transferred to another team.[51]  Goff denied the request.[52]  Thereafter, Garza continued to work near Hunt.[53]  Garza states that Hunt did not touch him for about three or four weeks thereafter.[54]  Starting in the middle of June 2009, however, again Hunt began to touch Garza inappropriately and to say "bad words," including asking Garza to have sex with him.[55]  Garza again complained to Lopez and asked Lopez to prevent Hunt's behavior; in response, Lopez laughed.[56]  Garza also complained to Goff and again asked to be transferred to another team; Goff did not respond to that request.[57]  Within two weeks after Warren assumed Goff's position, Garza asked Warren to be transferred to another department; Warren did not do so.[58]

---

[50]    Butler Dep., at 18:7-19:25.

[51]    Garza Dep., at 157:158:19.

[52]    *Id.*, at 158:1-2.

[53]    *Id.*, at 159:5-10.

[54]    *Id.*, at 160:22-23.

[55]    *Id.*, at 160:25-161:10.

[56]    *Id.*, at 161:22-162:6.

[57]    *Id.*, at 163:8-164:8.  Goff left NOV soon after Garza voiced this complaint.  *Id.*, at 164:4-8 ("He thinking now with -- with, I guess, with the company, he was 45 minutes to the early retirement package to signing and then left.").

[58]    *Id.*, at 167:19-169:11.

9

On August 13, 2009, NOV issued Garza a Corrective Action, signed by Warren and Landis, for arguing the "correct procedures for assembling shafts."[59]   In particular, NOV stated that Garza used a forklift "to push a sprocket assembly on," which NOV asserts "is not the proper way for installing a sprocket,"  and that Garza argued with Warren about the proper procedure.[60]   Garza refused to sign the Corrective Action, and continues to state that he disagrees with the writeup.[61]

On October 27, 2009, Garza again asked Warren to transfer him to the "mud pumps" because Hunt continued to touch him.[62]   Warren denied the request, and Garza returned to work.[63]  After Garza left Warren's office, Garza saw Landis and again requested a transfer because of Hunt's actions.[64]   Garza states that Landis did not ask Garza why he was uncomfortable working with Hunt.[65]  About fifteen minutes after Garza's conversation with Landis, Landis and Warren took Garza to Butler's

---

[59]   *Id.*, at 169:23-170:23; Third Corrective Action [Doc. # 57-12].

[60]   Third Corrective Action [Doc. # 57-12].

[61]   *Id.*; Garza Dep., at 170:13-23.

[62]   Garza Dep., at 181:10-17, 182:7-15.

[63]   *Id.*, at 182:19-24.

[64]   *Id.*, at 181:22-25, 183:8-24; Landis Dep., at 23:6-17, 24:17-25:4, 48:6-50:6.

[65]   Landis Dep., at 50:10-18.  Landis testifies that he told Garza that no other positions were available and that he had to remain with his team.  Statement of Jack Landis [Doc. # 57-4], at ECF-numbered page 2.

office, where Warren requested Garza's termination.[66]  Butler suspended Garza and sent him home.[67]

The NOV's rendition of these events differs substantially from that offered by Garza.  According to NOV, on October 27, 2009, Lopez announced to his team that he would be away from work for surgery and that he was leaving "Henry C." (whom NOV identifies as "Enrique Castellanos") in charge.[68]  Garza got upset about Lopez putting Castellanos in charge and began cursing.[69]  As a result of Lopez's announcement, Garza went searching for Banerjee, the plant manager at the time, and instead found Landis.  During a conversation with Landis, Warren, and Lopez, Garza again got upset, called Lopez a "liar," said that Warren was wrong for "writing him up," and exclaimed that NOV would never fire him and that he had more experience than Warren.[70]

The following day, Garza called Butler to check on his employment status.  The first time they spoke, Butler stated that he did not yet know whether Garza would be

---

[66]    Garza Dep., at 181:18-21.

[67]    *Id.*, at 182:1-3.

[68]    Written Statement of Rudy Lopez [Doc. # 54-3], at ECF-numbered page 25.

[69]    *Id.*

[70]    *Id.*

terminated.[71]  During a second call, Butler informed Garza that his employment was terminated, but did not provide a reason for the termination.[72]  The final termination form, signed by Butler, stated that Garza was terminated "due to several acts of insubordination to supervisors."[73]

In total, Garza alleges that Hunt touched his chest and "pinch[ed] . . . [his] nipples" between 20 to 25 times,[74] touched his behind approximately 25 times (with Hunt using both his hands and various tools),[75] touched his penis around 12 or 14 times with different tools,[76] and asked to have sex with him three times.[77]  On three or four occasions, Hunt attempted to penetrate Garza's anus with a welding rod and made a hole in Garza's uniform pants.[78]  On approximately 20 occasions Garza responded to Hunt's behavior by saying, "I don't like that. I like woman."[79]  Garza believes that Hunt's sexual propositions were "serious" because of the way Hunt

---

[71]     Garza Dep., at 179:23-25.

[72]     *Id.*, at 180:1-8.

[73]     NOV Employee Data Form [Doc. # 57-11].

[74]     Garza Dep., at 105:12-106:2.

[75]     *Id.*, at 115:17-117:4.  About 12 of those incidents involved Hunt touching Garza's behind with his hands.  *Id.*, at 116:24-25.

[76]     *Id.*, at 117:9-10.

[77]     *Id.*, at 106:19-107:20.

[78]     *Id.*, at 204:7-205:16.

[79]     *Id.*, at 106:13-16.

touched Garza's hand when Hunt spoke to him.[80]  Hunt also made faces, such as "blowing kisses," at Garza approximately 38 to 40 times; Garza perceived these all to be sexual advances.[81]

Garza testifies that Hunt also harassed other male employees at NOV.  Garza saw Hunt touch and grab the chest of Miguel Gutierrez ("Gutierrez") a "few times," and heard Hunt call Gutierrez "Miguela" (a female name, according to Garza) and say, "I like Miguela."[82]  Gutierrez made a formal complaint about Hunt's behavior to Goff on April 29, 2009.[83]  Garza testifies that he also observed Hunt touch the behind of an inspector, Luis Gonzales ("Gonzales"), with a welding rod when Gonzales was bending over.[84]  Gonzales got angry at Hunt and as a result made a complaint to Landis about Hunt's behavior, who subsequently spoke about the complaint with Goff.[85]  A third employee, Freddie Amaya ("Amaya"), reported to Garza that Hunt had touched Amaya's rear end while in the bathroom, and that Amaya had wanted to

---

[80]  *Id.*, at 107:16-20 ("Q: Okay.  Did you think he was serious?  A: Yes.  Because he touch me.  He touching my hand like this.  And then I push him.  Too many times.").

[81]  *Id.*, at 205:18-208:9.  Garza believes Hunt is homosexual.  *Id.*, at 118:17-20.

[82]  *Id.*, at 127:17-130:2.

[83]  *Id.*, at 127:21-22; *see also* Affidavit of Fact of Jose Garza [Doc. # 57-10] ("Mr. Hunt also had a similar behavior with Miguel Gutierrez, another co-worker and this incident was reported directly to Will Goff.").

[84]  Garza Dep., at 130:3-24.

[85]  *Id.*, at 132:18-134:19.

file a complaint but was afraid of losing his job.[86]

On June 18, 2012, the EEOC determined that "there is reasonable cause to believe that [Garza] and other male employees were subjected to a sexually hostile work environment" and that Garza "was subjected to disparate discipline, suspension, and eventually discharge, in retaliation for complaining about the sexual harassment."[87]   The EEOC's investigation revealed that Garza repeatedly complained to Lopez, and eventually complained to Butler, about Hunt's behavior.[88]   The EEOC further found that Garza was suspended—after complaining about Hunt's harassment—because of his alleged racially-charged comments to Hunt, and that Garza was reprimanded for his comments despite NOV lacking evidence to support Hunt's allegation.[89]

### B.    **Procedural Background**

Garza filed this case on November 9, 2012, in the 189th Judicial District Court of Harris County, Texas.   NOV subsequently removed the case to this Court on December 5, 2012 [Doc. # 1].   Garza initially asserted three causes of action against NOV under Title VII of the Civil Rights Act of 1964 ("Title VII"): (1) sexual

---

[86]     *Id.*, at 135:4-18.

[87]     EEOC Determination [Doc. # 57-17], at 2.

[88]     *See id.,* at 1-2.

[89]     *Id.*

discrimination/sexual harassment; (2) unlawful retaliation; and (3) national origin discrimination.[90]  On February 4, 2013, the Court issued an order granting NOV's unopposed motion to dismiss Garza's national origin discrimination claim [Doc. # 20].  On March 20, 2013, the Court denied Garza's motion to dismiss NOV's defenses [Doc. # 25].[91]

In the pending motion, NOV moves for summary judgment on Garza's remaining claims.[92]  For the reasons stated below, the Court denies NOV's Motion.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

---

[90]   *See* Plaintiff's Original Petition [Doc. # 1-2] ("Complaint"), at ECF-numbered pages 9-12.

[91]   The Court notes that Defendant has asserted various defenses that are still pending, many of which are not currently before the Court for a decision on their merits.

[92]   In its Motion, NOV also moves for summary judgment on Garza's "sex discrimination" claim, which the Court interprets as a claim of disparate treatment on the basis of Plaintiff's sex.  It is unclear from Gaza's Complaint [Doc. # 1] whether Garza intended to assert a stand-alone cause of action for sex discrimination, or whether his sex discrimination reference in the Complaint is intended only to bolster his claim of sexual harassment.  *See id.*, at ECF-numbered page 9-10.  What is clear, however, is that Garza nowhere addresses in his Response NOV's arguments seeking dismissal of his sex discrimination claim.  Accordingly,  the Court deems Garza to have abandoned any such claim.  Moreover, as Garza has offered no evidence showing that non-male employees were treated more favorably under circumstances similar to Garza's, he has failed to meet his burden to show a genuine question of material fact on the *prima facie* case for a claim of sex discrimination.  NOV is entitled to summary judgment on any such claim.

fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of

material fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the non-moving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings do not "constitute competent summary judgment evidence").  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*,

37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413).  Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *See id.* (internal citations and quotations omitted).

## III.  <u>SEXUAL HARASSMENT CLAIM</u>

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 200e-2(a)(1).  In *Meritor Savings Bank, F.S.B. v. Vinson*, the Supreme Court held that a party "may establish a violation of Title VII by proving discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 66 (1986).  For sexual harassment deriving from a hostile work environment to be actionable, it must "be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotations omitted); *see also Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).

An employer may be liable for sexual harassment whether the harassing employee (the "harasser") is a "co-worker" or a "supervisor" of the victim, but the test for liability differs depending on the harrasser's position.  Where the harasser is a co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439.  Where the harasser is a supervisor, however, the employer is strictly liable "[i]f the supervisor's harassment culminates in a tangible employment action." *Id.*  If no tangible employment action results, then "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of the preventive or

corrective opportunities that the employer provided." *Id.* There is no argument that Hunt was Garza's "supervisor;" thus, Garza, to prevail, must prove that NOV was "negligent in controlling working conditions." *See id.*

The Supreme Court also has recognized that Title VII's protections extend to same-sex sexual harassment claims—that is, where both the harasser and the victim are the same sex. *See Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998). Even in this context, the Supreme Court stressed that actionable harassment must be "discrimination . . . *because of* . . . *sex*." *Id.* at 80 (emphasis added). This Circuit has outlined a "two-step inquiry" to analyze the merits of a same-sex harassment claim.[93] *See E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc) (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002)). First, courts should determine "whether the alleged conduct was sex discrimination." *Id.* Second, courts should evaluate "whether the conduct meets the standard for a *quid pro quo* or hostile-work-environment claim." *Id.* Garza asserts

---

[93]  "To establish a claim of hostile work environment under Title VII, a plaintiff must prove he (1) belongs to a protected class; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [a protected characteristic]; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). "In the context of same-sex discrimination, we typically analyze these elements by way of a two-step inquiry." *See Boh Bros.*, 731 F.3d at 453; *Love v. Motiva Enters. LLC*, 349 F. App'x 900, 902 (5th Cir. 2009) (applying two-step inquiry in case of co-worker harassment).

only a hostile work environment claim.[94]

Even if Garza can prove he was subjected to harassment because of his sex, NOV is liable only if it was "negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439. "An employer that knows or should know about coworker harassment is required to appropriately respond to it." *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 189 (5th Cir. 2012). "An employer can escape liability if it takes remedial action calculated to end co-worker harassment as soon as it knows or should know of the harassment." *Id.*

## A.   Was Hunt's Conduct "Sex Discrimination"?

In *Oncale*, the Supreme Court offered three examples of conduct that could constitute same-sex harassment or discrimination. First, a plaintiff can show same-sex harassment by a harasser who makes "explicit or implicit proposals of sexual activity" if "there were credible evidence that the harasser was homosexual." *Oncale.*, 523 U.S. at 80. Second, a plaintiff can prove discrimination by presenting evidence that the harasser's conduct was "motivated by general hostility to the presence of [members of the same sex] in the workplace." *Id.* Third, "[a] same-sex harassment plaintiff may . . . offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed sex workplace." *Id.* at 80-81.

For some time, the Fifth Circuit appeared—though never explicitly held—that

---

[94]     *See* Complaint, at 5.

proof of same-sex discrimination was limited to the *Oncale* examples.  In *La Day*, for example, the Fifth Circuit stated that the *Oncale* Court "outlined three ways in which a plaintiff can show that an incident of same-sex harassment constitutes sex discrimination."  *See La Day*, 302 F.3d at 478.  Later cases in this Circuit suggested the same.  *See, e.g.*, *Love v. Motiva Enters. LLC*, 349 F. App'x 900, 902 (5th Cir. 2009) ("A plaintiff in a same-sex sexual harassment case may establish discrimination because of sex by showing [the *Oncale* examples].")*; see also id.* at 907 (Dennis, J., concurring in part and dissenting in part) ("In my opinion, the majority misreads *Oncale's* examples, not merely as typical instances of proof, but as rigid formulae by which every same-sex sexual harassment claim must survive or perish.").

Recently, however, the Fifth Circuit sitting en banc explicitly concluded that the *Oncale* examples were not so restrictive.  In *Boh Brothers*, the Court of Appeals was confronted with a same-sex harassment case in which the EEOC sought to prove sexual harassment based on a claim of "gender stereotyping," an evidentiary avenue not encompassed within the *Oncale* examples.[95]  *Boh Bros.*, 731 F.3d at 453.  The Court of Appeals held that *Oncale* "charted three evidentiary paths" that "are illustrative, not exhaustive, in nature," and thus allowed the EEOC to use evidence of gender stereotyping to prove same-sex harassment.  *Id.* at 455-56.  Indeed, other

---

[95]     "Specifically, the EEOC asserted that Wolfe harassed Woods because Woods was not a manly-enough man in Wolfe's eyes."  *Boh Bros.*, 731 F.3d at 453.

Circuits have likewise held that *Oncale's* examples are not exclusive, and that plaintiffs may prove same-sex harassment through other evidentiary means. *See, e.g.*, *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Pedroza v. Cintas Corp.*, 397 F.3d 1063, 1068 (8th Cir. 2005); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999).

Garza advances two arguments in support of his position that Hunt's conduct was "sex discrimination." First, Garza argues that the summary judgment record supports *Oncale's* first avenue—that is, that Hunt is homosexual and that he made "explicit or implicit proposals of sexual activity."[96] Second, Garza contends that even if Hunt's actions do not fit any of the *Oncale* models, that conduct can still constitute sexual harassment because the conduct was "sexual in nature" and thus "because of sex."[97]

Garza has presented proof of same-sex harassment through the first *Oncale* evidentiary alternative: There is ample circumstantial evidence in the record to support a finding that Hunt was homosexual and that Hunt made "proposals of sexual activity" to Garza.[98] The Fifth Circuit has identified "two types of evidence that

---

[96]     Response, at 14-15.

[97]     *Id.*, at 15-18.

[98]     The Court therefore does not resolve the parties' dispute regarding whether *Boh Brothers* extends to encompass the use of other evidentiary avenues other than "gender stereotyping" evidence to support a claim of same-sex harassment.

could serve as credible evidence of homosexuality: (1) evidence that the harasser 'intended to have some kind of sexual contact with the plaintiff rather than to merely humiliate him for reasons unrelated to sexual interest'; or (2) evidence that the harasser 'made same-sex sexual advances to others, especially to other employees.'" *Cherry*, 668 F.3d at 188 (quoting *La Day*, 302 F.3d at 480); *see also id.* ("Thus if a plaintiff presents evidence that he was harassed by a member of the same sex, and that the harassment was sexual rather than merely humiliating in nature, that evidence is sufficient to support a verdict in the plaintiff's favor."). Here, Garza testifies that Hunt asked him to have sex on three occasions. Garza also testifies that Hunt touched Garza's behind, both with his hands and with various tools, approximately 25 times; touched Garza's chest (and specifically his nipples) about 20 to 25 times; and touched Garza's penis about 12 to 14 times. Hunt also allegedly made other sexual advances to Garza, such as "blowing kisses" to Garza and making other sexually-suggestive faces at him. Garza, further, has presented evidence that Hunt behaved in similar (though apparently in less pervasive) ways towards other NOV employees, and on occasion touched the behinds of other employees or spoke about how he "liked" certain employees. This behavior, when viewed in the aggregate, is sufficient under Fifth Circuit precedent to support the conclusion that Hunt was homosexual, or that his harassment of Garza was sexual in nature, and that Hunt made proposals of sexual activity to Garza. Indeed, the Fifth Circuit has held that similar or less fulsome

evidence was sufficient to support a jury verdict for the plaintiff for same-sex harassment. *See Cherry*, 668 F.3d at 188 (finding harasser's crude text and sexually-explicative message to victim, invitation to victim "to stay at [the harasser's] house and wear his underwear," and repeated physical touching and caressing of victim's body was enough "to support the conclusion that [the] harassment was sexual in nature"); *La Day*, 302 F.3d at 481 (finding that harasser's comment that he was "jealous" of victim's girlfriend, combined with his poking of victim's anus, was "susceptible of [the] interpretation" that harasser was homosexual, and that the same evidence could constitute "explicit or implicit proposals of sexual activity"). Defendant's arguments to the contrary are rejected.

## B.    Was Garza Subject to a "Hostile Work Environment"?

To survive summary judgment, Garza must also show that he was "subjected to either *quid pro quo* or 'hostile environment' harassment." *La Day*, 302 F.3d at 481.  Garza only asserts the latter.

To establish that Hunt's harassment created a hostile work environment, Garza must show that the harassment "affected a term, condition, or privilege" of his employment, or, put another way, that it was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *see also Cherry*, 668 F.3d at 188.  To be actionable, "a sexually

objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Courts must look at the totality of the circumstances in assessing whether a work environment is sufficiently hostile, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88; *see also Cherry*, 668 F.3d at 189 (quoting same language from *La Day*). "This inquiry is necessarily fact-specific." *Boh Bros.*, 731 F.3d at 460.

The evidence here, construed in Plaintiff's favor, as the Court must on summary judgment, is sufficient to show that Hunt's harassment was severe and pervasive.[99] "Deliberate and unwanted touching of . . . intimate body parts can constitute severe sexual harassment." *Cherry*. 668 F.3d at 189 (quoting *Harvill*, 433 F.3d at 428). As previously indicated, Garza testifies that, over an approximately 14-month period, Hunt touched Garza's chest and nipples 20 to 25 times, Garza's behind (using his hands or tools) approximately 25 times, and Garza's penis (using various

---

[99]  In *La Day*, the Fifth Circuit noted that "to survive summary judgment on a hostile environment claim, a plaintiff need only show that the harasser's conduct was severe *or* pervasive." *La Day*, 302 F.3d at 483 (emphasis in original).  Here, there is evidence of both severity and pervasiveness that necessitates denying NOV's motion for summary judgment.

tools) approximately 12 to 14 times.  On three occasions Hunt explicitly asked Garza to have sex with him.  On 38 to 40 occasions Hunt made other sexual advances to Garza, such as "blowing kisses" or making other sexually-suggestive faces.  At times, according to Garza, Hunt engaged in these acts in front of co-workers or supervisors, including Garza's team leader, Lopez.  Hunt's behavior occurred on many occasions over the 14-month period.   Garza clearly considered this conduct abusive and harassing, and complained about it to his supervisors, including Lopez, Goff, and Landis at different times.   On multiple occasions, Garza requested that he be transferred to another group.

Garza also has raised a genuine issue of fact whether this conduct was "objectively offensive."   Resolution of this issue is not amenable to decision on summary judgment.  *See La Day*, 302 F.3d at 482.  Indeed, recently, the Fifth Circuit concluded that evidence of similar but less frequent conduct was sufficient to permit a jury to find a hostile work environment.  *See Cherry*, 668 F.3d at 189 (concluding that district court erred in granting judgment as a matter of law against a contrary jury holding and that harasser's repeated touching of victim, combined with fact that harasser sent sexually-explicit text messages and had touched the victim's rear end on one occasion, was sufficient to determine the harassment was severe and pervasive); *La Day*, 302 F.3d at 482-83 (reversing district court's grant of summary judgment on plaintiff's sexual harassment claim and holding that harasser's touching

of victim's anus was sufficiently "severe" to "get past summary judgment); *see also Boh Bros.*, 731 F.3d at 461-62 (holding that harasser's conduct, which included among other things showing the victim his penis, calling the victim "queer," and "hurl[ing] raw sex-based epithets" at the victim multiple times a day, was enough for the jury to conclude that the harassment was severe and pervasive, even in the context of an "all-male construction site").   Defendant's contention that it is entitled to summary judgment on this issue is unpersuasive.

### C.   Was NOV Negligent in Responding to the Harassment?

NOV could escape liability as a matter of law if it can show there is no genuine fact issue that the company appropriately responded to the complained-of harassment. An employer that "knows or should know" about coworker harassment is required to "appropriately respond" to that harassment, and is not liable if it "takes remedial action calculated to end [the] harassment as soon as it knows or should know of the harassment."  *Cherry*, 668 F.3d at 189; *see also Harvill*, 433 F.3d at 437 ("Prompt remedial action must be reasonably calculated to end the harassment, therefore, [defendant] may be held liable despite having taken remedial steps if [plaintiff] can establish that [defendant's] response was not reasonably calculated to halt the harassment.").   "Whether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case, such as the remedial steps taken and the severity of the harassment."  *Harvill*, 433 F.3d at 437.

There is a strongly disputed issue of material fact regarding what Garza told NOV and whether NOV took appropriate remedial action to respond to Garza's complaints of harassment.  Garza asserts that he complained about Hunt's behavior to Lopez around October 2008 and again in April 2009; to Goff, Miller, and Butler in April 2009; to Lopez, Goff, and Warren in June 2009; and to Warren and Landis in October 2009.  Garza testifies that Hunt's behavior occurred on many occasions during that time.[100]  NOV's human resources representatives investigated Garza's claims in April 2009.  They concluded that Garza was lying and merely had raised the sexual harassment issue to retaliate against Hunt, who had reported that Garza had used a racial slur against him.  NOV provided this as a reason for suspending Garza. There are genuine material fact issues on whether the conduct of the investigations and conclusions drawn were reasonable and thus whether NOV failed to take prompt remedial action.  For instance, a jury must decide whether NOV's decision to credit Hunt over Garza without actually interviewing Garza (and possibly without interviewing Hunt) was negligence in controlling work conditions and thus "could reasonably be interpreted as a failure to take prompt remedial action."  *See Cherry*, 668 F.3d at 189.  Moreover, there is a fact issue whether NOV meaningfully investigated Garza's claims, or took any action to prevent Hunt's conduct, after Garza

---

[100]     Garza apparently concedes that there was a "quiet period" between approximately October 2008 and April 2009, when Hunt was not pursuing him.

complained in June 2009 and October 2009.   In short, there is a genuine factual

dispute concerning the key question of the adequacy of the steps NOV took in

response to Garza's complaints of Hunt's harassment.

For each of the foregoing reasons, summary judgment on Garza's sexual

harassment claim is denied.

## IV.   RETALIATION CLAIM

Title VII also makes it "an unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has opposed any practice

made an unlawful employment practice by this subchapter, or because he has made

a charge, testified, assisted, or participated in an manner in an investigation,

proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a).   The

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802-04 (1973), applies where a plaintiff seeks to establish retaliation

based on circumstantial evidence.   *See Turner v. Baylor Richardson Med. Ctr.*, 476

F.3d 337, 345, 348 (5th Cir. 2007).[101]   To establish a *prima facie* retaliation claim,

"the plaintiff must show that (1) he participated in a Title VII protected activity, (2)

he suffered an adverse employment action by his employer, and (3) there is a causal

connection between the protected activity and the adverse action." *Cherry*, 668 F.3d

at 188 (quoting *Stewart v. Miss. Transport Comm.*, 583 F.3d 321, 331 (5th Cir.

---

[101]      Garza has not presented any direct evidence of retaliation by NOV.

2009)).  Once the plaintiff makes a *prima facie* case of discrimination, "the burden

then shifts to the employer to articulate a legitimate . . . non-retaliatory reason for its

employment action." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th

Cir. 2008).  If the employer meets that burden, the burden shifts back the plaintiff to

show "that the employer's reason is a pretext for the actual retaliatory reason." *Id.*

An employee can meet the burden to prove pretext by showing "that the desire to

retaliate was the but-for cause of the challenged employment action." *Univ. of Tex.*

*Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *see also Feist v. La., Dep't of*

*Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (stating that

*Nassar*'s "but-for" causation requirement is applied when considering pretext).  Put

another way, Garza must prove that "the unlawful retaliation would not have occurred

in the absence of the alleged wrongful action or actions of the employer." *Nassar*,

133 S. Ct. at 2533.  The plaintiff "must show a conflict in substantial evidence" on

the "but-for causation" question to avoid summary judgment.  *Feist*, 730 F.3d at

454.[102]

Garza contends that two "adverse employment actions" were retaliatory: his

May 1, 2009 suspension and his October 28, 2009 termination.  The Court agrees that

---

[102]   The Court notes that an injury can have multiple "but-for" causes, and *Nassar* does
        not require that Garza show that his opposition to his alleged sexual harassment was
        the "sole" cause for the adverse employment action.  *See Zann Kwan v. Andalez*
        *Group LLC*, 737 F.3d 834, 846 & n.5 (2d Cir. 2013).

Garza has raised a genuine issue of material fact as to each, and thus denies NOV's

Motion for Summary Judgment on this claim.

### A.    May 1, 2009 Suspension

Garza has established a *prima facie* case of retaliation regarding his May 1,

2009 suspension.  First, Garza engaged in Title VII protected activity by complaining

about Hunt's behavior (*i.e.*, his sexual harassment) to his supervisors, including to

Butler, the HR manager at the FM 529 facility, in April 2009.  *See Lemaire v. La.*

*Dep't of Trans. and Dev.*, 480 F.3d 383, 390 (5th Cir. 2007).  Second, Garza's three-

day suspension is an "adverse employment action" that may have "dissuaded a

reasonable worker from making or supporting a charge of discrimination."[103]

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also*

*Lemaire*, 480 F.3d at 390 (stating that a two-day suspension was an adverse

employment action).   Third, there is a temporal connection between Garza's

complaint and his suspension.  Garza raised the issue of Hunt's behavior to Butler

and Miller on April 27, 2009, and he was suspended four days later.  This short time

frame "suggests a causal connection."  *Lemaire*, 480 F.3d at 390 (finding that a

suspension given two weeks after an employee reported harassment was sufficiently

---

[103]    NOV argues that "[t]he suspension did not dissuade Garza from filing his EEOC
charge, so it was not a materially adverse action." Reply, at 14. *Burlington Northern*,
however, asks the trier of fact to look generally at whether a "reasonable worker"
would have been dissuaded; whether Garza himself was or was not dissuaded is thus
not dispositive.

close to suggest a causal connection at the *prima facie* stage).

NOV has articulated a "legitimate, non-retaliatory" reason for Garza's suspension.  NOV issued Garza a Corrective Action on April 27, 2009, based on the allegation that Garza used "racial language" to Hunt, and further noted that "[t]his is the second time that [Garza] has been disruptive and harassing his coworkers."[104] NOV provided Garza with a warning and stated that Garza must "show immediate and substained [*sic*] improvement or will be subject to further disciplinary action."[105] The Corrective Action issued to Garza on May 1, 2009, stated that Garza was suspended for various reasons, including NOV's finding that his sexual assault allegation was "borderline false" and was improper "retaliation" against Hunt for the latter's complaint about Garza.[106]  NOV representatives also found that Garza made comments using a "threatening tone" about "[plant manager] Richard Urquhart firing [Garza's] co-workers" and Garza's claimed "inability to be fired because of [his] friendship with Richard Urquhart."[107]  NOV also warned Garza that "kicking chairs in the lunchroom, future acts of aggression, or any other inappropriate acts or

---

[104]     First Corrective Action [Doc. # 57-6].

[105]     *Id.*

[106]     Second Corrective Action [Doc. # 57-7].

[107]     *Id.*

comments made in jest or otherwise will lead to your immediate termination."[108] NOV's concerns about Garza's disruptive behavior and behavior towards his co-workers are legitimate, non-retaliatory reasons for his suspension.  *See Robinson v. Our Lady of the Lake Reg'l Med. Ctr., Inc.*, 535 F. App'x 348, 354 (5th Cir. 2013) (explaining that employee's "inappropriate" and "unprofessional" actions were a legitimate, non-retaliatory reason for an adverse employment action that were not rebutted by a showing of pretext); *see also, e.g.*, *Matheny v. Safesite, Inc.*, 2004 WL 1932866, at *8 (N.D. Tex. Aug. 31, 2004) (holding that "insubordination and disruptive behavior" was a legitimate reason for employee's termination).

The Court next turns to the last *McDonald-Douglas* step—whether Garza can establish that NOV's proffered reason for the May 1, 2009 suspension was merely pretext for a retaliatory motive in suspending him for three days.  The Court concludes that a genuine disputed issue of material fact exists here.  Initially, it is noted that Garza's effort to establish that NOV's proffered legitimate reasons are pretext is unavailing to the extent he merely argues that he did not commit the offenses outlined in the Corrective Actions.  Disputing the facts underlying NOV's legitimate reasons, alone, is not sufficient to establish pretext.  *See Lemaire*, 480 F.3d at 391 ("Our job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions.  Our anti-discrimination

---

[108]     *Id.*

laws do not require an employer to make proper decisions, only non-retaliatory ones . . . . Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext.") (internal citations omitted).

Garza has presented evidence, however, that NOV's stated reason was not the primary reason for Garza's suspension and that he would not have been suspended but for his complaints about Hunt's sexually suggestive behavior.  Black and Miller, the NOV representatives who conducted or oversaw the investigation into Garza's complaints about Hunt, were aware of these complaints when they investigated Garza's allegedly disruptive and insubordinate behavior.  Black and Miller sanctioned Garza harshly while rejecting his complaints about Hunt.  Indeed, in the May 1, 2009 Corrective Action, NOV suggested that one reason for Garza's suspension was his complaints about Hunt's behavior.  A credibility question remains whether the NOV employees who decided to suspend Garza in fact were materially tainted by discomfort or annoyance arising from his own complaints about Hunt's conduct.  Furthermore, there is no evidence in the record of other employees being suspended for disruptive conduct similar to that in which NOV accused Garza of engaging, nor is there any evidence of company guidelines or policies supporting this sanction.  Thus, there is a genuine fact question whether the decisionmakers' stated reason for suspending Garza was only pretext for an underlying retaliatory reason.  The Court therefore denies NOV's motion for summary judgment on this claim.

### B.   October 28, 2009 Termination

Garza has made out a *prima facie* case of retaliation regarding NOV's October 28, 2009 termination of his employment.  Termination is unquestionably an adverse employment action.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("[A]n adverse employment action consists of *ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating.") (emphasis in original).  Garza engaged in several protected activities.  He complained—in April, June, and October 2009—to his supervisors at NOV prior to his termination about Hunt's behavior.  Garza also filed a discrimination charge with the EEOC in May 2009.  These complaints, including one the day before the termination, and requests for transfer to a different department are sufficient evidence to raise a genuine fact issue of a causal connection between his complaints and his termination.[109]

NOV has articulated a legitimate, non-discriminatory reason for Garza's termination.  NOV asserts that it terminated Garza for "several acts of insubordination to supervisors."[110]  Employee insubordination "is a legitimate, non-retaliatory reason

---

[109]   Garza testifies that on October 27, 2009, he asked Warren and Landis to transfer him to another group because Hunt had been touching him.  It is unclear whether Warren or Landis, who were new to their jobs, knew about Garza's earlier complaints or his EEOC charge.

[110]   Employee Data Form [Doc. # 57-11].

for taking an adverse employment action." *Lemaire*, 480 F.3d at 390.

Nevertheless, summary judgment in favor of NOV on this retaliation claim is not warranted. Disputed issues of material fact remain regarding whether NOV's articulated reason for Garza's termination was pretext for retaliation against him for his complaints about Hunt's sexually harassing conduct. Garza had directly and repeatedly complained about Hunt's behavior to Butler and others involved in the termination decision. Apparently, no one from the human resources department or upper management actually interviewed Garza, despite his repeated complaints and requests for transfer. NOV's witnesses, the decisionmakers involved in terminating Garza's employment,[111] could not supply examples of Garza's prior insubordination, the articulated basis for his termination.[112] The evidence of record raises a genuine fact issue whether NOV's decisionmakers ended Garza's employment because of his complaints and would not have decided on termination but for those complaints. The jury, in assessing the veracity of NOV's explanations, also may consider, among other things, the quality and earnestness of the investigation into Garza's complaints about Hunt. These various assessments involve credibility determinations, which must be left to the trier of fact to evaluate in deciding whether Garza would not have been

---

[111]    While Butler testifies that Dodd made the decision to terminate Garza's employment, *see* Butler Dep., at 72:2-4, the termination form is signed only by Butler, *see* Employee Data Form [Doc. # 57-11].

[112]    *See* Butler Dep., at 70:9-80:18; Landis Dep., at 55:10-56:4.

terminated "but for" his complaints.

Having determined that there are various genuine questions of material fact on Garza's retaliation claim, the Court concludes that summary judgment is not warranted. NOV's motion for summary judgment is denied on Garza's retaliation claim.

## V.        CONCLUSION AND ORDER

For the reasons stated above, it is hereby

**ORDERED** that Defendant National Oilwell Varco, L.P.'s Motion for Summary Judgment [Doc. # 54] is **DENIED**.  It is further

**ORDERED** that the parties must mediate this case on or before **June 16, 2014**.

SIGNED at Houston, Texas, this  16th  day of **May, 2014**.

Nancy F. Atlas
United States District Judge