UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE S. GARZA                                                    Civil Action No. 4:12-cv-03532
       Plaintiff

v.                                                                           Judge Nancy F. Atlas

NATIONAL OILWELL VARCO, L.P.

       Defendant

## JOINT PRETRIAL ORDER

**I.**    **APPEARANCE OF COUNSEL**

    **A.**    **Plaintiff Jose S. Garza**

        Peter Costea, Esq.
        Three Riverway, Suite 1800
        Houston, Texas 77056
        Telephone: (713) 337-3304
        Facsimile: (713) 659-5302
        Electronic mail: costealaw@yahoo.com

    **B.**    **Defendant National Oilwell Varco, L.P.**

        Christopher E. Moore, Esq.
        (Attorney-in-Charge)
        TX State Bar No. 24052778
        SDTX Admission No. 713063
        Christine M. White, Esq.
        Texas Bar No. 24068713
        SDTX Admission No. 712655
        Jennifer L. Englander, Esq.
        LA State Bar No. 29572
        SDTX Admission No. 1430436
        Ogletree, Deakins, Nash, Smoak
            & Stewart, P.C.
        One Shell Square
        701 Poydras St., Suite 3500
        New Orleans, LA 70139

Telephone:  (504) 648-3840
Facsimile:  (504) 648-3859
Electronic Mail:
christopher.moore@ogletreedeakins.com
christine.white@ogletreedeakins.com
jennifer.englander@ogletreedeakins.com

## II.     STATEMENT OF THE CASE

This lawsuit arises under Title VII of the Civil Rights Act of 1964, as amended, 42 USC Section 2000e et seq. Plaintiff Jose S. Garza claims he was subjected to same-sex sexual harassment while employed by the Defendant, and that he was terminated by the Defendant in retaliation for having complained of the harassment and having filed a charge of discrimination against the Defendant with the Equal Employment Opportunity Commission.

NOV denies that Garza was subjected to same-sex sexual harassment that created a hostile work environment.  NOV further contends that it had no knowledge of any ongoing harassment of Garza because of sex.

NOV further denies that there was any retaliation against Garza for any protected activity in which he may have engaged. NOV contends that Garza's employment was terminated on or about October 28, 2009, for legitimate, nonretaliatory reasons; namely, insubordination.

## III.    JURISDICTION

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff seeks recovery under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* for alleged violations of his civil rights under federal law.

## IV.   MOTIONS

The parties' respective motions in *limine* are being filed contemporaneously with this Pretrial Order.  There are no other motions currently pending before this Court.

## V.   CONTENTIONS OF THE PARTIES

### A.   Plaintiff's Contentions:

1. Plaintiff claims he was subjected to same-sex sexual harassment while employed by the Defendant, and that he was terminated by the Defendant in retaliation for having complained of the harassment, and for having filed a charge of discrimination against the Defendant with the Equal Employment Opportunity Commission.

2. Plaintiff was born in 1972, is married and the father of three (3) children.

3. He worked for Defendant from September 2005 to October 2009. Previously he worked for Defendant as contract labor through a staffing agency.

4. Defendant employed the Plaintiff at its FM 529 location in Harris County, Texas.  He worked in Defendant's drawworks department and reported to William Goff.

5. William Goff reported to Bill Miller, Manufacturing Supervisor.  Plaintiff also reported to a foreman, or "lead man," Rudy Lopez.

6. Lopez was still Plaintiff's supervisor when Plaintiff was terminated in October 2009, while Miller and Goff had retired earlier that year.

7. Miller was replaced by Jack Landis.

8. Plaintiff's performance was good, as shown in his performance evaluations.

9. In September 2008 Steven Hunt joined Plaintiff's group as a welder. Plaintiff first complained about him within four or five weeks after he started.  He complained to Lopez that Hunt was "weird" and playing "man to man." Lopez laughed.

10. Hunt had grabbed the Plaintiff's chest and nipples.

11. Plaintiff told Lopez "you need to talk with [Hunt]. I don't want to play like that." Lopez again laughed.

12. Plaintiff also informed Lopez that Hunt had touched his rear end with tools, like the long scale or the welding rod.

13. This conduct repeated itself for weeks, which led the Plaintiff to make another complaint to Lopez in April 2009.

14. Up to that point in time, over a period of weeks to months, Hunt had grabbed Plaintiff's chest 20 to 25 times. The grabbing consisted of pinching Plaintiff's nipples. Plaintiff reacted by pushing Hunt away, and raising his voice at him.

15. Plaintiff also told Hunt "20 times, I don't like that. I like woman."

16. The grabbing of Plaintiff's nipples occurred over time all the way till Plaintiff left the company.

17. Three times Hunt told the Plaintiff he wanted to have sex with him, and Plaintiff actually believed Hunt wanted to have sex with him.

18. The sexual comments were accompanied by the caressing of Plaintiff's hand, occasionally in front of employees, including Lopez.

19. One of the sex requests occurred while Hunt touched Plaintiff's bottom with his hand. Plaintiff told Lopez about this incident and Lopez responded "calm down, calm down, calm down."

20. The second time Hunt asked the Plaintiff to have sex with him, Plaintiff pushed Hunt and threatened him.

21. The third time Plaintiff felt like taking a hammer and hitting Hunt. However, one of his coworkers pulled Plaintiff to the side to calm him down.

22. Hunt also touched Plaintiff's rear end many times, with both, his hands, and his tools. Many times Hunt actually grabbed Plaintiff's rear.

23. Approximately 12 to 14 times Hunt touched Plaintiff's penis with different tools, such as the broom, big scale, piece of metal, round bar, or flat bar.

24. Occasionally, Hunt used the tools to insert them into Plaintiff's rectum. The pressure was significant because it ruined Plaintiff's uniform, and the welding rod penetrated his pants.

25. Hunt also made facial expressions to the Plaintiff conveying a sexual interest in him, and also blew kisses at him.

26.     Plaintiff thought Hunt was homosexual.

27.     From conversations with Lopez, Plaintiff understood that Hunt had been raped by his older brother in childhood. Lopez told the Plaintiff that for this reason Plaintiff had to be more understanding of Hunt's behavior.

28.     This conversation with Lopez occurred in April 2009.

29.     The harassment stopped for a while, but then it resumed. Plaintiff complained a second time to Lopez on April 9, 2008. He told Lopez Hunt had touched him again and had requested sex from him.

30.     Plaintiff complained again to William Goff on April 13, 2009. Goff, too, laughed at Plaintiff's complaint.

31.     Lopez told the Plaintiff he had spoken with Hunt, and Hunt claimed he touched the Plaintiff by accident. Plaintiff asked Lopez "to do something," and Lopez responded he was not Hunt's boss.

32.     Hunt touched other male employees as well. One of them was Miguel Gutierrez.

33.     Gutierrez, too, complained about Hunt, on April 29, 2009.

34.     Plaintiff personally saw Hunt touch Gutierrez, grabbing his nipples, and calling him "Miguela," the feminine version of "Miguel." Hunt also commented to Gutierrez "I like Miguela."

35.     Another male employee Hunt sexually harassed was Luis Gonzales. Plaintiff witnessed Hunt touch Gonzales' intimate parts with the welding rod.

36.     Gonzales complained to Landis about the incident and Landis came to Plaintiff's work area to inquire about what happened.

37.     Another male employee, Freddie Amaya, told the Plaintiff Hunt had cornered him in the bathroom, touching his rear end.

38.     After Plaintiff complained about Hunt, Hunt complained about Plaintiff calling him racist names.

39.     Miller asked the Plaintiff if he had called Hunt a "stupid Americano." Plaintiff denied it. He also refused to sign the write up Biller gave him on April 27, 2009.

5

40. On April 27, 2009 Plaintiff asked Miller what happened with his sexual harassment complaint. Miller stated he was not aware of any complaints by Plaintiff against Hunt. He asked Plaintiff to write a statement about the harassment, and Plaintiff complied on April 29, 2009.

41. The sexual harassment continued after April 13, 2009.

42. A few days after Plaintiff complained to Miller about the harassment he was suspended for three days on May 1, 2009. The write up accused the Plaintiff of having used racist language toward Hunt, kicking chairs in the break room, being aggressive toward employees, and threatening employees with termination.

43. Plaintiff denied all allegations and refused to sign the disciplinary form.

44. On May 6, 2009 Plaintiff filed his EEOC charge of discrimination. On June 18, 2012 the EEOC issued a Determination finding that Plaintiff had been subjected to same-sex harassment and retaliation.

45. Shortly after May 6, 2009 Plaintiff asked Goff to move him to a different team because he did not want to work with Hunt. His request was denied, and he continued to work around Hunt "every day."

46. By mid June 2009 Hunt resumed the sexual harassment "touching and saying words, bad words" to the Plaintiff. Plaintiff resumed complaining about Hunt to Lopez, but Lopez continued to laugh.

47. In June 2009 Plaintiff again complained about Hunt to Goff and asked, once more, he be moved to a different work area. Plaintiff was not transferred, and Goff retired soon thereafter.

48. After June 2009 Plaintiff stopped complaining because it was futile. He realized that if he complained, he would be disciplined again, as he had been on May 1, 2009. He also feared losing his job.

49. After Goff retired, Kevin Warren replaced him. Plaintiff told Warren about the sexual harassment and asked Warren to move him away from Hunt, but was not transferred.

50. On August 13, 2009 Warren wrote Plaintiff up, claiming he had "argued the correct procedures" for an operation. Plaintiff, however, did not comment on the procedure, or argue. He also did not involve himself in the procedure and did not drive the forklift as alleged.

51. Plaintiff refused to sign the disciplinary action.

52. On October 28, 2009 Plaintiff was terminated. Butler told him he had been fired, but no reason was given to him for the termination.

53. On October 27, 2009 Plaintiff told Warren Hunt continued to touch him and asked Warren to move him to a different department because he could not work with Hunt any more.

54. Warren told the Plaintiff he would not be transferred and that if he did not like the decision he would be fired.

55. On October 27, 2009 Plaintiff made the same complaint about Hunt to Landis.

56. Immediately after his conversation with Warren Plaintiff went back to his work area.

57. Fifteen minutes after this conversation Landis and Warren took the Plaintiff to Butler's office and Warren requested Plaintiff be terminated. Plaintiff was immediately suspended. He was not transferred out of Hunt's area. He called the following day for un update and was terminated.

58. In March 2011 Defendant terminated Hunt's employment because he had pulled a knife on a coworker at a company sponsored event.

**B.   Defendant's Contentions:**

1. Defendant denies that Garza was subjected to unwelcome, severe or pervasive harassment based upon sex.

2. Additionally and alternatively, Defendant denies it is liable for any alleged sexual harassment by Garza's co-worker.

3. Defendant denies it retaliated against Garza in violation of 42 U.S.C. §2000(e).

4. Defendant denies all remaining contentions asserted by Plaintiff.

## VI.   ADMISSIONS OF FACT

1. Defendant employed the Plaintiff from September 2005 to October 28, 2009.

2. Defendant employed the Plaintiff at its FM 529 plant in Harris County, Texas.

3. On April 27, 2009 Defendant gave the Plaintiff a write up.

4. On May 1, 2009 Defendant suspended the Plaintiff for three (3) days.

5. On May 6, 2009 Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission claiming sex discrimination and retaliation.

6. Defendant terminated the Plaintiff on October 28, 2009.

7. Plaintiff's ending pay rate was $19.00/hour.

**Defendant's Proposed Admissions of Fact:**

1. NOV's FM 529 facility ("FM 529") is a manufacturing facility within NOV's Rig Solutions division.

2. The FM 529 facility has several departments, one of which is the assembly department.

3. Employees in the assembly department assemble heavy oil field equipment such as draw works, mud pumps, rotating tables, torque converters, swivels, hooks and blocks, among other things.

4. Assembly is organized into departments along these product lines and draw works is one of the departments in assembly.

5. Each department in assembly has a supervisor and its assemblers are organized into teams of roughly four members, one of whom is a team lead.

6. The team lead is not part of management.

7. On September 26, 2005, Bob Miller hired Jose S. Garza to work for NOV at its FM 529 facility.

8. Garza worked as an assembler in the draw works department at FM 529.

9. When Garza began his employment with NOV, his supervisory chain of command, in ascending order, was as follows: Direct Supervisor (Draw Works Department) – William Goff, Sr.; Production Manager – Bob Miller; Plant Manager – Richard Urquhart.

8

10. After June 2009, Garza's chain of command was as follows: Direct Supervisor (Draw Works Department) – Kevin Warren; Production Manager – Jack Landis; Plant Manager – Anirban Banerjee.

11. NOV has a policy prohibiting discrimination and harassment, including sexual harassment, in the workplace. The policies contain procedures by which employees should report perceived harassment.

12. Plaintiff knew that the procedure for making a complaint about another employee was to talk to his supervisor and then to HR.

13. NOV's Human Resources Manager on site at FM 529 throughout Garza's employment was Bill Butler.

14. Corporate Human Resources for NOV Rig Solutions during Garza's employment included Jeff Dodd, Human Resources Director, and Meredith (Black) Bruce, Senior Human Resources Manager.

15. On September 4, 2008, Steve Hunt began working for NOV as a welder at FM 529.

16. Hunt was not Garza's supervisor.

17. On April 20, 2009, Bob Miller advised Bill Butler that Hunt wanted to make a complaint about Garza using racist remarks and aggressive behavior toward him.

18. Hunt claimed that Garza called Hunt "a stupid Americano" two times in one day during the week prior and that after the second time, Garza got in Hunt's face in a confrontational manner. Hunt claimed he was afraid that Garza would hit him from behind with a tool or pipe while he had his welding hood down.

19. Miller conducted an investigation into the allegation that Garza had used racial language and aggressive behavior and told Butler that the allegation had been confirmed.

20. In July 2007, Miller had issued Garza a documented verbal warning for "disruptive behavior, threats to fellow employee (co-worker) Galvan Oswaldo."

21. On April 27, 2009, Miller gave Garza a written warning for harassment and violation of company policy or procedure.

22. In response to receiving the April 27 corrective action, Garza stated that he wanted to file sexual assault charges against Hunt since he was being written up.

23. Garza never complained to Miller, Butler, or any other supervisor or manager about Hunt before April 27, 2009.

24. Garza's supervisor, Goff, first learned of Garza's complaint against Hunt on April 27, 2009.

25. Butler asked Garza to give a full account in writing of the alleged sexual assault, including "when, where, who witnessed, and details."

26. Garza admits Butler asked him to write down and explain "what kind of sex harassment, why -- what location, what time, and witnesses."

27. On April 29, 2009, Garza brought Butler a notarized "Affidavit of Fact" for the first time detailing his allegations regarding Hunt.

28. In his Affidavit, Garza stated that Hunt "acted in a rare way," "played and joked by touching me by pulling my nipples in front of our co-workers and made me feel uncomfortable." Garza also stated in his Affidavit that on April 9, 2009, Hunt "poked me in my buttocks with his hand and different tools in three different occasions, until I just told him to stop doing it and reported the incident to my team leader, Rudy Lopez."

29. Hunt's conduct stopped after Plaintiff told Rudy Lopez about it on April 9, 2009.

30. In April 2009, Lopez was Plaintiff's team lead and a member of Plaintiff's team, and was not Plaintiff's supervisor.

31. Garza explained all the reasons for his complaints against Hunt in the Affidavit he gave to Bill Butler.

32. Butler asked NOV's corporate HR office to conduct an investigation into Garza's allegations.

33. Meredith (Black) Bruce from corporate HR immediately went to the FM 529 facility to investigate the allegations Garza made about Hunt.

34. As part of the investigation, Bruce obtained a copy of Garza's Affidavit, as well as Butler's typed statement and the statements of other alleged witnesses, including the only witnesses identified in Garza's Affidavit.

10

35. Bruce relied on Garza's Affidavit to get the facts that he considered pertinent to his claim.

36. When she arrived at FM 529, Bruce spoke with Bill Butler, William Goff, and two of Garza's co-workers, Rudy Lopez and Miguel Gutierrez, all of whom were referenced in Garza's Affidavit.

37. Bruce investigated for one or two days and completed the investigation on May 1, 2009.

38. No witness corroborated Garza's allegations.

39. The investigation revealed that Garza made extremely offensive comments to Hunt, including "I'll sick this in you ass" [sic] and "I'll fuck you in the ass."

40. The investigation also brought to light other threatening and inappropriate comments by Garza to his co-workers, including "I will never get fired as long as Richard [Urquhart] is here," "me and Richard are friends and I can get people fired," "Mr. Richard is my friend and he buys me lunch or takes me out to eat," and "Richard is my buddy and I can get you fired if I ask him to fire you."

41. Miguel Gutierrez indicated that he felt "very uncomfortable with Jose Garza's sarcastic attitude." In the course of the investigation, Gutierrez told Bruce about an incident that occurred in the lunchroom, wherein Garza got into an argument with another employee and kicked two chairs away from a table.

42. As a result of the investigation, Bruce told Butler that she felt Garza's allegation was unfounded and recommended he be suspended, which recommendation was in accordance with NOV policy. Bruce concluded that Garza's complaint of sexual assault/harassment was made only to retaliate against Hunt for complaining that Garza had use racial language toward Hunt. Bruce believed Garza inflated the "poking" incident that had already been addressed and resolved by Lopez on April 9, only after Garza was reprimanded on April 27 for using racial language.

43. NOV's anti-harassment policy prohibits any form of retaliation against any employee for filing a bona fide complaint; however, "if, after investigating any complaint of harassment . . . National Oilwell Varco determines that the complaint is not brought forward in good faith or that an employee has purposely provided false information regarding the complaint, corrective action may be taken against the individual who filed the complaint or who gave false information."

44. On May 1, 2009, Bruce issued a corrective action to Garza, suspending him for three days.

11

45. On the last day of his suspension, May 6, 2009, Garza filed his charge of discrimination against NOV.

46. In June 2009, Kevin Warren was hired by NOV and became Garza's supervisor.

47. On August 13, 2009, Warren had to give Garza a corrective action for arguing with Warren about the "correct procedures for assembling shafts" and challenging Warren to install the piece himself stating that he (Garza) had more experience than his supervisor.

48. In October 2009, Kevin Warren was still Garza's direct supervisor and Jack Landis was Warren's direct supervisor.

49. On October 27, Garza approached Warren in Warren's office asking when he would be moved to another team. Warren explained that he needed to talk to his supervisor Landis more about arrangements of people in the shop before moving anyone.

50. A few hours later, team lead Rudy Lopez approached Warren to explain an issue that had occurred with Garza. Lopez had announced to his team that he would be absent from work for a medical issue and that in his absence Enrique Castellanos would be in charge of the team. In response, Garza stated he refused to answer to Castellanos and that he (Garza) had more experience and should be in charge. Warren went to talk to Garza about this insubordination and found him talking to Landis. After Warren had told Garza he was not moving any employees at that time, Garza went over Warren's head to Landis and demanded that he be moved from draw works to mud pumps. Landis explained to Garza that they did not need any more assemblers in the other assembly departments.

51. Warren walked up to Garza as he was talking to Landis and asked him about the situation Lopez had described and whether he had a problem reporting to Castellanos. In response, Garza started calling Lopez a liar. Warren told Garza he could get back to work and quit causing problems among his team or he could leave NOV. Garza kept calling Lopez a liar and would not get back to work. Garza started shaking his finger in Landis and Warren's faces, continuing to demand that he be moved despite already being told by his supervisor and manager that there was no place for him to move.

52. Warren brought Garza to Bill Butler in HR. After Warren explained the situation to Butler, Butler called in plant manager Anirban Banerjee. Warren recommended terminating Garza on the spot based upon his behavior on October 27. However, Banerjee, Butler, Warren, and Landis discussed the situation and decided instead

to suspend Garza until a decision was made about his continued employment with NOV.

53. After consulting with Jeff Dodd in corporate HR, on October 28, 2009, the decision was made to terminate Garza's employment for insubordination and that decision was communicated to him that same day.

54. Jack Landis made the termination decision in collaboration with HR and Warren.

## VII. CONTESTED ISSUES OF FACT

### A. Plaintiff's Contested Issues of Fact:

1. Whether Plaintiff was subjected to sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC Section 2000e et seq.

2. Whether Defendant terminated the Plaintiff in retaliation for having complained of sexual harassment or filed a complaint of discrimination with the Equal Employment Opportunity Commission in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC Section 2000e et seq.

## VIII. AGREED APPLICABLE PROPOSITIONS OF LAW

1. Plaintiff's suit arises under Title VII of the Civil Rights Act of 1964, as amended, 42 USC Section 2000e *et seq*.

2. The court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000(e) and 28 U.S.C. § 1331.

3. Venue of this matter is proper in the Southern District of Texas, Houston Division.

4. Same-sex sexual harassment is actionable. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 1001-1003 (1998).

5. Title VII prohibits retaliation against an employee who "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 USC Section 2000e-3(a).

  6. An employee's opposition to an unlawful employment practice is protected if "she had a reasonable, good faith belief that the incident … constituted unlawful" discrimination. Clark County School District v. Breeden, 532 US 268 (2000); Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996).

  7. The burden of proof in a retaliation case is "but for," meaning that but for the opposition to the sexual harassment Plaintiff would not have been terminated when he was. His complaints must have been the "but for" reason for his termination. University of Texas Southwest Medical Center v. Nassar, 133 S.Ct. 2517, 2528 (2013).

## IX. CONTESTED ISSUES OF LAW

### Plaintiff's Issues of Law:

  1. The elements of a sexual harassment case are the following: (1) the employee is a member of a protected class; (2) he was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of the employee's employment; and (5) the employer knew or should have known of the harassment and failed to take preventive, prompt, or effective remedial action. Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 298 (5th Cir. 2001); Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 343 (5th Cir. 2005).

  2. The level of proof in hostile work environment cases has been articulated by the United States Supreme Court in Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370-371, 510 US 17 (1993). It requires (1) discriminatory intimidation, ridicule, and insults; which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment; and (4) create an abusive work environment. See, also, DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 594 (5th Cir. 1995).

  3. A plaintiff is not required to show that his "harasser is homosexual in order to demonstrate that the harassing conduct was motivated by sexual desire." Dick v. Phone Directories Company, Inc., 397 F.3d 1256, 1260 (10th Cir. 2005). He is required to show that the "harassment was sexual in nature," not that the harasser himself was homosexual. Cherry v. Shaw Coastal, Inc., 668 F.3d 182, 188 (5th Cir. 2012).

  4. A prima facie case of retaliation requires that a plaintiff (1) engage in protected action; (2) sustain an adverse action; and (3) the existence of a causal link between the two. Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 348 (5th Cir. 2007).

  5. Complaining of sexual harassment is protected action and being terminated for that reason is retaliation. Royal v. CCC& Tres Arboles, LLC, 736 F3d 396, 404-404 (5th Cir. 2013).

      6.      Suspension is an adverse employment action. <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126 S.Ct. 2405, 2421-2422 (2006).

      7.      A prima facie case and evidence "casting doubt on the veracity of the employer's explanation is sufficient to find liability." <u>Palasota v. Haggar Clothing Co.</u>, 342 F.3d 569, 576 (5th Cir. 2003) (citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

**Defendant's Issues of Law**

      1.      To establish sexual harassment, Plaintiff must establish that the alleged conduct was based on his sex as opposed to male-on-male horseplay. He may do so by proving that the alleged harasser is homosexual and made explicit or implicit proposals of sexual activity. Plaintiff may prove that the alleged harasser is homosexual by proving that he: (1) "intended to have some kind of sexual contact with the Plaintiff rather than to merely humiliate him for reasons unrelated to sexual interest", or that he (2) "made same-sex sexual advances to others, especially to other employees." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013); *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 183, 188 (5th Cir. 2012); *Russell v. Univ. of Texas of Permian Basin*, 234 Fed. Appx. 195, 201 (5th Cir. 2007) (Under the Fifth Circuit's two-step process for evaluating same-sex sexual harassment cases, a plaintiff must first demonstrate that the sexual harassment was "discrimination because of sex.") (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002)); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998).

      2.      If Plaintiff can prove that the alleged harassing conduct toward him was based on his sex, then for Defendant to be liable for sexual harassment, Plaintiff must also prove that the conduct was sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment and create a hostile or abusive work environment. *Cherry*, 668 F.3d at 188-89; *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275 (1998)); *Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996); *Nash v. Electrospace System, Inc.*, 9 F.3d 401, 403 (5th Cir. 1993); *Shepherd v. Comptroller of Pub. Accounts of the State of Texas*, 168 F. 3d 871, 873 (5th Cir. 1999) (citations omitted)).

      3.      To determine whether a hostile work environment existed the evidence must be viewed from both the Plaintiff's perspective and from the perspective of a reasonable person. First, Plaintiff must actually find the conduct offensive. The court must also look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances. The evidence cannot be viewed from the perspective of an overly sensitive person, nor from the perspective of someone who is

never offended. Rather, the alleged harassing behavior must be such that a reasonable person in the same or similar circumstances as Plaintiff would find the conduct offensive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

4.  Defendant is only liable for sexual harassment if Plaintiff can prove that it knew or should have known of the harassment. To do so, Plaintiff must prove that (a) the harassment was known or communicated to a person who had the authority to receive, address, or report the complaint, even if that person did not do so, *Williamson v. City of Houston*, 148 F.3d 462, 466-67 (5th Cir. 1998), or (b) the harassment was so open and obvious that Defendant should have known of it. *Pfau v. Reed*, 125 F.3d 929 (5th Cir. 1997); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999).

5.  Defendant may not be liable for sexual harassment if it took prompt remedial action. Prompt remedial action is conduct by the Defendant that is reasonably calculated to stop the harassment and remedy the situation. Whether Defendant's actions were prompt and remedial depends upon the particular facts, and you may look at, among other things, the effectiveness of any actions taken. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989). An employer takes prompt remedial action when it takes the allegation seriously, conducts a prompt and thorough investigation, and immediately implements remedial and/or disciplinary measures based on the results of its investigation. *Carlson v. Rockwell Space Operations Co.*, 985 F. Supp. 674, 688-89 (S.D. Tex. 1996), *aff'd sub. nom. Carlson v. Rockwell Int'l Corp.*, 132 F.3d 1453 (5th Cir. 1997).

6.  Whether Garza was subjected to a hostile work environment because of sex in violation of 42 U.S.C. §2000(e) (Title VII).

7.  Whether Garza was subjected to retaliation in violation of 42 U.S.C. §2000(e) (Title VII).

## X.  EXHIBITS

Plaintiff's Exhibit List is filed separately. In the event there are other exhibits to be used in trial, they will be furnished to opposing counsel as soon as they are known.

Defendant's Exhibit List is filed separately. In the event there are other exhibits to be used in trial, they will be furnished to opposing counsel as soon as they are known.

## XI.  WITNESSES

### A.  Plaintiff

Plaintiff's Witness List is filed separately.

    B.    **Defendant**

Defendant's Witness List is filed separately.

In the event there are any other witnesses to be called at trial, their names, addresses, and the subject matter of their testimony shall be reported to opposing counsel as soon as they are known. This restriction shall not apply to rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably anticipated before the time of trial.

**XII.    SETTLEMENT**

The parties are scheduled for mediation with Gloria Portela on July 16, 2014.

**XIII.    TRIAL**

    1.    The trial will be by jury.

    2.    The trial will last approximately five (5) days.

    3.    There are no known issues regarding the availability of witnesses.

    4.    There are no known logistical problems.

**XIV.    ADDITIONAL ATTACHMENTS**

    1.    The parties' Joint Jury Charge is filed contemporaneously herewith.

| DATE | NANCY F. ATLAS<br>UNITED STATES DISTRICT JUDGE |
|---|---|

**APPROVAL:**

| /s/ *Peter Costea* | /s/ *Christopher E. Moore* |
|---|---|
| Peter Costea, Esq. | Christopher E. Moore, Esq. |
| Three Riverway, Suite 1800 | (Attorney-in-Charge) |
| Houston, Texas 77056 | TX State Bar No. 24052778 |
| Telephone: (713) 337-3304 | SDTX Admission No. 713063 |
| Facsimile: (713) 659-5302 | Christine M. White, Esq. |
| Electronic mail: costealaw@yahoo.com | Texas Bar No. 24068713 |
| | SDTX Admission No. 712655 |

17

Attorney for Plaintiff Jose S. Garza

Jennifer L. Englander, Esq.
LA State Bar No. 29572
SDTX Admission No. 1430436
Ogletree, Deakins, Nash, Smoak
    & Stewart, P.C.
One Shell Square
701 Poydras St., Suite 3500
New Orleans, LA 70139
Telephone:  (504) 648-3840
Facsimile:  (504) 648-3859
Electronic Mail:
christopher.moore@ogletreedeakins.com
christine.white@ogletreedeakins.com
jennifer.englander@ogletreedeakins.com

Attorneys for Defendant
National Oilwell Varco, L.P.

17080681.1